**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ  07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com


*Counsel for Plaintiff*


## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DENISE LABELLE, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>FUTURE FINTECH GROUP INC., SHANCHUN HUANG, JING CHEN, and MING YI,<br><br>    Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Denise Labelle ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation

conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Future FinTech Group Inc. ("Future FinTech" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Future FinTech securities from March 10, 2020 through January 11, 2024, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b), 20(a), 9(a) and 9(f) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein and subsequent damage occurred in this District.

5.      In connection with the acts, conduct and other wrongs alleged herein, Defendants (defined below), directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff Denise Labelle, as set forth in the accompanying certification, incorporated by reference herein, purchased Future FinTech securities during the Class Period and was economically damaged thereby.

7.      Defendant Future FinTech is incorporated in Florida and its headquarters are located at Americas Tower; 1177 Avenue of The Americas Suite 5100, New York, New York 10036. The Company's business activities include "supply chain financial services and trading, asset management and cross-border money transfer services. The Company has also expanded into cryptocurrency mining and cryptocurrency market data and information service business."

8.      Future FinTech's common shares trade on the NASDAQ under the ticker symbol "FTFT".

9.     Defendant Shanchun Huang ("Huang") has been Future FinTech's CEO since March 4, 2020. He also serves as a Company Director.

10.     Defendant Jing Chen ("Chen") served as the Company's Chief Financial Officer ("CFO") from 2019 until November 2020. Defendant Chen currently serves on the Board of Directors and as chair of the Audit Committee on the Board of Directors. Defendant Chen also served as Vice President of Future FinTech from November 2020 to April 2023.

11.     Defendant Ming Yi ("Yi") has served as the Company's CFO since November 30, 2020.

12.     Defendants Huang, Chen, and Yi are collectively referred to herein as the "Individual Defendants."

13.     Each of the Individual Defendants:

   a.     directly participated in the management of the Company;

   b.     was directly involved in the day-to-day operations of the Company at the highest levels;

   c.     was privy to confidential proprietary information concerning the Company and its business and operations;

   d.     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

> e.   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;
>
> f.   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or
>
> g.   approved or ratified these statements in violation of the federal securities laws.

14.   Future FinTech is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.   The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Future FinTech under *respondeat superior* and agency principles.

16.   Defendants Future FinTech and the Individual Defendants are collectively referred to herein as "Defendants."

## BACKGROUND

17.   NASDAQ Rule 5550(a)(2) states that for continued listing, "the minimum bid price per share for common stock shall be at least $1 per share."

18.   NASDAQ states the following on its website about delisting:

Delisting is the process where a company's stock is removed from a stock exchange, making it no longer available for public trading.

*This transition is crucial as it impacts how the stock is traded and can significantly alter a company's financial strategy and investor relations*.

*    *    *

*Delisting is not just a mere procedural step*. It represents a pivotal change in a company's life cycle.

*Delisting serves as a crucial indicator of a company's health and future prospects. For investors, it often signals a need for re-evaluation of the stock's value and potential risks*.

Delisting can affect market liquidity and investor access, leading to reduced trading volumes and challenges in stock transactions.

This alteration in market dynamics necessitates a strategic response form investors and can have long-term implications on investment portfolios.

(Emphasis added).

### <u>SUBSTANTIVE ALLEGATIONS</u>
**Materially False and Misleading**
**Statements Issued During the Class Period**

19.    On March 10, 2020, the Company issued a press release entitled "Future FinTech Announces Shanchun Huang as New CEO." This press release stated, in pertinent part:

*Mr. Huang has over 16 years of experience in the financial service and investment industry*. He has provided financing solutions and advice for high-growth companies in China and successfully assisted 37 enterprises to complete fundraising or public offerings in China. Most recently, *Mr. Huang served as the president of Wealth Index (Beijing) Fund Management Co., Ltd., which provides private equity fund management service, from March 2011 to March 2020 and president of Wealth Index (Beijing) International*

6

***Investment Consulting Co., Ltd., which provides investment management and consulting services for non-securities related business, from August 2004 to March 2020***. From May 2001 to June 2004, Mr. Huang was the vice president of Zhejiang Geely Holding Group Corporation, a global automobile company headquartered in Hangzhou, China. Mr. Huang graduated from Hefei Staff University of Science and Technology in July 1986 majoring in news collection and editing.

Mr. Huang is also a prolific writer and has published four books in the finance and investment area in China. These books include *How to Raise Money to Start a Business, the Road to Red Chips, Comparison and Research Among Global Capital Markets, and The Practice of Small and Medium Enterprises Listed Overseas and Hong Kong*. Mr. Huang is the Knight Commander of Grace of the Order of Saint Lazarus of Jerusalem, and the first Grand Prior of the Grand Priory of China.

"We are very pleased that Mr. Huang will be joining the team as our Chief Executive Officer," said Yongke Xue, Chairman of the Board of the Company. "A key pillar of the Company's strategy is bringing onboard top leadership to accelerate our blockchain based e-commerce, digital asset technology and applications, and financial technology and service business. ***Mr. Huang brings the right mix of talent, experience and success to lead the Company's next stage of growth***."

"I'm thrilled to join Future FinTech's leadership team at a time when blockchain and traditional industry are intersecting to create breakthroughs," said Shanchun Huang. "I look forward to working with the team to execute on our transformational growth strategy."

(Emphasis added).

20.    This statement was materially false and misleading at the time it was made because it extolled Defendant Huang's experiences while failing to disclose that he was manipulating the Company's stock at that time.

21.    On November 4, 2020, the Company filed with the SEC its amended annual report on Form 10-K/A for the period ending December 31, 2019 (the "2019

Annual Report"). Attached to the 2019 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Huang and Chen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

22.    The 2019 Annual Report contained the following risk disclosure regarding the possibility of the Company being delisted from the NASDAQ:

> ***In recent years, our Common Stock has been in danger of being delisted from the NASDAQ Stock Market ("NASDAQ").***
>
> On each of April 20, 2016, May 24, 2016 and August 17, 2016, the Company received a notification letter from the staff of the Listing Qualifications Department of NASDAQ (the "Staff") indicating that the Company was not in compliance with NASDAQ's continued listing requirements because the Company was not in compliance with the NASDAQ Listing Rule 5250(c)(1) (the "Rule") with respect to certain of its annual and quarterly reports.
>
> On October 12, 2016, the Company received a delisting determination letter (the "Determination Letter") from the Staff notifying the Company that because the Company had not filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 (the "Form 10-K") and its Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2016 and June 30, 2016, (together, the "Reports") by October 11, 2016, the deadline by which the Company was to file all Reports in order to regain compliance with the Rule, the Company's common stock was subject to delisting from the NASDAQ Global Market.
>
> On October 19, 2016, the Company requested a hearing before the NASDAQ Hearings Panel (the "Panel") under Listing Rule 5815(a) to appeal the delisting determination from the Staff. On November 2, 2016, the Company was granted an extended stay as to the suspension

of the Company's shares from trading by the Panel until the Company's scheduled hearing before the Panel on December 15, 2016 and issuance of a final Panel decision. Following a hearing, the Panel required that the Company regain compliance by January 31, 2017. By letter dated February 2, 2017, the Panel notified the Company that (i) the Company had regained compliance, (ii) the Company's Common Stock would continue to be listed on the NASDAQ Global Market, and (iii) the Panel was closing the matter.

On December 1, 2017, the Company received written notice from NASDAQ stating that the Company was not in compliance with the requirement of the minimum Market Value of Publicly Held Shares ("MVPHS") of $5,000,000 for continued listing on the NASDAQ Global Market, as set forth in NASDAQ Listing Rule 5450(b)(1)(C). The Company received notice that it had regained compliance on January 4, 2018.

On November 26, 2018, the Company received written notice from the NASDAQ Stock Market stating that the Company was not in compliance with the requirement of maintaining a minimum of $10,000,000 in stockholders' equity for continued listing on the NASDAQ Global Market, as set forth in NASDAQ Listing Rule 5450(b)(1)(A). Alternatively, the Company could consider applying to transfer the Company's securities to the NASDAQ Capital Market, which has a minimum stockholders' equity requirement of $2,500,000.

On December 28, 2018, the Company received confirmation from the Nasdaq Stock Market that its application to transfer the listing of its common stock from the Nasdaq Global Market to the Nasdaq Capital Market (the "Capital Market") had been approved. The Company's common stock began trading on the Capital Market on December 31, 2018.

On February 28, 2019, the Company received a letter from NASDAQ notifying the Company that, because the closing bid price for the Company's common stock listed on NASDAQ was below $1.00 for 30 consecutive trading days, the Company no longer met the minimum bid price requirement for continued listing on NASDAQ under NASDAQ Marketplace Rule 5550(a)(2). On May 7, 2019, the Company received a written notification from the NASDAQ Stock Market Listing

Qualifications Staff indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.

On April 17, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 10-K").

On May 21, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2019.

On August 20, 2019, the Company received a notification letter from the NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019.

On October 16, 2019, the Company received a letter from the NASDAQ Listing Qualifications Staff notifying the Company that it has regained compliance with NASDAQ's periodic filing requirements for continued listing on the Nasdaq Capital Market. The letter noted that as a result of the September 3, 2019 filing of the 201810-K and the September 30, 2019 filing of the Forms 10-Q for the periods ended March 31, and June 30, 2019 with the Securities and Exchange Commission, the Company has regained compliance with Listing Rule 5250(c)(1) and the matter is now closed.

On September 4, 2019, the Company received written notice from the NASDAQ stating that the Company did not meet the requirement of maintaining a minimum of $2,500,000 in stockholders' equity for continued listing on the NASDAQ Capital Market, as set forth in NASDAQ Listing Rule 5550(b)(1), the Company also does not meet the alternative of market value of listed securities of $35 million under NASDAQ Listing Rule 5550(b)(2) or net income from continuing operations of $500,000 in the most recently completed fiscal year or in two of the last three most recently completed fiscal years under NASDAQ Listing Rule 5550(b)(3), and the Company is no longer in

compliance with the NASDAQ Listing Rules. On March 18, 2020, the Company received written notice form NASDAQ stating that the Company complies with the Listing Rule 5550(b)(1). However, as noted in NASDAQ letter dated December 17, 2019, if the Company fails to evidence such compliance upon filing its Form 10-K for the fiscal year ended December 31, 2019, it may be subject to delisting. At that time, NASDAQ will provide written notification to the Company, which may then appeal Staff's determination to a Hearings Panel.

23.    This statement was materially false and misleading because it omitted the unlawful measures, specifically, manipulative trading, that Defendant Huang undertook in order to prop up the price of the Company's stock above $1 per share, in order to prevent a delisting of the Company's stock from the NASDAQ exchange.

24.    On March 12, 2021, the Company and Defendant Huang filed with the SEC an Initial insider holdings report on Form 3 (the "Holdings Report"), which had a reporting date of March 4, 2020, the day Defendant Huang became Future FinTech's CEO. Defendant Huang signed the Holdings Report, which contained the following:

1/13/24, 1:21 PM                                           SEC FORM 3

SEC Form 3

FORM 3

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

INITIAL STATEMENT OF BENEFICIAL OWNERSHIP OF SECURITIES

OMB APPROVAL

OMB Number: 3235-0104
Estimated average burden hours per response: 0.5

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person | 2. Date of Event Requiring Statement (Month/Day/Year) | 3. Issuer Name and Ticker or Trading Symbol |
|---|---|---|
| Huang Shanchun | 03/04/2020 | Future FinTech Group Inc. [ FTFT ] |

1. Name and Address of Reporting Person
Huang Shanchun
(Last) (First) (Middle)
1177 AVENUE OF THE AMERICAS, SUITE 5100
(Street)
NEW YORK   NY   10036
(City) (State) (Zip)

4. Relationship of Reporting Person(s) to Issuer (Check all applicable)
X Director
X Officer (give title below)
10% Owner
Other (specify below)
Chief Executive Officer

5. If Amendment, Date of Original Filed (Month/Day/Year)

6. Individual or Joint/Group Filing (Check Applicable Line)
X Form filed by One Reporting Person
Form filed by More than One Reporting Person

**Table I - Non-Derivative Securities Beneficially Owned**

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|
| | | | |

**Table II - Derivative Securities Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|---|---|
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |

Explanation of Responses:
No securities are beneficially owned.

/s/ Shanchun Huang      03/12/2021
** Signature of Reporting Person      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
* If the form is filed by more than one reporting person, see Instruction 5 (b)(v).
** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).
Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.
Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.

25. This was materially false and misleading because it omitted that Defendant Huang had owned Future FinTech stock at the time he became Future FinTech's CEO.

26. On April 15, 2021, the Company filed with the SEC its annual report on Form 10-K for the period ending December 31, 2020 (the "2020 Annual Report"). Attached to the 2020 Annual Report were certifications pursuant to SOX signed by defendants Huang and Yi attesting to the accuracy of financial reporting,

the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

27.    The 2020 Annual Report contained the following risk disclosure regarding the possibility of the Company being delisted from the NASDAQ:

> **In recent years, our Common Stock has been in danger of being delisted from the NASDAQ Stock Market ("NASDAQ").**
>
> On February 28, 2019, the Company received a letter from NASDAQ notifying the Company that, because the closing bid price for the Company's common stock listed on NASDAQ was below $1.00 for 30 consecutive trading days, the Company no longer met the minimum bid price requirement for continued listing on NASDAQ under NASDAQ Marketplace Rule 5550(a)(2). On May 7, 2019, the Company received a written notification from the NASDAQ Stock Market Listing Qualifications Staff indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.
>
> On April 17, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 10-K"). On May 21, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2019. On August 20, 2019, the Company received a notification letter from the NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019.
>
> On October 16, 2019, the Company received a letter from the NASDAQ notifying the Company that it has regained compliance with NASDAQ's periodic filing requirements for continued listing on the Nasdaq Capital Market. The letter noted that as a result of the September 3, 2019 filing of the Form 10-K for the year ended on

December 31, 2018 and the September 30, 2019 filing of the Forms 10-Q for the periods ended March 31, and June 30, 2019 with the Securities and Exchange Commission, the Company has regained compliance with Listing Rule 5250(c)(1) and the matter is now closed.

On September 4, 2019, the Company received written notice from the NASDAQ stating that the Company did not meet the requirement of maintaining a minimum of $2,500,000 in stockholders' equity for continued listing on the NASDAQ Capital Market, as set forth in NASDAQ Listing Rule 5550(b)(1), the Company also does not meet the alternative of market value of listed securities of $35 million under NASDAQ Listing Rule 5550(b)(2) or net income from continuing operations of $500,000 in the most recently completed fiscal year or in two of the last three most recently completed fiscal years under NASDAQ Listing Rule 5550(b)(3), and the Company is no longer in compliance with the NASDAQ Listing Rules. On March 18, 2020, the Company received written notice form NASDAQ stating that the Company complies with the Listing Rule 5550(b)(1).

On November 4, 2019, the Company received a letter from the Nasdaq notifying the Company that, because the closing bid price for the Company's common stock listed on Nasdaq was below $1.00 for 30 consecutive trading days, the Company no longer meets the minimum bid price requirement for continued listing on Nasdaq under Nasdaq Marketplace Rule 5550(a)(2), which requires a minimum bid price of $1.00 per share. On April 14, 2020, the Company received a written notification from the Nasdaq indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.

28.     This statement was materially false and misleading because it omitted the unlawful measures, specifically, manipulative trading, that Defendant Huang had previously engaged in in order to prop up the price of the Company's stock above $1 per share, in order to prevent a delisting of the Company's stock from the NASDAQ exchange.

29.     On March 22, 2023, the Company filed with the SEC its amended annual report on Form 10-K/A for the period ending December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to SOX signed by defendants Huang and Yi attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

30.     The 2021 Annual Report contained the following risk disclosure regarding the possibility of the Company being delisted from the NASDAQ:

*In recent years, our Common Stock has been in danger of being delisted from the NASDAQ Stock Market ("NASDAQ").*

On February 28, 2019, the Company received a letter from NASDAQ notifying the Company that, because the closing bid price for the Company's common stock listed on NASDAQ was below $1.00 for 30 consecutive trading days, the Company no longer met the minimum bid price requirement for continued listing on NASDAQ under NASDAQ Marketplace Rule 5550(a)(2). On May 7, 2019, the Company received a written notification from the NASDAQ Stock Market Listing Qualifications Staff indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.

On April 17, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 10-K"). On May 21, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2019. On August 20, 2019, the Company received a notification letter from the NASDAQ stating the Company was not in compliance with

NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019.

On October 16, 2019, the Company received a letter from the NASDAQ notifying the Company that it has regained compliance with NASDAQ's periodic filing requirements for continued listing on the Nasdaq Capital Market. The letter noted that as a result of the September 3, 2019 filing of the Form 10-K for the year ended on December 31, 2018 and the September 30, 2019 filing of the Forms 10-Q for the periods ended March 31, and June 30, 2019 with the Securities and Exchange Commission, the Company has regained compliance with Listing Rule 5250(c)(1) and the matter is now closed.

On September 4, 2019, the Company received written notice from the NASDAQ stating that the Company did not meet the requirement of maintaining a minimum of $2,500,000 in stockholders' equity for continued listing on the NASDAQ Capital Market, as set forth in NASDAQ Listing Rule 5550(b)(1), the Company also does not meet the alternative of market value of listed securities of $35 million under NASDAQ Listing Rule 5550(b)(2) or net income from continuing operations of $500,000 in the most recently completed fiscal year or in two of the last three most recently completed fiscal years under NASDAQ Listing Rule 5550(b)(3), and the Company is no longer in compliance with the NASDAQ Listing Rules. On March 18, 2020, the Company received written notice form NASDAQ stating that the Company complies with the Listing Rule 5550(b)(1).

On November 4, 2019, the Company received a letter from the Nasdaq notifying the Company that, because the closing bid price for the Company's common stock listed on Nasdaq was below $1.00 for 30 consecutive trading days, the Company no longer meets the minimum bid price requirement for continued listing on Nasdaq under Nasdaq Marketplace Rule 5550(a)(2), which requires a minimum bid price of $1.00 per share. On April 14, 2020, the Company received a written notification from the Nasdaq indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.

On March 1, 2022, Future FinTech Group Inc. (the "Company") received a letter from the Nasdaq Stock Market ("Nasdaq") notifying

the Company that, because the closing bid price for the Company's common stock listed on Nasdaq was below $1.00 for 30 consecutive trading days, the Company no longer meets the minimum bid price requirement for continued listing on Nasdaq under Nasdaq Marketplace Rule 5550(a)(2), which requires a minimum bid price of $1.00 per share (the "Minimum Bid Price Requirement"). The notification has no immediate effect on the listing of the Company's common stock. In accordance with Nasdaq Marketplace Rule 5810(c)(3)(A), the Company has a period of 180 calendar days from the date of notification, until August 29, 2022 (the "Compliance Period"), to regain compliance with the Minimum Bid Price Requirement. If at any time before the expiration of the Compliance Period the bid price of the Company's common stock closes at or above $1.00 per share for a minimum of 10 consecutive business days, Nasdaq will provide written notification that the Company has achieved compliance with the Minimum Bid Price Requirement. If the Company does not regain compliance by the end of the Compliance Period, the Company may be eligible for an additional 180 calendar day period to regain compliance. To qualify, the Company will be required to meet the continued listing requirement for market value of publicly held shares and all other initial listing standards for The Nasdaq Capital Market, with the exception of the bid price requirement, and will need to provide written notice of its intention to cure the deficiency during the second compliance period by effecting a reverse stock split, if necessary. However, if it appears to Nasdaq that the Company will not be able to cure the deficiency, or if the Company is otherwise not eligible, Nasdaq will provide notice that the Company's securities will be subject to delisting. The Company intends to continue actively monitoring the bid price for its common stock between now and the expiration of the Compliance Period and will consider all available options to resolve the deficiency and regain compliance with the Minimum Bid Price Requirement.

31.    This statement was materially false and misleading because it omitted the unlawful measures, specifically, manipulative trading, that Defendant Huang had previously engaged in in order to prop up the price of the Company's stock

above $1 per share, in order to prevent a delisting of the Company's stock from the NASDAQ exchange.

32. On April 29, 2023, the Company filed with the SEC its annual report on Form 10-K for the period ending December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were certifications pursuant to SOX signed by defendants Huang and Yi attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

33. The 2022 Annual Report contained the following risk disclosure regarding legal risks:

> ***If we become subject to additional scrutiny, criticism and negative publicity involving U.S.-listed China-based companies, we may have to expend significant resources to investigate and resolve the matter which could harm our business operations, any offering and our reputation and could result in a loss of your investment in our shares, especially if such matter cannot be addressed and resolved favorably.***

> Recently, U.S. public companies that have substantially operations in China have been the subject of intense scrutiny, criticism and negative publicity by investors, financial commentators and regulatory agencies. ***Much of the scrutiny, criticism and negative publicity has centered around financial and accounting irregularities, a lack of effective internal controls over financial accounting, inadequate corporate governance policies or a lack of adherence thereto and, in some cases, allegations of fraud.*** As a result of the scrutiny, criticism and negative publicity, the publicly traded stock of many U.S.-listed China-based companies has decreased in value and, in some cases, has become virtually worthless. ***Many of these companies have been subject to shareholder lawsuits and SEC enforcement actions and have conducted internal and external investigations into the allegations***.

The Company has received subpoenas from the SEC's Division of Enforcement requiring us to produce documents and detailed information relating to, among other things, the Company's accounting procedures and treatment, management oversight, and the sale of HeDeTang Holdings (HK) Ltd. to New Continent International Co., Ltd. The Company has provided responsive documents and information and will continue to cooperate with regulator and produce requested documents and information. ***It is not clear what effect this sector-wide scrutiny, criticism and negative publicity will have on us and our business***. ***If we become the subject of any unfavorable allegations, whether such allegations are proven to be true or untrue, we will have to expend significant resources to investigate such allegations and/or defend our company***. This situation may be a major distraction to our management. ***If such allegations are not proven to be groundless, our business operations will be severely hindered and your investment in our shares could be rendered worthless***.

(Emphasis added).

34.     This statement was materially false and misleading because it understated the level of regulatory and compliance risk facing the Company, given that its present CEO had manipulated the price of the Company's stock.

35.     The 2022 Annual Report contained the following risk disclosure regarding the possibility of the Company being delisted from the NASDAQ:

***In recent years, our Common Stock has been in danger of being delisted from the NASDAQ Stock Market ("NASDAQ").***

Our common stock is currently listed on the Nasdaq Capital Market. The NASDAQ Stock Market LLC has requirements that a company must meet in order to remain listed on NASDAQ, for example, NASDAQ rules require us to maintain a minimum bid price of $1.00 per share of our common stock. We may be unable to meet NASDAQ listing requirements, including minimum bid price, minimum levels of stockholders' equity or market values of our common stock in which case, our common stock could be delisted. If

our common stock were to be delisted, the liquidity of our common stock would be materially adversely affected and the market price of our common stock could decrease.

On February 28, 2019, the Company received a letter from NASDAQ notifying the Company that, because the closing bid price for the Company's common stock listed on NASDAQ was below $1.00 for 30 consecutive trading days, the Company no longer met the minimum bid price requirement for continued listing on NASDAQ under NASDAQ Marketplace Rule 5550(a)(2). On May 7, 2019, the Company received a written notification from the NASDAQ Stock Market Listing Qualifications Staff indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.

On April 17, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 10-K"). On May 21, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2019. On August 20, 2019, the Company received a notification letter from the NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019.

On October 16, 2019, the Company received a letter from the NASDAQ notifying the Company that it has regained compliance with NASDAQ's periodic filing requirements for continued listing on the Nasdaq Capital Market. The letter noted that as a result of the September 3, 2019 filing of the Form 10-K for the year ended on December 31, 2018 and the September 30, 2019 filing of the Forms 10-Q for the periods ended March 31, and June 30, 2019 with the Securities and Exchange Commission, the Company has regained compliance with Listing Rule 5250(c)(1) and the matter is now closed.

On September 4, 2019, the Company received written notice from the NASDAQ stating that the Company did not meet the requirement of

maintaining a minimum of $2,500,000 in stockholders' equity for continued listing on the NASDAQ Capital Market, as set forth in NASDAQ Listing Rule 5550(b)(1), the Company also does not meet the alternative of market value of listed securities of $35 million under NASDAQ Listing Rule 5550(b)(2) or net income from continuing operations of $500,000 in the most recently completed fiscal year or in two of the last three most recently completed fiscal years under NASDAQ Listing Rule 5550(b)(3), and the Company is no longer in compliance with the NASDAQ Listing Rules. On March 18, 2020, the Company received written notice form NASDAQ stating that the Company complies with the Listing Rule 5550(b)(1).

On November 4, 2019, the Company received a letter from the Nasdaq notifying the Company that, because the closing bid price for the Company's common stock listed on Nasdaq was below $1.00 for 30 consecutive trading days, the Company no longer meets the minimum bid price requirement for continued listing on Nasdaq under Nasdaq Marketplace Rule 5550(a)(2), which requires a minimum bid price of $1.00 per share. On April 14, 2020, the Company received a written notification from the Nasdaq indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.

On March 1, 2022, the Company received a letter from the Nasdaq Stock Market ("Nasdaq") notifying the Company that, because the closing bid price for the Company's common stock listed on Nasdaq was below $1.00 for 30 consecutive trading days, the Company no longer meets the minimum bid price requirement for continued listing on Nasdaq under Nasdaq Marketplace Rule 5550(a)(2), which requires a minimum bid price of $1.00 per share (the "Minimum Bid Price Requirement"). The Company has a period of 180 calendar days from the date of notification, until August 29, 2022 (the "Compliance Period"), to regain compliance with the Minimum Bid Price Requirement. On August 30, 2022, the Company received a written notification from the NASDAQ Stock Market Listing Qualifications Staff (the "Staff") indicating that the Company has been granted an additional 180 calendar day period or until February 27, 2023, to regain compliance with the $1.00 minimum closing bid price requirement for continued listing on the NASDAQ Capital Market pursuant to NASDAQ Listing Rule. On January 26, 2023, the Company

filed with the Florida Secretary of State's office Articles of Amendment (the "Amendment") to amend its Second Amended and Restated Articles of Incorporation, as amended ("Articles of Incorporation"). As a result of the Amendment, the Company has authorized and approved a 1-for-5 reverse stock split of the Company's authorized shares of common stock from 300,000,000 shares to 60,000,000 shares, accompanied by a corresponding decrease in the Company's issued and outstanding shares of common stock (the "Reverse Stock Split"). The common stock will continue to be $0.001 par value. The Company's shares of common stock began to trade on the NASDAQ Stock Market on the post-Reverse Stock Split basis under the symbol "FTFT" on February 1, 2023. On February 15, 2023, the Company received a written notification from the NASDAQ Stock Market Listing Qualifications Staff indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement for continued listing on the NASDAQ Capital Market pursuant to NASDAQ Listing Rule 5550(a)(2) and that the matter is now closed.

36.    This statement was materially false and misleading because it omitted the unlawful measures, specifically, manipulative trading, that Defendant Huang had previously engaged in in order to prop up the price of the Company's stock above $1 per share, in order to prevent a delisting of the Company's stock from the NASDAQ exchange.

37.    The statements contained in paragraphs 19, 21, 22, 24, 26, 27, 29, 30, 32, 33, and 35 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendant Shanchun Huang

manipulated the price of Future FinTech stock; (2) Defendant Huang and Future FinTech lied to the Securities and Exchange Commission about the nature of Defendant Huang's ownership of Future FinTech stock; (3) Future FinTech understated its legal risk; (4) Future FinTech did not disclose the unlawful measures Defendant Huang took to prop up the price of its stock; and (5) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

38.     On January 11, 2024, around or after market close, the SEC posted a press release on its website entitled "SEC Charges Future FinTech CEO Shanchun Huang With Fraud and Disclosure Failures." (The "SEC Announcement"). The SEC Announcement stated the following:

> The [SEC] today charged Shanchun Huang with manipulative trading in the stock of Future FinTech Group Inc., using an offshore account shortly before he became Future FinTech's CEO in 2020. The SEC also charged Huang with failing to disclose his beneficial ownership of Future FinTech stock as well as transactions in such stock.

39.     Attached to the SEC Announcement was a complaint that the SEC filed against Defendant Huant in the United States District Court for the Southern District of New York (the "SEC Complaint" or the "Complaint"). The SEC Complaint stated that Defendant Huang "***manipulated the stock price of Future FinTech by buying***

***hundreds of thousands of Future FinTech shares to artificially increase the company's stock price shortly before and after he became CEO in March 2020***." (Emphasis added).

40.     Further, "[t]o induce investors to purchase Future FinTech stock, ***Huang sought to inflate the share price of Future FinTech to avoid the company being delisted by Nasdaq***[.]" (Emphasis added). The reason that Future FinTech faced a delisting of its stock by Nasdaq "its failure ***to maintain a minimum price of $1 per share, which would have made Future FinTech stock less attractive***." (Emphasis added).

41.     The SEC Complaint stated the following about the volume and nature of Defendant Huang's manipulative trades:

> ***From in or about January 2020 through April 2020 (the "Relevant Period"),*** using a securities account ***maintained at an offshore financial institution***, Huang engaged in ***manipulative trades of Future FinTech stock. Huang repeatedly traded at a volume so large it constituted a high percentage of the daily volume of Future FinTech stock transactions, placed multiple buy orders in short timeframes, placed limit buy orders (orders to buy the stock at a specified price or better) with escalating limit prices from one order to the next***, and ***typically purchased Future FinTech stock at the top of the National Best Bid and Offer ("NBBO") 1 spread***, trades that ***generally would not make economic sense for an investor who sought to buy the stock at the lowest available price.***

(Emphasis added).

---

1 The SEC Complaint contained a footnote which noted that "[i]n general terms the National Best Bid and Offer ("NBBO") means the best bid (the highest price any buyer is willing to offer to buy the stock) and the best offer (the lowest price any seller is willing to accept for the stock). *See* 17 C.F.R. § 242.600(b)(50)."

42.     The Complaint noted that "[H]uang's trades were intended to, and at times did, push the Future FinTech stock price upward.

43.     In addition, the Complaint noted that "***upon becoming [Future FinTech's CEO] in March 2020, Huang repeatedly failed to make required public filings with the Commission about his beneficial ownership of Future FinTech stock and his Future FinTech stock transactions***." (Emphasis added).

44.     By March of 2021, Defendant Huang had sold all of his Future FinTech stock. At this time, he filed an Initial Statement of Beneficial Ownership, which the SEC Complaint noted "***failed to state that Huang owned Future FinTech stock at the time he became CEO in March 2020 until his final shares were sold in March 2021***." (Emphasis added).

45.     Finally, the Complaint noted that "***Huang has never filed any forms with the Commission disclosing his ownership of or transactions in Future FinTech stock from January 2020 through March 2021***." (Emphasis added).

46.     On this news, the price of the Company's stock went down by $0.27, or 20.93%, to close at $1.02 on January 12, 2024.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

47.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired the Company's securities

publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

48.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

49.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the Exchange Act was violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

c.      whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

e.      whether Defendants acted knowingly or recklessly in issuing false filings;

f.      whether the prices of Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g.     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

53.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.     The Company's shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

b.     As a public issuer, the Company filed periodic public reports;

c.     The Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

      d.     The Company's shares were liquid and traded with moderate to heavy volume during the Class Period; and

      e.     The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

54. Based upon the foregoing, the market for Company securities promptly digested current information regarding the Company from all publicly-available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

55. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### **FIRST CAUSE OF ACTION**
**Violation of Section 10(b) of the Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against All Defendants**

56. Plaintiffs repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     This cause of action is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

60.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were

30

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

61.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

62.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's

securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

63.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

64.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

65.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Future FinTech securities during the Class Period.

### SECOND CAUSE OF ACTION
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

66.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

67.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated,

directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

68.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

69.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

70.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**THIRD CAUSE OF ACTION**
**Violation of Section 9(a) and 9(f) Of**
**The Exchange Act Against the All Defendants**

71.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

72.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (2) engaged in a scheme to inflate the price of Future FinTech shares; and (3) mislead and caused Plaintiffs and other members of the Class to purchase Future FinTech shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

73.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for

Future Fintech's shares in violation of Sections 9(a) and 9(f) of the Exchange Act. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

74.     By virtue of the foregoing, Defendants made statements which were at the time and in the light of the circumstances under which they were made, false or misleading with respect to the value of Future FinTech's shares, which Defendants knew or had reasonable ground to believe were so false or misleading.

75.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make said false or misleading statements with respect to the value of Future FinTech shares, which Defendants knew or had reasonable grounds to believe were so false or misleading.

76.     Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents of the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these Defendants enjoyed significant personal contact and familiarity with the other

35

Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

77.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Future FinTech's true value and Defendants' price manipulation, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired Future FinTech shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

78.    By virtue of the foregoing, Defendants violated Section 9(a) and 9(f) of the Exchange Act, 15 U.S.C. § 78i(a) and 78i(f).

79.    As a direct and proximate result of Defendants' conduct as described herein, Plaintiffs have suffered significant damages and are entitled to such damages from Defendants, jointly and severally.

80.    This action was filed within one year of discovery of the fraud and within three years of each Plaintiffs' purchases of shares giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

b.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: January 16, 2024                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**
                                           /s/ Laurence M. Rosen

Laurence Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ  07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*