James M. Wilson, Jr. (admitted *pro hac vice*)
Raymond N. Barto (#086182013)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com
Email: rbarto@faruqilaw.com

[additional counsel listed in signature block]

*Attorneys for Lead Plaintiff Scott Present*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DENISE LABELLE, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>FUTURE FINTECH GROUP INC., SHANCHUN HUANG, JING CHEN, and MING YI,<br><br>    Defendants. | No. 2:24-cv-00247-JXN-JSA<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><u>CLASS ACTION</u> |

# TABLE OF CONTENTS

SUMMARY OF THE ACTION ..................................................................2

INTRODUCTION .....................................................................................3

JURISDICTION AND VENUE ...............................................................10

PARTIES...................................................................................................11

SUBSTANTIVE ALLEGATIONS ..........................................................15

I.    BACKGROUND ..............................................................................15

    A.    Overview of the Nasdaq Capital Market Listing Requirements .........15

    B.    Future FinTech ...........................................................................16

    C.    Huang ..........................................................................................18

II.   HUANG ENGAGED IN MANIPULATIVE TRANSACTIONS TO ARTIFICIALLY INCREASE FUTURE FINTECH STOCK PRICE..........20

    A.    Huang Placed Manipulative Trades from January 13, 2020, through April 9, 2020 ..........................................................20

        1.    Huang's Trading on January 27, 2020....................................22

        2.    Huang's Trading on January 28, 2020....................................23

        3.    Huang's Trading on February 4, 2020....................................24

        4.    Huang's Trading on February 6, 2020....................................26

        5.    Huang's Trading in March and April 2020 .............................27

        6.    Huang's Offshore Securities Account Is Liquidated and Closed.........................................................................29

    B.    Huang Knew of His Own Future FinTech Trades and Controlled His Offshore Securities Account.......................................30

    C.    Huang Failed to Disclose His Ownership and Purchases of Future FinTech Stock .................................................32

III.    MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND/OR OMISSIONS CONCERNING HUANG'S
        MANIPULATIVE TRADING ................................................................34

IV.    MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND/OR OMISSIONS CONCERNING REGULATIONS AND
        INTERNAL CONTROLS ...................................................................47

V.    MATERIALLY FALSE AND MISLEADING STATEMENTS
       AND/OR OMISSIONS CONCERNING HUANG'S OWNERSHIP
       AND PURCHASES OF FUTURE FINTECH STOCK................................49

VI.    THE TRUTH EMERGES ....................................................................51

VII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................53

        A.    *Respondeat Superior* and Agency Principles Apply...........................55

        B.    Defendant Huang Knew About His Own Manipulation of the
               Market for Future FinTech Stock.......................................................55

        C.    Defendants Chen and Yi Knew or Recklessly Disregarded
               Huang's Manipulative Trading ........................................................57

        D.    Huang's Loans to Future FinTech Support a Strong Inference of
               Scienter ......................................................................................59

        E.    Defendants' Financial Experience ....................................................61

        F.    The SEC's Investigation into Huang's Manipulative Trading of
               Future FinTech Stock Supports a Strong Inference of Scienter .........64

        G.    Future FinTech's Remedial Measures and Huang's Departure
               Support Scienter ............................................................................65

        H.    Defendant Huang Violated Future FinTech's Insider Trading
               Policy............................................................................................66

        I.    SOX Certifications ...........................................................................67

VIII.    LOSS CAUSATION ...........................................................................68

IX.    CLASS ACTION ALLEGATIONS.............................................................73

ii

X.     CONTROL PERSON LIABILITY ................................................................76

XI.    THE FRAUD ON THE MARKET PRESUMPTION ................................77

XII.   THE *AFFILIATED UTE* PRESUMPTION....................................................78

XIII.  NO STATUTORY SAFE HARBOR ........................................................79

XIV.  CAUSES OF ACTION........................................................................81

COUNT I....................................................................................................81

COUNT II ................................................................................................83

COUNT III ..............................................................................................84

XV.   PRAYER FOR RELIEF ..........................................................................86

XVI.  JURY TRIAL DEMAND ..........................................................................87

Lead Plaintiff Scott Present ("Plaintiff") brings this action pursuant to Sections 9(a)(2), (f), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, individually and on behalf of all other persons and entities, who purchased or otherwise acquired the publicly traded common stock of Future FinTech Group Inc., a Nasdaq-listed company, ("Future FinTech" or the "Company") during the period between March 10, 2020, and January 11, 2024, inclusive (the "Class Period"), and were damaged thereby (subject to certain exclusions enumerated, below) (the "Class").

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based upon, *inter alia*, the independent investigation of Court-appointed Lead Counsel Faruqi & Faruqi, LLP.  That investigation included review and analysis of, among other things: (i) Future FinTech's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) research reports and advisories by securities and financial analysts; (iii) press releases, presentations, and media reports issued by and disseminated by the Company; (v) news reports and media concerning Future FinTech and other facts related to this action; (vi) data reflecting the price of Future FinTech common stock; (vii) an investigation conducted by the SEC based, in part, on Shanchun Huang's own documents and investigative testimony, and the ensuing complaint brought by the

1

SEC (the "SEC Complaint" or "SEC Compl.");[1] and (viii) information readily available on the Internet.  Lead Counsel's investigation regarding the factual allegations concerned herein is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants (as defined herein) or are exclusively within their custody or control.  Plaintiff believes that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This case centers around blatant stock manipulation that was performed to artificially inflate the price of Future FinTech's publicly traded stock. The manipulation was carried out by former Chief Executive Officer ("CEO") Shanchun Huang ("Huang"), was known or recklessly disregarded by all Defendants, but not disclosed to the market or the SEC.  Specifically, in November 2019, the Company was at risk of being delisted from the Nasdaq Global Select Market ("Nasdaq") exchange when its stock price declined below Nasdaq's required $1.00 minimum trade price.  After Huang was approached about becoming CEO – at an annual salary of only $1.00 – Huang began to engage in the

---

[1]      *Securities and Exchange Commission v. Huang*, No. 24 Civ. 00238 (JHR) ("SEC Action") (S.D.N.Y. Jan. 11, 2024), ECF No. 1, attached hereto as Exhibit A.  Unless stated otherwise, the following conventions apply: all citations and internal quotation marks are omitted and all emphases are added.

manipulative stock transactions.  These trades were a success, artificially elevating the price of Future FinTech stock approximately 100%.  When Huang's bank uncovered the manipulative stock transactions in 2021, it closed his account.  The SEC also commenced an investigation into Huang's stock manipulation around that time and obtained sworn testimony from Huang.  Defendants knew about this investigation by the SEC but took no action to investigate or disclose it to the market.  Instead, they made false and misleading statements to investors that the Company was addressing the threat of delisting and about the level of regulatory and compliance risk facing the Company.  The SEC then commenced a civil action against Huang in 2024 in the Southern District of New York based on that investigation, and obtained a temporary restraining order ("TRO") against Huang based on the same or similar allegations and claims asserted herein.[2]

**INTRODUCTION**

2.      Future FinTech was previously a fruit juice maker under the name SkyPeople Fruit Juice, but completely changed its operations in 2017 to engage in blockchain e-commerce and adopted the new name "Future FinTech."

---

[2]      The TRO was superseded by a stipulation between Huang and the SEC that froze certain of his assets while that case is litigated.

3.    The transformation in 2017 was not going well and by 2019, the Company's stock had been in danger of being delisted from the Nasdaq Global Select Market ("Nasdaq") multiple times.

4.    In late 2019, Nasdaq informed the Company that because the closing bid price for its stock was below $1 for 30 trading days once again, it no longer met the minimum bid price for continued listing on the Nasdaq. Future FinTech had 180 days to meet the minimum bid price requirement or face delisting.

5.    As Nasdaq itself explains, "[d]elisting is a significant event in the life cycle of a publicly traded company and has far-reaching implications for investors." Delisting often "indicat[es] serious issues within the company, and can lead to significant market uncertainty and a loss of investor confidence."

6.    For Future FinTech, the risks of delisting were existential. Accordingly, the Company assured investors that it would "continue actively monitoring the bid price for its common stock between now and the expiration of the Compliance Period and will consider all available options to resolve the deficiency and regain compliance[.]" Yet, by the end of 2019, its stock was still trading around $0.45 per share.

7.    It was around this time (late 2019 and early 2020) that Huang, founder of a bond management company that only operated in China, was approached by Future FinTech to become its new CEO. Huang, who had never served as an

4

executive of a company that trades on an American stock exchange, testified that he got the job through his friend, the founder and then-CEO of Future FinTech, Yongke Xue ("Xue").

8.       Suddenly, in early 2020, Future FinTech's stock started to trend upward, exceeding the $1 threshold in early March 2020.  Defendants would have known that this uptick in the stock price was remarkably suspicious since the Company was in such dire financial straits that, according to Huang's testimony to the SEC, Huang had to loan the Company money on multiple occasions to pay for rent and employee wages.

9.       Unbeknownst to the market, Future FinTech's stock price increase was the direct result of Huang's manipulative undisclosed stock transactions. Huang had secretly bought hundreds of thousands of shares of Future FinTech through his personal offshore HSBC securities account.  Despite having never previously bought or sold Future FinTech stock, in the roughly two-month span between January 13, 2020 and March 4, 2020, Huang bought 500,379 shares.  This could not have gone unnoticed by Chief Financial Officer ("CFO") Jing Chen ("Chen"), given her role and the Company's pledge to "continue actively monitoring the bid price" during the then-ongoing period in which Future FinTech had to get its stock price over $1.

5

10.     Huang became CEO on March 4, 2020, and continued to buy shares for awhile thereafter.

11.     His trades employed classic manipulative techniques to artificially raise the stock's price.  These techniques included placing multiple buy orders in short timeframes; placing buy orders with escalating prices from one order to the next throughout the day to increase the price of Future FinTech stock; placing buy orders at the top of the market; and engaging in large volume trading, including seven days when Huang's purchases of Future FinTech stock constituted 26% or more of the stock's daily trading volume.  Huang's manipulative trading techniques succeeded.  On April 16, 2020, Future FinTech announced that the Company regained compliance with the relevant Nasdaq rule, as the Company's stock price had closed above $1.00 per share for ten consecutive days.

12.     Notably, when Huang did start to sell some of his Future FinTech stock (while still buying shares), those proceeds funded most of the $289,000 in loans he gave the Company.  Given that Huang's CEO salary was merely $1, the source of these loan funds, combined with the conveniently timed rise in Future FinTech's stock price, should have raised red flags for CFO Chen, and thereafter for her successor CFO Ming Yi ("Yi").  Indeed, Huang testified that he did not have much money at the time he was lending it to Future FinTech.

6

13.    Huang and the other Defendants actively sought to hide the truth throughout the Class Period.  In press releases and SEC filings, Future FinTech and Huang touted Huang's experience as the reason he was hired, disclosing nothing about the massive stock manipulation he had engaged in.  Future FinTech, Huang, and Chen also discussed in detail the back and forth over the years with Nasdaq regarding Future FinTech's failure to comply with the minimum bid price and other listing rules, without ever explaining that the CEO's manipulative trades enabled the Company to maintain its listing after 2019.

14.    Additionally, despite being required to do so within 10 days of becoming CEO, Huang did not file the requisite form (Form 3) with the SEC disclosing the amount of Future FinTech stock he owned.  When he eventually filed this form (over a year late, and shortly after HSBC shut down his account for suspected fraud), it falsely stated that he owned no stock when he became CEO.

15.    Meanwhile, beginning on or about April 2021, Future FinTech, Huang, and Yi informed the market that Future FinTech was responding to SEC subpoenas about "the Company's accounting procedures and treatment, management oversight, and the sale of HeDeTang Holdings (HK) Ltd. to New Continent International Co., Ltd," but omitted the SEC's investigation into Huang's stock manipulation.  In fact, Future FinTech painted the SEC's inquiries as being driven by "sector-wide scrutiny, criticism, and negative publicity" due to

7

its role as a "U.S.-listed China-based compan[y]." Thus, they understated the level of regulatory and compliance risk facing the Company.

16. Indeed, the SEC had been investigating Huang's price manipulation of Future FinTech stock since at least early 2021. This would have been obvious to Yi as an executive officer because Huang and the Company were represented by the Company's counsel during Huang's investigative testimony in April 2021. The fact that the Company's newly hired CEO had provided sworn testimony to the SEC regarding his Future FinTech stock transactions was not disclosed to investors. Finally, on January 11, 2024, the SEC charged Huang with fraud and disclosure failures. The same day, the SEC posted a press release on its website stating that the SEC "charged Shanchun Huang with manipulative trading in the stock of Future FinTech Group Inc., using an offshore account shortly before he became Future FinTech's CEO in 2020." The press release further stated that "[t]he SEC also charged Huang with failing to disclose his beneficial ownership of Future FinTech stock as well as transactions in such stock."

17. The press release contained a link to a complaint that the SEC filed against Huang in the United States District Court for the Southern District of New York. The SEC Complaint stated that "[t]o induce investors to purchase Future FinTech stock, Huang sought to inflate the share price of Future FinTech to avoid the company being delisted by Nasdaq due to its failure to maintain a minimum

price of $1 per share, which would have made Future FinTech stock less attractive." The SEC Complaint also stated that "Huang has never filed any forms with the Commission disclosing his ownership of or transactions in Future FinTech stock from January 2020 through March 2021." The SEC seeks fines and to have Huang barred from serving as an officer or director of a public company.

18.    When the truth about Huang's price manipulation was eventually revealed through a series of corrective disclosures or materializations of risks, Plaintiff and other members of the Class of investors in Future FinTech suffered significant damages. During the Class Period, as a result of Huang's manipulative stock transactions and Defendants' cover up of these manipulative transactions, Future FinTech's common stock reached its peak of $11.29 per share on January 8, 2021. At the end of the Class Period, when the truth about Huang's actions was finally disclosed the market, the stock price was trading at $0.27 per share on January 11, 2024, an incredible 98% decrease. When the truth eventually emerged, Future FinTech lost millions of dollars in market capitalization.

19.    On January 15, 2024, Future FinTech's Board of Directors (the "Board") agreed to establish an independent committee to review and investigate the SEC's allegations concerning Huang's manipulative trading and disclosure failures. The Board also imposed restrictions on Huang trading in the Company's stock during the pendency of the litigation. In addition, the Board decided to

provide training to Company officers, directors, and employees as to appropriate trading practices under the Company's insider trading policy.  Huang resigned from his positions as a director of the Board and the CEO and President of Future FinTech on August 5, 2024.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 9(a)(2), 9(f), 10(b), and 20(a) of the Exchange Act (15 U.S.C. §§ 78i, 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

22.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein and subsequent damage occurred in this District.

23.     In connection with the acts, conduct and other wrongs alleged herein, Defendants (defined below), directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

**PARTIES**

24.    Plaintiff Scott Present, as set forth in his Certification previously submitted to the Court (ECF No. 7-4), purchased Future FinTech's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

25.    Defendant Future FinTech is a comprehensive financial and digital technology service provider[3] incorporated under the laws of the State of Florida, with principal executive offices located at 1177 Avenue of the Americas, Suite 5100, New York, NY 10036, USA.  The Company's securities trade in an efficient market on the Nasdaq under the ticker symbol "FTFT."

26.    The Company, through its subsidiaries, conducts asset management, brokerage, and investment banking services in Hong Kong; operates a cross-border payment business in the United Kingdom; provides cryptocurrency trading data information services in the United Arab Emirates; and engages in supply chain trading and finance businesses in the People's Republic of China ("China").[4]  In addition, the Company provides digital asset computing power custody services in

---

[3]    *Who We Are*, FUTURE FINTECH GRP. INC, http://www.ftft.com/en/about/who_we_are/ (last visited July 10, 2025).
[4]    *Id.*

Paraguay and has initiated digital asset mining farm operations in the United States.[5]

27.    Defendant Huang was Future FinTech's CEO and a Director of the Board from March 4, 2020 to August 5, 2024.  Future FinTech, Current Report, Item 5.02 (Form 8-K) (Mar. 10, 2020) ("March 10, 2020 8-K" or "Mar. 10, 2020 8-K");[6] Future FinTech, Current Report, Item 5.02 (Form 8-K) (Aug. 9, 2024) ("Aug. 9, 2024 8-K").[7]  He also served as the President of the Company from December 4, 2023, to August 5, 2024.  Future FinTech, Current Report, Item 5.02 (Form 8-K) (Dec. 5, 2023); Aug. 9, 2024 8-K.  Huang is the defendant in the civil action commenced by the SEC, which asserts factual allegations and has claims similar to those asserted herein.  In the SEC Action, Huang has: (i) entered a general appearance; (ii) accepted service of the complaint and waived service of summons; and (iii) consented to that court's jurisdiction over him and the subject matter of that action.  *See* Ex. D at 1.  According to sworn testimony given by Huang in 2021 pursuant to the SEC investigation of him, Huang has travelled to New York multiple times and has owned a home in Glen Cove, New York.  Ex. B at 23:19-25.  Notably, in February 2024, the SEC served on Mr. Huang's counsel a

---

5    *Id*.

6    https://www.sec.gov/Archives/edgar/data/1066923/000121390020005821/ea119412-8k_futurefintech.htm.

7    https://www.sec.gov/Archives/edgar/data/1066923/000121390024066845/ea0210897-8k_future.htm.

motion seeking to require court approval prior to any sale of that property to prevent Mr. Huang from moving sale proceeds outside the country. SEC Action, ECF No. 28 at 1-2. While the motion was pending, Mr. Huang secretly sold the property in April 2024 and transferred the net proceeds to his wife in the U.K. *Id.* at 2.

28. Defendant Chen served as the Company's CFO from May 21, 2019, until November 30, 2020. Future FinTech, Current Report, Item 5.02 (Form 8-K) (May 22, 2019) ("May 22, 2019 8-K");[8] Future FinTech Current Report, Item 5.02 (Form 8-K) (Dec. 2, 2020) ("Dec. 2, 2020 8-K").[9] Defendant Chen also served as Vice President of Future FinTech from November 30, 2020, to April 2023. Dec. 2, 2020 8-K; Bon Natural Life Ltd., Registration Statement 94 (Form F-1) (Nov. 14, 2024) ("Bon Natural F-1").[10] Chen appears to no longer be associated with Future FinTech and is currently a Director at Bon Natural Life Ltd., a Chinese company, located in Shaanxi Province of China. Bon Natural F-1 at 94.

29. Defendant Yi has served as the Company's CFO since November 30, 2020. Dec. 2, 2020 8-K.

---

[8]    https://www.sec.gov/Archives/edgar/data/1066923/000121390019009402/f8k051619_futurefintech.htm.

[9]    https://www.sec.gov/Archives/edgar/data/1066923/000121390020040493/ea130826-8k_futurefin.htm.

[10]    https://www.sec.gov/Archives/edgar/data/1816815/000149315224046762/formf-1.htm.

30.    Defendants Huang, Chen, and Yi are collectively referred to hereinafter as the "Individual Defendants" and, together with Future FinTech, as the "Defendants."  The Individual Defendants were directly or indirectly involved in the oversight or implementation of the Company's internal controls and possessed the power and authority to control the contents of Future FinTech's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Future FinTech's SEC filings, press releases, and market communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Future FinTech, and their access to material information not available to the public, the Individual Defendants knew the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

31.    The Individual Defendants are liable for the false statements and omissions pleaded herein under Section 10(b) and 20(a) of the Exchange Act, and Rule 10b-5(b) thereunder.  Huang is also liable for the manipulative trading and scheme claims brought under Sections 9(a), 9(f), and Rule 10b-5(a) and (c) herein.

## SUBSTANTIVE ALLEGATIONS

## I.    BACKGROUND

### A.    Overview of the Nasdaq Capital Market Listing Requirements

32.    According to the Nasdaq Rule 5550, "[a] Company that has its Primary Equity Security listed on the Capital Market must continue to meet all of the requirements set forth in Rule 5550(a) . . . ."  Nasdaq Rule 5550.  Nasdaq Rule 5550(a)(2) states that for continued listing, the "[m]inimum bid price [must be] at least $1 per share[.]"  Nasdaq Rule 5550(a)(2).

33.    Nasdaq states the following on its website about delisting:

Delisting is the process where a company's stock is removed from a stock exchange, making it no longer available for public trading.

***This transition is crucial as it impacts how the stock is traded and can significantly alter a company's financial strategy and investor relations.***

***Stock exchanges set financial thresholds that companies must maintain, such as minimum share price and market capitalization.***

\*      \*      \*

***Falling short of these benchmarks can trigger delisting, signaling potential trouble within the company and possibly leading to decreased investor confidence and a decline in stock value.***

\*      \*      \*

***[Involuntary] delisting is often perceived negatively, indicating serious issues within the company, and can lead to significant market uncertainty and a loss of investor confidence.***

*For investors, involuntary delisting is a red flag, signaling potential risks and the need for cautious evaluation. It often necessitates a thorough reassessment of the investment's viability and the company's future prospects.*

\*    \*    \*

### Impact of Delisting on Investors

\*    \*    \*

The initial reaction to delisting can significantly affect investor sentiment, often leading to a sharp sell-off.

*The urgency to liquidate positions, especially in cases of involuntary delisting, can result in substantial financial losses for shareholders.*

\*    \*    \*

*Delisting is a significant event in the life cycle of a publicly traded company and has far-reaching implications for investors.*[11]

### B.    Future FinTech

34.    In 1998, Future FinTech was incorporated under the name Cyber Public Relations, Inc.  Future FinTech, Annual Report 9 (Form 10-K) (Sept. 3, 2019).[12]

35.    In 2008, the Company became an indirect holding company for SkyPeople Juice Group Co. Ltd. and changed its name to SkyPeople Fruit Juice,

---

[11]    True Tamplin, *Delisting | Definition, Causes, Types, Process, Impact, Strategies*, NASDAQ, INC. (Dec. 21, 2013), https://www.nasdaq.com/articles/delisting-definition-causes-types-process-impact-strategies.

[12]    https://www.sec.gov/Archives/edgar/data/1066923/000121390019017066/f10k2018_futurefintech.htm.

Inc. ("SkyPeople"). *Id.* As SkyPeople, the company engaged in the production and sale of fruit juices, purees, and concentrates. *Id.* at iii.

36.    In 2017, the Company changed its name to Future FinTech as part of a business transition to blockchain technology and e-commerce. *Id.* at iii, 10.

37.    In or about August 2019, Future FinTech's stock price dropped below $1.00 per share and continued trending downward in the following months, dropping to $0.65 in early November 2019, based on information available on Bloomberg Law. *See* Ex. E, Future FinTech Stock Price Data from Bloomberg Law from August 6, 2019 to May 7, 2021 at 12-14.

38.    On November 4, 2019, Nasdaq notified Future FinTech that the Company was not in compliance with the minimum bid price requirement under Nasdaq Rule 5550(a)(2) because the closing bid price for Future FinTech's stock had fallen below $1.00 per share for 30 consecutive trading days. *See* Future FinTech, Current Report, Item 3.01 (Form 8-K) (Nov. 8, 2019) ("Nov. 8, 2019 8-K").[13]

39.    Nasdaq's letter notified Future FinTech that it had 180 days to meet Nasdaq's minimum bid price requirement or face potential delisting. *See id.*

---

[13]    https://www.sec.gov/Archives/edgar/data/1066923/000121390019022582/f8k110419_futurefintech.htm.

40.    On November 8, 2019, Future FinTech filed a Form 8-K with the SEC notifying the public of the Nasdaq's letter.  The filing assured the public that "[t]he Company intends to continue actively monitoring the bid price for its common stock between now and the expiration of the Compliance Period [May 4, 2020] and will consider all available options to resolve the deficiency and regain compliance with the Minimum Bid Price Requirement." *See id*.

41.    On December 27, 2019, Future FinTech's stock price fell to $0.435. Ex. E at 11.

### C.    Huang

42.    In December 2017, Huang opened several new financial accounts at a financial institution in Hong Kong, including a securities account linked to a savings account.  *See* Ex. F, Huang Financial Accounts Opening Documents. Huang was the sole account holder on both accounts and the only person with authority over either account.  *Id.*

43.    For at least four months prior to January 2020, there were no stocks traded in Huang's securities account.  *See* Ex. C, Huang Securities Account Statements at 1–2.

44.    In sworn investigative testimony before the SEC on April 26, 2021, Huang stated that, in approximately late 2019 or early 2020, he was approached by

Future FinTech's founder and former CEO, Yongke Xue, about the possibility of Huang becoming CEO of Future FinTech.  *See* Ex. B at 29:4–30:18.

45.    On January 13, 2020, Huang's securities account began trading in one stock, Future FinTech.  *See* Ex. C at 3.

46.    On March 4, 2020, Huang was named CEO of Future FinTech.  *See* Mar. 10, 2020 8-K.

47.    Between January 2020 and January 2021, Huang used his securities account to purchase over 667,000 Future FinTech shares and sell 575,500 Future FinTech shares in approximately 390 transactions.  *See* Ex. C.

48.    In ten transactions between March 23, 2020, and June 19, 2020, Huang loaned a total of $289,000 to Future FinTech to help it cover Future FinTech's operating expenses, based on bank documents obtained by the SEC.  *See* Ex. A ¶ 34; Ex. G, Huang Loans to Future FinTech.

49.    Proceeds from his Future FinTech stock sales funded $259,000 of the $289,000 Huang loaned to Future FinTech.  Ex. A ¶ 35.

50.    Based on bank account records obtained by the SEC, on January 9, 2021, Future FinTech repaid Huang's loan.  *See* Ex. H, Loan Repayment Records.

## II.    HUANG ENGAGED IN MANIPULATIVE TRANSACTIONS TO ARTIFICIALLY INCREASE FUTURE FINTECH STOCK PRICE

### A.    Huang Placed Manipulative Trades from January 13, 2020, through April 9, 2020

51.    Attached hereto as Exhibit I is a chart showing Huang's trading volume compared with the total reported trading volume for Future FinTech stock from January 13, 2020 to April 9, 2020.  This chart is based on publicly available trading data and Huang's account statements.  As reflected in the chart, there were seven days during that period when Huang's trading constituted 26% or more of the daily reported trading volume of the stock.

52.    Attached hereto as Exhibit J is a spreadsheet the SEC created that shows a sample of Huang's trading that reflects his placing of multiple buy orders in short timeframes and/or the placing of limit buy orders[14] with escalating limit prices from one order to the next.  Ex. K ¶ 25.  According to the SEC, this chart accurately summarizes the Future FinTech stock transaction data reflected in the Wharton Research Data Services ("WRDS") Trade and Quote ("TAQ") database.  Ex. K ¶¶ 24, 25.

53.    Attached hereto as Exhibit L is a spreadsheet comparing various Huang purchases with the National Best Bid and Offer ("NBBO")[15] spread,

---

[14]    A limit buy order is used when a trader wants to buy a security at a specific price.

[15]    In general terms, the NBBO means the best bid (the highest price any buyer

reflecting the many instances that Huang purchased stock at the top of the NBBO spread, trades that generally would not make economic sense for an investor who sought to buy the stock at the lowest available price.  Ex. K ¶ 26.  According to the SEC, this chart accurately summarizes the Future FinTech stock transaction data reflected in the WRDS TAQ database.  *Id*.  In contrast, other market participants typically purchased Future FinTech shares in the middle of the NBBO spread.

54.    Prior to January 13, 2020, Huang had never purchased any Future FinTech stock.  Ex. A ¶ 38.

55.    From January 13, 2020, until Huang became CEO on March 4, 2020, Huang purchased 500,379 shares of Future FinTech in his account, with no sales, based on account statements.  Ex. A ¶ 39; Exs. C at 3-9 & I.

56.    Future FinTech's share price at the time of Huang's initial purchase on January 13, 2020, was $0.629 per share.  Ex. A ¶ 40.  Huang purchased 4,750 Future FinTech shares that day.  Ex. A ¶ 40; Exs. C at 3 & I at 1.

57.    Future FinTech stock's closing price on January 13, 2020, was $0.65 per share.  Ex. E at 11.

58.    Going forward, the share price of Future FinTech trended upward, closing above $1.00 for the first time on February 21, 2020.  *Id*. at 10-11.

---

is willing to offer to buy the stock) and the best offer (the lowest price any seller is willing to accept for the stock).  *See* 17 C.F.R. § 242.600(b)(15).

59.     The majority of Huang's Future FinTech stock purchases fell within the price range of $0.90 to $0.98 per share.  Ex. A ¶ 43; Exs. C at 3-9 & I.

60.     According to the SEC, from January 13, 2020, through April 9, 2020, Huang purchased over 570,000 Future FinTech shares at a total cost of more than $520,000, placing buy orders on two-thirds of the trading days in that period.  Ex. A ¶ 44.

61.     Oftentimes, Huang placed multiple buy orders in short timeframes, pushing the stock price upward.  *Id*. at ¶ 45.

62.     On seven days in 2020 (January 27–28; February 4, 6, and 14; March 16; and April 8), Huang's purchases of Future FinTech were 26% or more of Future FinTech's daily trading volume.  Paragraphs 63-86 below detail four examples of such trading.

### 1.     Huang's Trading on January 27, 2020

63.     On January 27, 2020, Huang's trading in Future FinTech stock constituted 42% of the reported daily trading volume.  Ex. I at 1.

64.     That morning, when the Nasdaq market opened, Future FinTech stock's opening price was $0.79 per share.  Ex. E at 11.

65.     That day, Huang placed 13 block purchase orders, ranging in size from 2,000 to 20,000 shares, for a total of 91,000 shares in a 23-minute span that dominated trading activity.  Ex. J at 1.

66.    Many of the limit buy orders had escalating prices, as depicted below:

| DATE | TIME | ORDER QUANTITY | LIMIT BUY PRICE |
|---|---|---|---|
| 1/27/2020 | 11:56 am | 2,000 | $0.81 |
| 1/27/2020 | 11:57 am | 3,000 | $0.82 |
| 1/27/2020 | 11:58 am | 5,000 | $0.82 |
| 1/27/2020 | 11:59 am | 2,000 | $0.84 |
| 1/27/2020 | 12:01 pm | 5,000 | $0.84 |
| 1/27/2020 | 12:01 pm | 10,000 | $0.84 |
| 1/27/2020 | 12:04 pm | 10,000 | $0.88 |
| 1/27/2020 | 12:05 pm | 10,000 | $0.88 |
| 1/27/2020 | 12:08 pm | 2,000 | $0.90 |
| 1/27/2020 | 12:10 pm | 20,000 | $0.88 |
| 1/27/2020 | 12:13 pm | 2,000 | $0.90 |
| 1/27/2020 | 12:16 pm | 10,000 | $0.90 |
| 1/27/2020 | 12:19 pm | 10,000 | $0.90 |

*Id.*

67.    Future FinTech stock's closing price on January 27, 2020, was $0.8398 per share.  Ex. E at 11.

## 2.    Huang's Trading on January 28, 2020

68.    On January 28, 2020, Huang's trading in Future FinTech stock constituted 43% of the reported daily trading volume.  Ex. I at 1.

69.    That morning, when the Nasdaq market opened, Future FinTech stock's opening price was $0.8575 per share.  Ex. E at 11.

70.    Shortly after 10:30 am, Huang began trading Future FinTech stock by placing a buy order for 2,000 shares with a limit price of $0.87, the top of the NBBO.  Exs. J at 1 & L at 1.

71.     In less than an hour, Huang placed eight Future FinTech buy orders near the top or above the NBBO spread for 31,000 shares—five orders for 5,000 shares and three orders for 2,000 shares.  Ex. J at 1.  With one exception, the limit prices of these orders were escalating when Huang set the limit price as depicted in the table below and Exhibits J at 1 and L at 1:

| DATE | TIME | ORDER QUANTITY | LIMIT BUY PRICE | BID | ASK |
|------|------|----------------|-----------------|-----|-----|
| 1/28/2020 | 10:32 am | 2,000 | $0.87 | $0.8501 | $0.8700 |
| 1/28/2020 | 10:45 am | 5,000 | $0.89 | $0.8500 | $0.8597 |
| 1/28/2020 | 10:53 am | 5,000 | $0.89 | $0.8585 | $0.8597 |
| 1/28/2020 | 11:05 am | 5,000 | $0.86 | $0.8502 | $0.8596 |
| 1/28/2020 | 11:06 am | 5,000 | $0.87 | $0.8502 | $0.8700 |
| 1/28/2020 | 11:08 am | 5,000 | $0.87 | $0.8502 | $0.8700 |
| 1/28/2020 | 11:10 am | 2,000 | $0.88 | $0.8701 | $0.8800 |
| 1/28/2020 | 11:28 am | 2,000 | $0.88 | $0.8701 | $0.8799 |

72.     According to the SEC, when Huang's last purchase order was executed at 11:46 am, his trading for the day had exceeded the volume of all other traders up to that point.  Ex. A ¶ 59.

73.     Future FinTech stock's closing price on January 28, 2020, was $0.85 per share.  Ex. E at 1.

### 3.    Huang's Trading on February 4, 2020

74.     On February 4, 2020, trading in Future FinTech stock from Huang's securities account constituted 34% of the daily trading volume.  Ex. I at 1.

75.     That morning, when the Nasdaq market opened, Future FinTech stock's opening price was $0.87 per share.  Ex. E at 10.

76.     According to the SEC, beginning at 2:46 pm, when the Future

FinTech stock price was $0.8489 and the NBBO spread was $0.83-$0.849, several

sequential orders and trades were made in Huang's securities account.  Ex. A ¶ 63.

The first order was for 5,000 shares at a limit price of $0.85 per share.  *Id.* This

was followed by a series of 16 limit buy orders in just over 30 minutes.  *Id.*; Exs. J

at 1 & L at 1.

77.     The limit buy orders from Huang's securities account on February 4,

2020, had mostly escalating limit prices at or above the upper limit of the NBBO

spread, as depicted below and in Exhibits J at 1 and L at 1:

| DATE | TIME | ORDER QUANTITY | LIMIT BUY PRICE | BID | ASK |
|---|---|---|---|---|---|
| 2/4/2020 | 9:30 am | 500 | N/A | $0.8650 | $1.0000 |
| 2/4/2020 | 9:30 am | 500 | N/A | $0.8650 | $1.0000 |
| 2/4/2020 | 2:46 pm | 5,000 | $0.85 | $0.8300 | $0.8489 |
| 2/4/2020 | 2:47 pm | 5,000 | $0.85 | $0.8400 | $0.8488 |
| 2/4/2020 | 2:48 pm | 5,000 | $0.87 | $0.8500 | $0.8600 |
| 2/4/2020 | 2:50 pm | 3,000 | $0.88 | $0.8700 | $0.8800 |
| 2/4/2020 | 2:52 pm | 2,000 | $0.90 | $0.8800 | $0.9000 |
| 2/4/2020 | 3:05 pm | 3,000 | $0.90 | $0.8700 | $0.8849 |
| 2/4/2020 | 3:06 pm | 1,800 | $0.90 | $0.8700 | $0.8849 |
| 2/4/2020 | 3:07 pm | 3,000 | $0.90 | $0.8700 | $0.8900 |
| 2/4/2020 | 3:09 pm | 3,000 | $0.89 | $0.8701 | $0.8800 |
| 2/4/2020 | 3:10 pm | 3,000 | $0.90 | $0.8901 | $0.9000 |
| 2/4/2020 | 3:11 pm | 5,000 | $0.91 | $0.8900 | $0.8907 |
| 2/4/2020 | 3:11 pm | 3,000 | $0.92 | $0.9100 | $0.9194 |
| 2/4/2020 | 3:13 pm | 3,000 | $0.94 | $0.9201 | $0.9300 |
| 2/4/2020 | 3:14 pm | 1,000 | $0.95 | $0.9400 | $0.9470 |
| 2/4/2020 | 3:14 pm | 2,000 | $0.95 | $0.9400 | $0.9500 |
| 2/4/2020 | 3:15 pm | 2,000 | $0.98 | $0.9500 | $0.9699 |

| 2/4/2020 | 3:16 pm | 3,000 | $0.98 | $0.9200 | $0.9700 |
| 2/4/2020 | 3:17 pm | 1,000 | $0.99 | $0.9200 | $0.9800 |
| 2/4/2020 | 3:18 pm | 2,000 | $0.97 | $0.9600 | $0.9900 |
| 2/4/2020 | 3:25 pm | 2,000 | $0.98 | $0.9600 | $0.9673 |
| 2/4/2020 | 3:59 pm | 2,000 | MKT | $0.9300 | $0.9600 |

78.     According to the SEC, as a result of the trading from Huang's securities account that day, the Future FinTech market price initially rose to $0.98 and the NBBO spread rose to $0.9215-$0.98.  Ex. A ¶ 65.

79.     According to the SEC, the Future FinTech stock price then dropped to $0.9215.  Ex. A ¶ 66.  At that time, three additional limit orders were placed from Huang's securities account with limit prices near or above the upper limit of the prevailing NBBO spread, as depicted in the three limit buy orders from 3:17 pm to 3:25 pm in the chart in paragraph 77 above and in Exhibit I.  *Id*.

80.     According to the SEC, the final purchase order of the day from Huang's securities account was made less than one minute before the market closed, with a price near the top of the NBBO spread.  Ex. A ¶ 67.  Huang's final purchase order was for 2,000 shares at a price of $0.9621 per share.  *Id*.

81.     Future FinTech stock's closing price on February 4, 2020, was $0.97 per share.  Ex. E at 10.

### 4.     Huang's Trading on February 6, 2020

82.     The opening Future FinTech stock price on February 6, 2020, was $0.89 per share.  Ex. E at 10.

83.     That day, the purchase of 103,000 Future FinTech shares through Huang's securities account constituted 60% of Future FinTech's reported daily trading volume.  Ex. I at 1.

84.     According to the SEC, purchasing through Huang's securities account began at 9:57 am and within nine minutes, the price was up to $1.05, at which point his trading stopped.  Ex. A ¶ 71.

85.     According to the SEC, after the price dropped to $0.91, a series of five buy orders were placed through Huang's securities account during the last five minutes of trading, with the last execution price at $0.9799.  Ex. A ¶ 72.

86.     Future FinTech stock's closing price on February 6, 2020, was $0.9141 per share.  Ex. E at 10.

### 5.     Huang's Trading in March and April 2020

87.     Based on the account statements the SEC obtained for Huang's securities account, on March 23, 2020, Huang sold Future FinTech shares for the first time, selling 10,000 shares at a price of $1.01 per share for total proceeds of $9,946.77.  Ex. C at 11.

88.     The same day, Huang made a $30,000 loan to Future FinTech, the first of the loans to Future FinTech described above.  Ex. G at 1.

89.    On March 27, 2020, an additional 21,500 Future FinTech shares were sold from Huang's securities account at a price of $0.99 per share for total proceeds of $20,959.03.  Ex. C at 11.

90.    On April 1, 2020, Huang purchased 10,200 Future FinTech shares at an average price of $1.09 per share.  Exs. C at 11 & I at 2.

91.    The opening Future FinTech stock price on April 1, 2020, was $1.05 and the closing price was $1.1281.  Ex. E at 9.

92.    On April 8, 2020, Huang purchased 19,500 Future FinTech shares at an average price of $1.22 per share.  Exs. C at 12 & I at 2.

93.    The opening Future FinTech stock price on April 8, 2020, was $1.18 and the closing price was $1.20.  Exs. E at 9.

94.    On April 9, 2020, 8,500 Future FinTech shares were purchased through Huang's securities account at an average price of $1.20 per share.  Ex. C at 13-14 & I at 2.  The settlement date for the April 9, 2020, transactions was April 14, 2020.  Ex. C at 13-14.

95.    The opening Future FinTech stock price on April 9, 2020, was $1.17 and the closing price was $1.20.  Ex. E at 9.

96.    On April 16, 2020, Future FinTech publicly filed a Form 8-K with the SEC, along with a press release announcing that, as of April 14, 2020, Future FinTech was back in compliance with Nasdaq Rule 5550(a)(2), as the Future

FinTech stock price had closed above $1.00 per share for ten consecutive days. *See* Current Report, Item 8.01 (Form 8-K) (Apr. 16, 2020).[16]

97.    From April 16, 2020, to January 4, 2021, Huang purchased more than 97,000 additional shares of Future FinTech and sold more than 534,000 shares through his offshore securities account.[17]  Ex. A ¶ 84; Ex. C at 14-37.

### 6.    Huang's Offshore Securities Account Is Liquidated and Closed

98.    The final Future FinTech voluntary stock trades in Huang's securities account were placed on January 4, 2021, after which the account was frozen.  Ex. A ¶ 86; Ex. C at 34.

99.    In a letter to Huang dated February 8, 2021, HSBC, the financial institution holding the securities account informed Huang that it was "committed to the highest standards in its controls against financial crimes" and, after a "comprehensive review" of his account, they would no longer be able to provide him with banking services.  *See* Ex. M at 1.

100.    On March 3, 2021, Huang's offshore securities account was liquidated, including 107,497 shares of Future FinTech at a price of $5.818 per

---

[16]    https://www.sec.gov/Archives/edgar/data/1066923/000121390020009297/ ea120733-8k_futurefintech.htm

[17]    Beginning in June 2020, Huang also traded sporadically in four other securities through his Hong Kong securities account, based on Huang's securities account statements.  Ex. C at 19-37.

share for total proceeds of $625,435.86.  *See* Ex. A ¶ 89; Ex. C at 37.  The account was closed on March 10, 2021.  *See id.*

### B. Huang Knew of His Own Future FinTech Trades and Controlled His Offshore Securities Account

101.   Huang was the sole account holder on his securities account, and proceeds in his securities account from Future FinTech stock sales were used to fund Huang's personal expenses, as well as $259,000 of the $289,000 Huang loaned to Future FinTech.  Ex. A ¶ 106.

102.   In addition, according to the SEC, audio recordings of telephone conversations between the financial institution holding Huang's securities account and Huang concerning banking or trading issues related to his securities account indicate Huang's control over the securities account.  *Id.* at ¶ 101.

103.   All telephone calls between the financial institution holding Huang's securities account and Huang were made from the country Huang was in at the time, as described in the paragraphs below.  *Id.* at ¶ 102.

104.   In one call originating from Dubai, United Arab Emirates ("UAE"), the caller was identified as Mr. Huang.  Mr. Huang complained of being unable to trade for 20 days and provided the bank representative with two telephone numbers—a UAE number and a United Kingdom ("UK") number.  *Id.* at ¶ 103.

105.   Huang later admitted in testimony before the SEC on April 26, 2021, that the UK number was his cell phone number.  *Id.* at ¶ 104.

106.    In another call originating from London, the caller identified himself as Shanchun Huang and complained that he was unable to sell or buy U.S. stocks in his account.  *Id.* at ¶ 105.  During the call, Huang also provided a credit card number matching one of Huang's credit card accounts.  *Id.*

107.    Finally, the location of credit card charges from Huang's two credit card accounts with the offshore financial institution and location data from the IP addresses used to access Huang's securities account and make Future FinTech trades in 2020 overwhelmingly corresponded to the locations Huang moved to throughout the year.  *Id.* at ¶¶ 99–100.

108.    At the beginning of 2020, Huang lived in China.  *Id.* at ¶ 91.  Huang's credit card charges and IP addresses from January 2020 correspond to China.  *Id.* at ¶ 92.  In or about late January 2020, Huang left China to live in Dubai, where he remained through August 2020.  *Id.* at ¶ 93.  Huang's credit card charges and IP addresses from February 2020 through August 2020 correspond to Dubai.  *Id.* at ¶ 94.

109.    In approximately September 2020, Huang left Dubai and began living in London, UK.  *Id.* at ¶ 97.  He lived in London from September 2020 through the time his securities account was liquidated in March 2021, except for a visit to Dubai in late January through mid-February 2021.  *Id.* at ¶ 98. Beginning in

September 2020 and going forward, Huang's credit card charges and IP addresses correspond to London.[18]  *Id.* at ¶ 99.

### C.   Huang Failed to Disclose His Ownership and Purchases of Future FinTech Stock

110.    As alleged above, Huang was named CEO and a director of Future FinTech on March 4, 2020.  *Supra* ¶ 10.

111.    Every director or officer of a company that issues any equity security registered pursuant to Section 12 of the Exchange Act is required to file with the SEC, within ten days after becoming an officer or director, a statement disclosing the amount of stock in that company that the officer or director beneficially owns. *See* 15 U.S.C. § 78p(a).

112.    Subsequent statements must be filed if there is a change in stock ownership.  *See* 15 U.S.C. § 78p(a)(2)(C).  Such additional statements must indicate ownership by the officer or director at the date of filing and any changes in ownership since the most recent filing.  *See* 15 U.S.C. § 78p(a)(3)(B).

---

[18]    On February 4, 6, and 10, 2020, on March 27, 2020, on April 9, 2020, on May 22, 2020, and on June 16, 2020, trading in Huang's securities account appears to have occurred in both Dubai and Hong Kong or China.  *Id.* at ¶¶ 95-96.  The only plausible inferences from the facts alleged is that either Huang spoofed the location of one of the other IP addresses used on the dates when trades were made from IP addresses in other locations or that someone he authorized and directed made the relevant trades on those days.

113.    Pursuant to Rule 16a-3 under the Exchange Act [17 C.F.R. § 240.16a-3], initial statements of beneficial ownership must be filed on Form 3, statements of changes in beneficial ownership must be filed on Form 4, and annual statements of changes in beneficial ownership must be filed on Form 5.  *See* 56 Fed. Reg. 7242-01, 7267-68, Reporting Transactions and Holdings (Feb. 21, 1991).

114.    Huang failed to file a Form 3 disclosing his ownership of Future FinTech stock with the SEC within ten days of becoming CEO on March 4, 2020.

115.    According to the SEC, on March 4, 2020, Huang owned 500,379 shares of Future FinTech stock.  Ex. A ¶¶ 39, 108; Ex. C at 7.

116.    On March 3, 2021, all shares, including Future FinTech stocks, in Huang's securities account were liquidated and the account was closed.  Ex. C at 37.

117.    According to Huang's account statements, between March 4, 2020, and March 3, 2021, Huang purchased over 165,000 Future FinTech shares and sold more than 680,500 Future FinTech shares in more than 250 transactions.  Ex. A ¶ 113; Ex. C at 7-37.

118.    Huang never filed any Form 4s or Form 5s with the SEC disclosing his numerous Future FinTech stock transactions.  Ex. A ¶ 114.

119.    On March 12, 2021, the Company and Huang belatedly filed a Form 3 with the SEC, which had a reporting date of March 4, 2020, the day Huang became

Future FinTech's CEO.  *See* Huang Form 3 (Mar. 12, 2021) (image appears at ¶140 herein).[19]

120.    In answer to Item 2 of the form, which asks for the "Date of Event Requiring Statement," Huang answered "03/04/2020."  *Id.*  However, the tables for securities owned were left blank, and in the Explanation of Responses, Huang represented: "No securities are beneficially owned."  *Id.*  Huang did not disclose in his Form 3 that he had owned shares in Future FinTech from the time he became CEO on March 4, 2020, through March 3, 2021, when he liquidated his shares.  *Id.*

## III.  MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS CONCERNING HUANG'S MANIPULATIVE TRADING

121.    On March 10, 2020, the Company issued a press release entitled "Future FinTech Announces Shanchun Huang as New CEO" ("Huang Hiring PR").  This press release stated, in pertinent part:

> Future FinTech Group Inc. (Nasdaq: FTFT; the "Company"), a company engages in blockchain based e-commerce, ***announced that its board of directors appointed Mr. Shanchun Huang (also known as Shawn Shanchun Huang) as the Company's Chief Executive Officer and a director of the Board, effective March 4, 2020.*** Mr. Yongke Xue resigned as the Chief Executive Officer of the Company on March 4, 2020 but will remain as the Chairman of the Board of Directors of the Company (the "Board").
>
> ***Mr. Huang has over 16 years of experience in the financial service and investment industry.*** He has provided financing solutions and

---

[19]    https://www.sec.gov/Archives/edgar/data/1513689/000121390021015031/xslF345X02/ownership.xml.

advice for high-growth companies in China and successfully assisted 37 enterprises to complete fundraising or public offerings in China. Most recently, ***Mr. Huang served as the president of Wealth Index (Beijing) Fund Management Co., Ltd., which provides private equity fund management service, from March 2011 to March 2020 and president of Wealth Index (Beijing) International Investment Consulting Co., Ltd., which provides investment management and consulting services for non-securities related business, from August 2004 to March 2020.*** From May 2001 to June 2004, Mr. Huang was the vice president of Zhejiang Geely Holding Group Corporation, a global automobile company headquartered in Hangzhou, China. Mr. Huang graduated from Hefei Staff University of Science and Technology in July 1986 majoring in news collection and editing.

***Mr. Huang is also a prolific writer and has published four books in the finance and investment area in China.*** These books include How to Raise Money to Start a Business, the Road to Red Chips, ***Comparison and Research Among Global Capital Markets, and The Practice of Small and Medium Enterprises Listed Overseas and Hong Kong.*** Mr. Huang is the Knight Commander of Grace of the Order of Saint Lazarus of Jerusalem, and the first Grand Prior of the Grand Priory of China.

"We are very pleased that Mr. Huang will be joining the team as our Chief Executive Officer," said Yongke Xue, Chairman of the Board of the Company. "A key pillar of the Company's strategy is bringing onboard top leadership to accelerate our blockchain based e-commerce, digital asset technology and applications, and financial technology and service business. ***Mr. Huang brings the right mix of talent, experience and success to lead the Company's next stage of growth****.*"

"I'm thrilled to join Future FinTech's leadership team at a time when blockchain and traditional industry are intersecting to create breakthroughs," said Shanchun Huang. "I look forward to working with the team to execute on our transformational growth strategy."

122.    On March 10, 2020, the Company filed with the SEC its Form 8-K signed by Defendant Huang.  The March 10, 2020 8-K contained the following statements concerning Huang's appointment as the CEO of Future FinTech:

> On March 4, 2020, the Board appointed Mr. Shanchun Huang (also known as Shawn Shanchuan Huang) as the Company's Chief Executive Officer and a member of the Board to fill the vacancies created by the resignation of Mr. Xue and Mr. Yan.
>
> Mr. Huang, age 54, ***has served as the president of Wealth Index (Beijing) Fund Management Co., Ltd., which provides private equity fund management service, from March 2011 to March 2020, and as the president of Wealth Index (Beijing) International Investment Consulting Co., Ltd., which provides investment management and consulting services for non-securities related business, from August 2004 to March 2020.*** From May 2001 to June 2004, Mr. Huang was the vice president of Zhejiang Geely Holding Group Corporation, a global automobile company headquartered in Hangzhou, China. Mr. Huang graduated from Hefei Staff University of Science and Technology in July, 1986, majoring in news collection and editing. ***The Board believes that Mr. Huang's significant business experience will be an asset to the Company and the Board.***

123.    The statements in the preceding paragraphs, ¶¶121-22, made by Future FinTech and Huang, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements touted Defendant Huang's talent, experience and success to lead the Company to its next stage of growth, when Huang was at the time engaged in manipulative stock transactions with the intent to artificially increase the price of Future FinTech's publicly traded stock and failed to disclose that he was

manipulating the Company's stock at the time to induce investors to purchase

Future FinTech stock.

124.   On June 2, 2020, the Company filed with the SEC its annual report on

Form 10-K for the period ending December 31, 2019 (the "2019 Annual Report").

The 2019 Annual Report was signed by Defendants Huang and Chen and

contained the following statements concerning Future FinTech's delisting from

Nasdaq:

> ***In recent years, our Common Stock has been in danger of being delisted from the NASDAQ Stock Market ("NASDAQ").***
>
> On each of April 20, 2016, May 24, 2016 and August 17, 2016, the Company received a notification letter from the staff of the Listing Qualifications Department of NASDAQ (the "Staff") indicating that the Company was not in compliance with NASDAQ's continued listing requirements because the Company was not in compliance with the NASDAQ Listing Rule 5250(c)(1) (the "Rule") with respect to certain of its annual and quarterly reports.
>
> On October 12, 2016, the Company received a delisting determination letter (the "Determination Letter") from the Staff notifying the Company that because the Company had not filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 (the "Form 10-K") and its Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2016 and June 30, 2016, (together, the "Reports") by October 11, 2016, the deadline by which the Company was to file all Reports in order to regain compliance with the Rule, the Company's common stock was subject to delisting from the NASDAQ Global Market.
>
> On October 19, 2016, the Company requested a hearing before the NASDAQ Hearings Panel (the "Panel") under Listing Rule 5815(a) to appeal the delisting determination from the Staff. On November 2, 2016, the Company was granted an extended stay as to the suspension

of the Company's shares from trading by the Panel until the Company's scheduled hearing before the Panel on December 15, 2016 and issuance of a final Panel decision. Following a hearing, the Panel required that the Company regain compliance by January 31, 2017. By letter dated February 2, 2017, the Panel notified the Company that (i) the Company had regained compliance, (ii) the Company's Common Stock would continue to be listed on the NASDAQ Global Market, and (iii) the Panel was closing the matter.

On December 1, 2017, the Company received written notice from NASDAQ stating that the Company was not in compliance with the requirement of the minimum Market Value of Publicly Held Shares ("MVPHS") of $5,000,000 for continued listing on the NASDAQ Global Market, as set forth in NASDAQ Listing Rule 5450(b)(1)(C). The Company received notice that it had regained compliance on January 4, 2018.

On November 26, 2018, the Company received written notice from the NASDAQ Stock Market stating that the Company was not in compliance with the requirement of maintaining a minimum of $10,000,000 in stockholders' equity for continued listing on the NASDAQ Global Market, as set forth in Nasdaq Listing Rule 5450(b)(1)(A). Alternatively, the Company could consider applying to transfer the Company's securities to the NASDAQ Capital Market, which has a minimum stockholders' equity requirement of $2,500,000.

On December 28, 2018, the Company received confirmation from the Nasdaq Stock Market that its application to transfer the listing of its common stock from the Nasdaq Global Market to the Nasdaq Capital Market (the "Capital Market") had been approved. The Company's common stock began trading on the Capital Market on December 31, 2018.

On February 28, 2019, the Company received a letter from NASDAQ notifying the Company that, because the closing bid price for the Company's common stock listed on NASDAQ was below $1.00 for 30 consecutive trading days, the Company no longer met the minimum bid price requirement for continued listing on NASDAQ under NASDAQ Marketplace Rule 5550(a)(2). On May 7, 2019, the

Company received a written notification from the NASDAQ Stock Market Listing Qualifications Staff indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.

On April 17, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 10-K").

On May 21, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2019.

On August 20, 2019, the Company received a notification letter from the NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019.

On October 16, 2019, the Company received a letter from the NASDAQ Listing Qualifications Staff notifying the Company that it has regained compliance with NASDAQ's periodic filing requirements for continued listing on the Nasdaq Capital Market. The letter noted that as a result of the September 3, 2019 filing of the 2018 10-K and the September 30, 2019 filing of the Forms 10-Q for the periods ended March 31, and June 30, 2019 with the Securities and Exchange Commission, the Company has regained compliance with Listing Rule 5250(c)(1) and the matter is now closed.

***On September 4, 2019, the Company received written notice from the NASDAQ stating that the Company did not meet the requirement of maintaining a minimum of $2,500,000 in stockholders' equity for continued listing on the NASDAQ Capital Market, as set forth in NASDAQ Listing Rule 5550(b)(1), the Company also does not meet the alternative of market value of listed securities of $35 million under NASDAQ Listing Rule 5550(b)(2) or net income from continuing operations of $500,000 in the most recently completed fiscal year or in two of the last three most***

39

*recently completed fiscal years under NASDAQ Listing Rule 5550(b)(3), and the Company is no longer in compliance with the NASDAQ Listing Rules. On March 18, 2020, the Company received written notice form [sic] NASDAQ stating that the Company complies with the Listing Rule 5550(b)(1). However, as noted in NASDAQ letter dated December 17, 2019, if the Company fails to evidence such compliance upon filing its Form 10-K for the fiscal year ended December 31, 2019, it may be subject to delisting. At that time, NASDAQ will provide written notification to the Company, which may then appeal Staff's determination to a Hearings Panel.*[20]

125.    The statements in the preceding paragraph were repeated in the Company's November 4, 2020, Amendment No. 1 to 2019 Annual Report on Form 10-K/A, filed with the SEC and signed by Defendants Huang and Chen.[21]  Oddly, despite having previously disclosed that it received a notice from Nasdaq on November 4, 2019 notifying Future FinTech that it was not in compliance with the $1 minimum bid price, this information was omitted entirely from the 2019 10-K and its amendment.

126.    Defendants Huang and Chen signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that they filed with the SEC in connection with the filing of the 2019 Annual Report.  The certifications state that the annual report "fully complies with the requirements of Section 13(a) or 15(d) of the

---

[20]    Future FinTech, Annual Report 40-41 (June 2, 2020), https://www.sec.gov/Archives/edgar/data/1066923/000121390020013926/f10k2019_futurefintech.htm.

[21]    Future FinTech, Annual Report, Amendment No. 1 at 40-41 (Nov. 4, 2020), https://www.sec.gov/Archives/edgar/data/1066923/000121390020035017/f10k2019a1_futurefintech.htm.

Securities Exchange Act of 1934[,]" and that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  *See* Exs. 32.1, 32.2 to the 2019 Annual Report.

127.    Rule 13a-14(a) certifications that Huang and Chen also signed in connection with the filing of the 2019 Annual Report state in relevant part:

> 2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact*** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> *        *        *

> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): . . .
> **(b) *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.***

*See* Exs. 31.1, 31.2 to the 2019 Annual Report.[22]

---

[22]    https://www.sec.gov/Archives/edgar/data/1066923/000121390020013926/f10k2019ex31-1_futurefintech.htm; https://www.sec.gov/Archives/edgar/data/1066923/000121390020013926/f10k2019ex31-2_futurefintech.htm.

128.   The statements described in ¶¶124-27 were materially false and misleading when made because Future FinTech, Huang, and Chen knowingly and/or recklessly made them while omitting the manipulative trading that Defendant Huang undertook in order to artificially inflate the price of the Company's stock to above $1.00 per share to prevent Future FinTech's delisting from Nasdaq, for his personal gain,  and to induce investors to purchase Future FinTech stock.

129.   On April 15, 2021, the Company filed with the SEC its annual report on Form 10-K for the period ending December 31, 2020 (the "2020 Annual Report").  The 2020 Annual Report was signed by Defendants Huang and Yi and contained the following statements concerning Future FinTech's delisting from Nasdaq:

> **In recent years, our Common Stock has been in danger of being delisted from the NASDAQ Stock Market ("NASDAQ").**
>
> On February 28, 2019, the Company received a letter from NASDAQ notifying the Company that, because the closing bid price for the Company's common stock listed on NASDAQ was below $1.00 for 30 consecutive trading days, the Company no longer met the minimum bid price requirement for continued listing on NASDAQ under NASDAQ Marketplace Rule 5550(a)(2). On May 7, 2019, the Company received a written notification from the NASDAQ Stock Market Listing Qualifications Staff indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.
>
> On April 17, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with

NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 10-K"). On May 21, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2019. On August 20, 2019, the Company received a notification letter from the NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019.

On October 16, 2019, the Company received a letter from the NASDAQ notifying the Company that it has regained compliance with NASDAQ's periodic filing requirements for continued listing on the Nasdaq Capital Market. The letter noted that as a result of the September 3, 2019 filing of the Form 10-K for the year ended on December 31, 2018 and the September 30, 2019 filing of the Forms 10-Q for the periods ended March 31, and June 30, 2019 with the Securities and Exchange Commission, the Company has regained compliance with Listing Rule 5250(c)(1) and the matter is now closed.

On September 4, 2019, the Company received written notice from the NASDAQ stating that the Company did not meet the requirement of maintaining a minimum of $2,500,000 in stockholders' equity for continued listing on the NASDAQ Capital Market, as set forth in NASDAQ Listing Rule 5550(b)(1), the Company also does not meet the alternative of market value of listed securities of $35 million under NASDAQ Listing Rule 5550(b)(2) or net income from continuing operations of $500,000 in the most recently completed fiscal year or in two of the last three most recently completed fiscal years under NASDAQ Listing Rule 5550(b)(3), and the Company is no longer in compliance with the NASDAQ Listing Rules. On March 18, 2020, the Company received written notice form [sic] NASDAQ stating that the Company complies with the Listing Rule 5550(b)(1).

***On November 4, 2019, the Company received a letter from the Nasdaq notifying the Company that, because the closing bid price for the Company's common stock listed on Nasdaq was below $1.00***

*for 30 consecutive trading days, the Company no longer meets the minimum bid price requirement for continued listing on Nasdaq under Nasdaq Marketplace Rule 5550(a)(2), which requires a minimum bid price of $1.00 per share. On April 14, 2020, the Company received a written notification from the Nasdaq indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.*

130.    Substantially similar language appeared in the following documents:

a)    Future FinTech's Form 10-K filed with the SEC on April 15, 2022 for the period ended December 31, 2021 (the "2021 Annual Report"), signed by Defendants Huang and Yi;[23]

b)    Future FinTech's October 19, 2022 response to an SEC letter, signed by Defendant Huang;[24]

c)    Future FinTech's December 16, 2022 response to an SEC letter, signed by Defendant Huang;[25]

d)    Future FinTech's February 14, 2023 response to an SEC letter, signed by Defendant Huang;[26] and

---

[23]    Future FinTech, Annual Report 40 (Form 10-K) (Apr. 15, 2022), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001066923/000121390022020106/f10k2021_futurefintech.htm.

[24]    Future FinTech, Correspondence to SEC, Annex A at 42 (Oct. 19, 2022), https://www.sec.gov/Archives/edgar/data/1066923/000121390022064932/filename1.htm.

[25]    Future FinTech, Correspondence to SEC, Annex A at 44 (Dec. 16, 2022), https://www.sec.gov/Archives/edgar/data/1066923/000121390022080468/filename1.htm.

[26]    Future FinTech, Correspondence to SEC, Annex A at 46 (Feb. 14, 2023),

      e)     Future FinTech's Amendment No. 1 to the 2021 Annual Report on Form 10-K/A, filed with the SEC on March 22, 2023, and signed by Defendants Huang and Yi.[27]

131.   The Annual Reports discussed above also contained substantially similar language in certifications made pursuant to SOX as those contained in ¶¶126-27, *supra*.  Specifically, this language appeared in the 2020 Annual Report certified by Huang and Chen, the 2021 Annual Report and Amended No. 1 to the 2021 Annual Report on Form 10K/A certified by Huang and Yi.

132.   The statements described in ¶¶129-31 were materially false and misleading because Future FinTech, Huang, and/or Yi knowingly and/or recklessly made them while omitting the manipulative trading, that Defendant Huang undertook in order to artificially inflate the price of the Company's stock to above $1.00 per share to prevent Future FinTech's delisting from Nasdaq, for his personal gain, and to induce investors to purchase Future FinTech stock.

133.   On April 19, 2023, the Company filed with the SEC its annual report on Form 10-K for the period ending December 31, 2022 (the "2022 Annual Report").  The 2022 Annual Report was signed by Defendants Huang and Yi and

---

https://www.sec.gov/Archives/edgar/data/1066923/000121390023011122/filename1.htm.

[27]   Future FinTech, Annual Report 46 (Amendment No. 1 to Form 10-K) (Mar. 22, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001066923/000121390023022083/f10k2021a1_futurefin.htm.

contained the same false and misleading statements as those in ¶129 above and

added the following language before the paragraph that begins with "On February

28, 2019, the Company received a letter from NASDAQ . . . .":

> *In recent years, our Common Stock has been in danger of being delisted from the NASDAQ Stock Market ("NASDAQ").*
>
> *Our common stock is currently listed on the NASDAQ Capital Market. The NASDAQ Stock Market LLC has requirements that a company must meet in order to remain listed on NASDAQ, for example, NASDAQ rules require us to maintain a minimum bid price of $1.00 per share of our common stock. We may be unable to meet NASDAQ listing requirements, including minimum bid price, minimum levels of stockholders' equity or market values of our common stock in which case, our common stock could be delisted. If our common stock were to be delisted, the liquidity of our common stock would be materially adversely affected and the market price of our common stock could decrease.*

134.    The 2022 Annual Report also contained substantially similar language

in certifications made pursuant to SOX as those contained in ¶¶126-27, *supra*.  The

Annual Report was certified by Huang and Yi.

135.    The statements described in ¶¶133-34, were materially false and

misleading when made because Future FinTech, Huang, and Yi knowingly and/or

recklessly made them while omitting the, manipulative trading, that Defendant

Huang undertook in order to artificially inflate the price of the Company's stock to

above $1.00 per share to prevent Future FinTech's delisting from Nasdaq, for his

personal gain, and to induce investors to purchase Future FinTech stock.

IV.   **MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS CONCERNING REGULATIONS AND INTERNAL CONTROLS**

136.   On April 15, 2021, the Company filed with the SEC the 2020 Annual Report.  The 2020 Annual Report was signed by Defendants Huang and Yi and contained the following statements concerning regulations and internal controls:

> *As a public company, we are obligated to maintain effective internal controls over financial reporting. Our internal controls may be determined not to be effective, which may adversely affect investor confidence in us and, as a result, decrease the value of our Common Stock.*
>
> \* \* \*
>
> *If we become subject to additional scrutiny, criticism and negative publicity involving U.S.-listed China-based companies, we may have to expend significant resources to investigate and resolve the matter which could harm our business operations, this offering and our reputation and could result in a loss of your investment in our shares, especially if such matter cannot be addressed and resolved favorably.*
>
> Recently, U.S. public companies that have substantially all of their operations in China have been the subject of intense scrutiny, criticism and negative publicity by investors, financial commentators and regulatory agencies. *Much of the scrutiny, criticism and negative publicity has centered around financial and accounting irregularities, a lack of effective internal controls over financial accounting, inadequate corporate governance policies or a lack of adherence thereto and, in some cases, allegations of fraud.* As a result of the scrutiny, criticism and negative publicity, the publicly traded stock of many U.S.-listed China-based companies has decreased in value and, in some cases, has become virtually worthless. *Many of these companies have been subject to shareholder lawsuits and SEC enforcement actions and have conducted internal and external investigations into the allegations. On February 21, 2020, the Company has received subpoenas from the SEC's Division of Enforcement requiring us to produce documents and detailed*

47

*information relating to, among other things, the Company's accounting procedures, management oversight, and the sale of HeDeTang Holdings (HK) Ltd. to New Continent International Co., Ltd.* The Company has provided responsive documents and information requested in the subpoena. *It is not clear what effect this sector-wide scrutiny, criticism and negative publicity will have on us and our business. If we become the subject of any unfavorable allegations, whether such allegations are proven to be true or untrue, we will have to expend significant resources to investigate such allegations and/or defend our company.* This situation may be a major distraction to our management. *If such allegations are not proven to be groundless, our business operations will be severely hindered and your investment in our shares could be rendered worthless.*

2020 Annual Report 20, 23.

137.    Substantially similar language appeared in the following documents:

a)    The 2021 Annual Report (at 31) filed with the SEC on April 15, 2022 and signed by Defendants Huang and Yi;

b)    Future FinTech's October 19, 2022 response to an SEC letter (at Annex A at 23), signed by Defendant Huang;

c)    Future FinTech's December 16, 2022 response to an SEC letter (at Annex A at 35), signed by Defendant Huang;

d)    Future FinTech's February 14, 2023 response to an SEC letter (at Annex A at 37), signed by Defendant Huang; and

e)    Future FinTech's Amendment No. 1 to the 2021 Annual Report on Form 10-K/A (at 37) filed with the SEC on March 22, 2023, and signed by Defendants Huang and Yi; and

f)    The 2022 Annual Report (at 44) filed with the SEC on April 19, 2023, signed by Defendants Huang and Yi.

138.    The Annual Reports discussed above also contained substantially similar language in certifications made pursuant to SOX as those contained in ¶¶126-27, *supra*.  Specifically, this language appeared in the 2021 Annual Report, Amendment No. 1 to the 2021 Annual Report on Form 10K/A, and 2022 Annual Report certified by Huang and Yi.

139.    The statements described in ¶¶136-38 were knowingly and/or recklessly materially false and misleading when made by Future FinTech, Huang, and Chen because the statements understated the level of regulatory and compliance risk facing the Company, given that its present CEO secretly engaged in stock transactions to manipulate the price of the Company's stock to increase above $1.00 per share to prevent Future FinTech's delisting from Nasdaq, for his personal gain, and to induce investors to purchase Future FinTech stock.

V.    **MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS CONCERNING HUANG'S OWNERSHIP AND PURCHASES OF FUTURE FINTECH STOCK**

140.    On March 12, 2021, the Company and Defendant Huang filed with the SEC a Form 3, which had a reporting date of March 4, 2020, the day Huang became Future FinTech's CEO.  Defendant Huang signed the Form 3, stating that Huang did not own any Future FinTech shares.  In answer to Item 2 of the form,

which asks for the "Date of Event Requiring Statement," Huang answered

"03/04/2020."  However, the tables for securities owned were left blank, and in the

Explanation of Responses, Huang represented: "No securities are beneficially

owned[,]" as depicted below:

141.   The statements in the preceding paragraph were materially false and misleading when made because Future FinTech and Huang knew or recklessly disregarded that Huang had owned 500,379 shares of Future FinTech stock at the time he became Future FinTech's CEO on March 4, 2020.  Ex. A ¶¶ 108, 112–13; Ex. C at 7.

## VI.   THE TRUTH EMERGES

142.   On January 11, 2024, around or after market close, the SEC posted a press release on its website entitled, "SEC Charges Future FinTech CEO Shanchun Huang With Fraud and Disclosure Failures" (the "SEC Announcement").  The SEC Announcement stated the following:

> The [SEC] today charged Shanchun Huang with manipulative trading in the stock of Future FinTech Group Inc., using an offshore account shortly before he became Future FinTech's CEO in 2020.  The SEC also charged Huang with failing to disclose his beneficial ownership of Future FinTech stock as well as transactions in such stock.

> . . . . Huang allegedly used an account in Hong Kong to place trades in Future FinTech stock beginning in January 2020, at a time when Future FinTech was at risk of being delisted from NASDAQ because its stock price had fallen below NASDAQ's minimum bid price requirement of $1.00 per share. Huang allegedly bought more than 530,000 shares of Future FinTech over a two-month period and repeatedly traded at a volume so large that his trades constituted a high percentage of the daily volume of Future FinTech stock transactions. Huang also allegedly placed multiple buy orders in short timeframes, placed limit buy orders with escalating limit prices from one order to the next, and made trades that generally would not make economic sense for an investor seeking to buy the stock at the lowest available price. The SEC's complaint alleges that Huang's trades were intended to, and at times did, push the Future FinTech stock price up.

For example, on February 6, 2020, when Huang's trading constituted 60 percent of the daily trading volume, he placed multiple buy orders within nine minutes, driving the price up from $0.89 to $1.05, at which point his trading stopped.

Huang was named Future FinTech's CEO in March 2020. Upon becoming CEO of Future FinTech, Huang was required to file initial, annual, and change of ownership forms about his holdings of Future FinTech stock, but he failed to do so for the year after he became CEO. As alleged in the complaint, in March 2021, after he no longer owned any Future FinTech stock, Huang belatedly filed a misleading initial form representing that he owned no Future FinTech stock.

"Timely disclosure of insider stock transactions is a fundamental component of the federal securities laws that ensures the fair operation of our securities markets," said Sheldon L. Pollock, Associate Regional Director of the SEC's New York Regional Office. "CEOs should assume that the use of an offshore account will not prevent the staff of the SEC from identifying manipulative trading."[28]

143.    The SEC Announcement also attached the complaint that the SEC filed against Huang in the United States District Court for the Southern District of New York.  The SEC Complaint stated that Huang "*manipulated the stock price of Future FinTech by buying hundreds of thousands of Future FinTech shares to artificially increase the company's stock price shortly before and after he became CEO in March 2020.*"  Ex. A ¶ 1.

144.    Further, "[t]o induce investors to purchase Future FinTech stock, Huang sought to inflate the share price of Future FinTech to avoid the company

---

[28]    https://www.sec.gov/newsroom/press-releases/2024-5#:~:text=The%20 SEC's%20complaint%2C%20filed%20in,officer%2Dand%2Ddirector%20bar.

being delisted by Nasdaq[.]" *Id.* at ¶ 2.  Future FinTech was facing delisting due to "its failure to maintain a minimum price of $1 per share, which would have made Future FinTech stock less attractive." *Id.*

145.   The market was shocked and started questioning Future FinTech's stability.  For example, on January 11, 2024, after market close, the *Wall Street Journal* published an article stating, "[t]he SEC seeks fines and to have Huang barred from serving as an officer or director of a public company. . . .  The company's website didn't appear to be active on Thursday afternoon."[29]

146.   On this news, the price of Future FinTech's common stock fell by $0.27 per share, or approximately 20.93%, to close at $1.02 per share on January 12, 2024.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

147.   Defendants acted with scienter because at the time they issued public documents and other statements in Future FinTech's name, they knew or, with extreme recklessness, disregarded the fact that such statements were materially false and misleading or omitted material facts necessary to make the statements not misleading.  Defendants knew such documents and statements would be issued or

---

[29]    Dean Seal, *SEC Charges Future FinTech Group CEO Huang With Manipulative Trading*, MARKETSCREENER (Jan. 11, 2024, 5:28 PM), https://www.marketscreener.com/quote/stock/FUTURE-FINTECH-GROUP-INC-35806834/news/SEC-Charges-Future-Fintech-Group-CEO-Huang-With-Manipulative-Trading-45727018/.

disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

148.   The Individual Defendants received information reflecting the true facts regarding Future FinTech, its operations, and business practices; had control over and/or received the Company's materially misleading misstatements; and/or their associations with the Company made them privy to confidential proprietary information concerning Future FinTech.  Accordingly, the Individual Defendants were active and culpable participants in the fraudulent schemes alleged herein. The Individual Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

149.   These facts, in conjunction with the additional indicia of scienter alleged in paragraphs 150 through 186, collectively support a strong inference that throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading.

### A.    *Respondeat Superior* and Agency Principles Apply

150.    Future FinTech is liable for the acts of the Individual Defendants under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so.  The scienter of the Individual Defendants is similarly imputed to Future FinTech under *respondeat superior* and agency principles.

### B.    Defendant Huang Knew About His Own Manipulation of the Market for Future FinTech Stock

151.    A strong inference of Huang's knowledge and manipulative intent can be drawn from his trades in Future FinTech's stock.

152.    Huang necessarily knew that he was trading in Future FinTech stock. He was the sole account holder and the only person with authority over the account.  Exs. A ¶¶ 29, 106; C & F.

153.    Additionally, the timing of Huang's trades suggests that he entered into them for the express purpose of manipulating the stock to get it over the delisting threshold.  According to his own testimony, he was approached by the founder in late 2019/early 2020 about becoming Future FinTech's CEO.  *See* Ex. B at 29:4–30:18.  This timeframe lines up with the Company's receipt of the November 2019 Nasdaq notice that it was below the minimum bid requirement, and the date he began trading in Future FinTech stock—January 13, 2020—well

before the May 4, 2020 deadline to regain compliance. Indeed, due to Huang's trading, the Company was back in compliance in April 2020.

154. Moreover, Huang used common manipulative tactics when trading. Ordinarily, investors seek to buy a stock at the lowest available price. Huang's trading suggests that he was doing the opposite. For example, he repeatedly traded in volumes so high that his trades constituted a high percentage of the daily volume of Future FinTech stock. Ex. I. According to the SEC, he also placed multiple buy orders in short time frames, placed limit buy order (orders to buy the stock at a specified price or better), with escalating limit prices from one order to the next, and typically purchased at the top of the NBBO spread. *See* Exs. A, J, K, L.

155. Huang's concealment of his trades further supports scienter: he never disclosed his ownership of Future FinTech stock in required filings once he became CEO, such as a Form 3 ("Initial Statement of Beneficial Ownership of Securities"), although he was required to do so as CEO and a director of Future Fintech. ¶¶113-14.

156. In a letter to Huang dated February 8, 2021, HSBC, the financial institution holding the securities account in which Huang made the relevant Future FinTech trades, informed Huang that it was "committed to the highest standards in its controls against financial crimes" and, after a "comprehensive review" of his account, they would no longer be able to provide him with banking services. *See*

Client Letter, dated February 8, 2021, Ex. M at 1.  On March 12, 2021, only after

his securities account was closed due to suspected fraud and all his Future FinTech

shares liquidated, the Company and Huang belatedly filed a Form 3 with the SEC

stating that Huang did not own any shares in Future FinTech on March 4, 2020, the

day Huang became Future FinTech's CEO.  This was a lie, as explained above.

157.    In sworn investigative testimony before the SEC on April 26, 2021,

Huang stated that he reviews and ultimately signs and approves Future FinTech's

filings and press releases.  *See* Ex. B at 66:23–25, 72:21–73:6, 74:2–7.  Thus,

Huang necessarily knew the contents of the documents he signed that contained

false and misleading statements, and therefore knew or recklessly disregarded that

their contents were false or misleading in light of his knowledge of his own

manipulative trading practices.

**C.    Defendants Chen and Yi Knew or Recklessly Disregarded Huang's Manipulative Trading**

158.    As CFO from May 21, 2019, until November 30, 2020, Defendant

Chen was necessarily aware of Nasdaq's notice that the Company was in danger of

being delisted if the minimum bid price stayed below $1.00.

159.    The Company's own filing on November 8, 2019 that announced the

Nasdaq notice also stated, "[t]he Company intends to continue actively monitoring

the bid price for its common stock between now and the expiration of the

Compliance Period and will consider all available options to resolve the deficiency

and regain compliance with the Minimum Bid Price Requirement." Nov. 8, 2019 8-K.

160.    As CFO, Chen would have been involved in monitoring the bid price between November 8, 2019 through the end of the Compliance Period (May 4, 2020) and discussing options to resolve the minimum bid price deficiency.

161.    Given that Huang had no incentive to start trading in Future FinTech stocks when he did (that is, before he was formally appointed CEO), and the fact that Huang was to be paid a salary by Future FinTech to be CEO of only $1 U.S. dollar annually, on information and belief,  Huang engaged in the manipulative stock transactions in order to artificially increase the price of Future FinTech stock to meet the Nasdaq $1.00 minimum trade price so that the stock could continue to trade on an efficient market and so Huang could then personally benefit from the increased stock price.  Thus, given Chen's position and the material risk of getting delisted, it is highly likely that Chen was aware of this arrangement.

162.    Yi, who replaced Chen as CFO in November 2020, would necessarily have been apprised of the SEC investigation into Huang's trades.  Based on the date of Huang's investigative testimony, April 26, 2021, the SEC's investigation was necessarily going on since at least that date. Ex. B.  Yi, as CFO, would have been aware that the investigation was ongoing and what it was about.  After all, the

Company's counsel was present during Huang's testimony and represented them both (Huang and Future FinTech). *Id.* at 9:20-10:2.

163.   As such, he would have known or recklessly disregarded that the SEC filings he signed that made the false and misleading statements about the Nasdaq delisting and investigations were false and misleading when made.

164.   Yi, along with Huang, were also motivated to keep Future FinTech's stock price artificially inflated because their salaries were low (approximately $48,000 and $1, respectively) and their compensation was largely stock based:

| Year | Stock Award & Value | Shanchun Huang | Ming Yi |
|---|---|---|---|
| 2021 | Stock Award | 500,000 | 20,000 |
| | Value | $1,405,000 | $56,200 |
| 2022 | Stock Award | 800,000 | 100,000 |
| | Value | $336,000 | $42,000 |
| 2023 | Stock Award | 200,000 | |
| | Value | $248,000 | N/A |

*See* 2021 Annual Report 76; 2022 Annual Report 63.

### D.   Huang's Loans to Future FinTech Support a Strong Inference of Scienter

165.   After becoming CEO, in ten transactions between March 23, 2020, and June 19, 2020, Huang loaned a total of $289,000 to Future FinTech to help cover Future FinTech's operating expenses. *See* Ex. A ¶ 34; Huang Loans to Future FinTech, Ex. G.

166.    Proceeds from Future FinTech stock sales funded $259,000 of the $289,000 that Huang loaned to Future FinTech after he became the CEO of Future FinTech.  Ex. A ¶ 35; Huang Loans to Future FinTech, Ex. G.  In sworn investigative testimony before the SEC on April 26, 2021, Huang stated that, after he became CEO, he "personally had to loan the company money" because "the company didn't have money to pay the rent, to pay the employees."  *See* Ex. B at 33:4–8, 34:20–22.

167.    Notably, Huang's loans to Future FinTech were made in ten separate transactions.  He testified that he did this because "I didn't really have much money.  So I only paid a little by little."  *Id.* at 33:22–34:19.  In fact, a review of the timing of his loans and his stock sales shows that these loans were mostly funded by those sales.  For example, his first sale of Future FinTech stock was made on March 23, 2020, for proceeds of $9,946.77.  *See* Ex. C at 11.  That same day, he loaned the Company $30,000, Ex. G at 1, and sold another $20,959.03 worth of shares a few days later, which covered nearly the entire cost of the loan.  Ex. C at 11.  This pattern continued.  *See* Ex. N.

168.    On January 9, 2021, Future FinTech repaid Huang's loan.  *See* Loan Repayment Records, Ex. H.  Future FinTech's Audit Committee approved one of these interest-free loans from Huang.  The 2020 Annual Report F-18.

169.    Chen was CFO while Huang made these loans and sold thousands of shares to cover them.  Given the close attention being paid to the Company's share price in light of Nasdaq scrutiny and the coordination between Huang's loan amounts and his trading, Chen either knew about Huang's trading or acted with deliberate recklessness in disregarding it.

### E.    Defendants' Financial Experience

170.    Individual Defendants were highly educated, trained, and experienced in investing and finance and were therefore well-aware that their statements regarding Future FinTech's delisting from Nasdaq were false and/or misleading and omitted material information.

171.    Defendant Huang has over 20 years of experience in the financial service and investment industry.  Prior to joining Future FinTech in March 2020, Huang served as the president of Wealth Index (Beijing) Fund Management Co., Ltd., which provides private equity fund management services and invests in privately raised shares, from March 2011 to March 2020 and president of Wealth Index (Beijing) International Investment Consulting Co., Ltd., which provides investment management and consulting services for non-securities related business, from August 2004 to March 2020.  *See* Huang Hiring PR; Ex. B at 43:18-44:3.  From 2004 to March 2020, Huang served as the CEO of Fortune Index Fund Management Co., Ltd., where he was directly participating in the Fund's

investments. *See* Ex. B at 26:25–27:19. Huang also published four books on finance and investment in China and lectured on investment banking at many universities. *See* Ex. B at 30:6–7. These books include *Comparison and Research Among Global Capital Markets*, and *The Practice of Small and Medium Enterprises Listed Overseas and Hong Kong.* Huang Hiring PR. Huang graduated from Hefei Staff University of Science and Technology in July 1986, majoring in news collection and editing. Huang Hiring PR.

172. Defendant Chen has over 20 years of experience in the financial service industry. Bon Natural F-1 at 94. Prior to joining Future FinTech in 2019, Chen served as the CFO of AnZhiXinCheng (Beijing) Technology Co., Ltd. from August 2018 to May 2019. May 22, 2019 8-K. Chen has also served as an independent director of Hello iPayNow (Beijing) Company Ltd. since April 2019. Bon Natural F-1 at 94. From August 2017 to July 2018, Chen served as the CFO of Beijing Logis Technology Development Co., Ltd., a company listed on The National Equities Exchange and Quotations Co., Ltd. of China, which is a Chinese over-the-counter stock trading system. May 22, 2019 8-K. From June 2016 to July 2017, Chen served as the Group CFO of Beijing AnWuYou Food Co., Ltd. *Id.* Chen also served as the CFO of Beijing DKI Investment Management Co., Ltd. from August 2012 to May 2016. *Id.* Chen's other professional experience includes service as the CFO of Yayi International Inc. from February 2010 to April

2012, the CFO of China Natural Gas, Inc. from May 2009 to January 2010, and CFO of Origin Agritech Inc. from December 2007 to September 2008.  Bon Natural F-1 at 94.  Chen also served as the Senior Director of Finance of iKang Healthcare Group Inc. from December 2006 to November 2007 and as the Director of Finance of Elong Inc. from August 2001 to November 2006.  *Id.*

173.    Chen received a degree of Doctor of Business Administration from Victoria University, Neuchatel, Switzerland in March 2008 and an MBA degree from City University of Seattle, Washington, U.S., in April 2000.  *Id.* at 95.  Chen graduated from Shanghai Institute of Tourism with a major in Accounting in July 1985 and completed her studies of Supervisory Skills in Hong Kong Polytechnic Institute in September 1993.  *Id.*  Chen holds a Fellow Membership of CPA Australia (FCPA) and a Fellow Membership of the Association of International Accountants U.K. (FAIA).  *Id.*  Chen is also a Member of the Chartered Institute of Management Accountants (CIMA), a Senior Member of the International Financial Management (SIFM) accredited by the Ministry of Human Resources and Social Security of China, and a Certified Internal Control Professional, as granted by Internal Control Institute (ICI).  *Id.*

174.    Defendant Yi has over 17 years of experience in the financial service and investment industry.  Dec. 2, 2020 8-K.  Prior to joining Future FinTech in November 2020, Yi had served as an independent director of Hudson Capital Inc.

since March 31, 2020. *Id.* Yi was the CFO of SSLJ.com Limited from July 2018 to July 2019. *Id.* From June 2011 to August 2018, Yi was the CFO and a board member of Wave Sync Corp. (formerly known as China Bio-Energy Corp). *Id.* From September 2009 to April 2011, Yi served as a senior manager at Qi He Certified Public Accountants Co. Ltd. *Id.* From July 2007 to August 2010, Yi was a senior auditor at Ernst & Young. *Id.* Yi received his Bachelor of Science degree in Accounting from School of Business Administrations of Liaoning University in 2004 and his Master of Science degree in Accounting and Finance from Victory University, Australia in 2006. *Id.* Yi is a Certified Public Accountant in Australia. *Id.*

### F. The SEC's Investigation into Huang's Manipulative Trading of Future FinTech Stock Supports a Strong Inference of Scienter

175. According to the filings in the SEC Action, the SEC deposed Defendant Huang on April 26, 2021, about his manipulative trading of Future FinTech stock. Ex. B; SEC Action, ECF No. 11-1.

176. The Individual Defendants, as officers of the Company, were obligated to investigate the bases for the SEC's investigation into Huang's price manipulation of Future FinTech stock and would have discovered that Huang placed manipulative trades in Future FinTech stock from January 13, 2020, through April 9, 2020. In fact, in response to Nasdaq's notice of delisting, the Company specifically stated in its November 8, 2019 Form 8-K that it "intend[ed]

to continue actively monitoring the bid price for its common stock between

[November 8, 2019] and the expiration of the Compliance Period [May 4, 2020]."

Nov. 8, 2019 8-K.

177.   On July 29, 2024, the court held in the SEC Action:

> ***It appears from the evidence presented that the Commission has shown a likelihood of success on the merits of its claim, or at least an inference, that Defendant has violated Sections 9(a)(2), 10b, and 16(a) of the Exchange Act [15 U.S.C. §§ 78i(a)(2), 78j(b), 78p(a)] and Rules 10b-5(a), 10b-5(c), and 16a-3 [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c), 240.16a-3] thereunder by intentionally trading Future FinTech stock in a manner which artificially inflated Future FinTech's stock price and failing to disclose his ownership of and transactions in Future Fintech stock.***

SEC Action, ECF No. 45 at 3 ¶ 1.

## G.   Future FinTech's Remedial Measures and Huang's Departure Support Scienter

178.   On January 16, 2024, Future FinTech issued a press release entitled

"Future FinTech Responds to Inquiry of CEO," stating:

> Future Fintech Group Inc. (Nasdaq: FTFT), (hereinafter referred to as "Future FinTech," "FTFT" or the "Company"), a comprehensive financial and digital technology service provider, announced today its Board of Directors (the "Board") held a meeting on January 15, 2024 to respond to allegations made to its Chief Executive Officer ("CEO") by the Securities and Exchange Commission (the "SEC"). The Board agreed to establish an independent committee to review and investigate the allegations made by SEC. ***The Board also imposed restrictions on the CEO to trade in the Company's stock during the pendency of the litigation. In addition, the Board decided to provide training to Company officers, directors and employees as to***

*appropriate trading practices under the insider trading policy of the Company.*[30]

179.   The Board's approach—restrictions on Huang's trading and training regarding appropriate trading practices—supports the truth of the SEC's allegations.

180.   On August 5, 2024, Huang resigned from his positions as a director of the Board and the CEO and President of Future FinTech.  Aug. 9, 2024 8-K.  On August 5, 2024, Future FinTech appointed Mr. Hu Li as a director of the Board and the CEO and President of Future FinTech.  *Id.*

### H.    Defendant Huang Violated Future FinTech's Insider Trading Policy

181.   In 2009, Future FinTech established a company-wide insider trading policy.  Ex. O.  The Insider Trading Policy provided that "the anti-fraud provisions of the federal securities laws prohibit fraudulent, manipulative, or deceptive trading practices. Persons who violate these prohibitions are subject to potential civil or criminal penalties."  Ex. O at 3.  The Insider Trading Policy also stated that "Form 3 Insiders are required to file an initial statement of their beneficial ownership of the Company's stock on Form 3 within ten days after becoming insiders.  All officers and directors must file a Form 3 regardless of whether they

---

[30]    https://www.prnewswire.com/news-releases/future-fintech-responds-to-inquiry-of-ceo-302035684.html.

hold any of the Company's stock." Ex. O at 5. Huang violated this policy when he manipulated the market for Future FinTech stock and failed to disclose his beneficial ownership of Future FinTech stock within ten days after becoming the CEO of Future FinTech on March 4, 2020.

182. The existence of this policy supports an inference that Huang knew about the requirement to file a Form 3 and failed to do so.

## I.    SOX Certifications

183. As stated above in ¶¶126-27, Defendants Huang, Chen, and Yi signed SOX certifications attesting that the respective annual reports they signed "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *See* ¶¶126-27.

184. The certifications also stated in relevant part:

2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact*** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

*             *             *

67

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): . . .

**(b)** *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.*

*See id.*

185.   These statements were false and misleading for the reasons explained in §§ III–IV, above.

186.   Ultimately, when viewed collectively, Plaintiff's allegations support a strong inference of fraudulent intent on the part of the Individual Defendants or, at the very least, a strong inference that their conduct was highly unreasonable and an extreme departure from standards of ordinary care.  In either case, Plaintiff has adequately pleaded scienter.

## VIII.  LOSS CAUSATION

187.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiff and the Class to suffer substantial damages.

188.   During the Class Period, Plaintiff and other Class members purchased Future FinTech securities at artificially inflated prices and suffered substantial losses and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized.

The price of Future FinTech securities declined significantly causing Plaintiff and other Class members to suffer losses and damages when Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized.

189.   Defendants issued false and misleading statements and material omissions regarding the possibility of Future FinTech being delisted from Nasdaq and Huang's beneficial ownership of Future FinTech stock.  On the strength of these false and misleading statements and material omissions, the price of the Company's securities was artificially inflated to a Class Period high of $11.29 per share on January 8, 2021.  Ex. E at 3.  Those misrepresentations and omissions that were not immediately followed by an upward movement in the price of the Company's securities also served to maintain the share price at artificially inflated levels by maintaining and supporting a false positive perception of Future FinTech's business, operations, performance, and prospects.  On the dates these false and misleading statements were corrected and/or the risks concealed by them materialized through the issuance of information regarding Huang's price manipulation and failure to disclose Huang's ownership of Future FinTech stock, the price at which Future FinTech securities traded declined as a result of the truth

being disclosed to the market, and investors suffered losses due to this decline in the price of Future FinTech securities.

190.   The true facts and risks regarding Huang's price manipulation and failure to disclose Huang's ownership of Future FinTech stock, which were omitted and/or misrepresented by Defendants, eventually caused the price of Future FinTech securities to decline on January 11, 2024, thereby causing harm to investors.

191.   The market for Future FinTech common stock was open, well-developed, and efficient at all relevant times, with an average daily trading volume of approximately 366,368 shares during the Class Period.  As a result of Defendants' misstatements and material omissions, as alleged herein, Future FinTech's common stock traded at artificially inflated prices.  Plaintiff and other Class members purchased Future FinTech common stock relying upon the integrity of the market relating to Future FinTech common stock and suffered economic losses as a result thereof.

192.   On January 11, 2024, around or after market close, the SEC posted the SEC Announcement.  The SEC Announcement stated the following:

> The Securities and Exchange Commission today charged Shanchun Huang with manipulative trading in the stock of Future FinTech Group Inc., using an offshore account shortly before he became Future FinTech's CEO in 2020. The SEC also charged Huang with failing to disclose his beneficial ownership of Future FinTech stock as well as transactions in such stock.

70

. . . . Huang allegedly used an account in Hong Kong to place trades in Future FinTech stock beginning in January 2020, at a time when Future FinTech was at risk of being delisted from Nasdaq because its stock price had fallen below Nasdaq's minimum bid price requirement of $1.00 per share. Huang allegedly bought more than 530,000 shares of Future FinTech over a two-month period and repeatedly traded at a volume so large that his trades constituted a high percentage of the daily volume of Future FinTech stock transactions. Huang also allegedly placed multiple buy orders in short timeframes, placed limit buy orders with escalating limit prices from one order to the next, and made trades that generally would not make economic sense for an investor seeking to buy the stock at the lowest available price. The SEC's complaint alleges that Huang's trades were intended to, and at times did, push the Future FinTech stock price up. For example, on February 6, 2020, when Huang's trading constituted 60 percent of the daily trading volume, he placed multiple buy orders within nine minutes, driving the price up from $0.89 to $1.05, at which point his trading stopped.

Huang was named Future FinTech's CEO in March 2020. Upon becoming CEO of Future FinTech, Huang was required to file initial, annual, and change of ownership forms about his holdings of Future FinTech stock, but he failed to do so for the year after he became CEO. As alleged in the complaint, in March 2021, after he no longer owned any Future FinTech stock, Huang belatedly filed a misleading initial form representing that he owned no Future FinTech stock.

"Timely disclosure of insider stock transactions is a fundamental component of the federal securities laws that ensures the fair operation of our securities markets," said Sheldon L. Pollock, Associate Regional Director of the SEC's New York Regional Office. "CEOs should assume that the use of an offshore account will not prevent the staff of the SEC from identifying manipulative trading."

193.    Attached to the SEC press release was a complaint that the SEC filed

against Defendant Huang in the United States District Court for the Southern

District of New York.  The SEC Complaint stated that "[t]o induce investors to

71

purchase Future FinTech stock, Huang sought to inflate the share price of Future FinTech to avoid the company being delisted by Nasdaq due to its failure to maintain a minimum price of $1 per share, which would have made Future FinTech stock less attractive." Ex. A ¶ 2.

194.   The SEC Complaint also stated that "Huang has never filed any forms with the Commission disclosing his ownership of or transactions in Future FinTech stock from January 2020 through March 2021." *Id.* ¶ 7.

195.   The market was shocked and started questioning Future FinTech's stability. For example, on January 11, 2024, after market close, the *Wall Street Journal* published an article stating, "[t]he SEC seeks fines and to have Huang barred from serving as an officer or director of a public company. . . . The company's website didn't appear to be active on Thursday afternoon."[31]

196.   As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Future FinTech's common stock fell by $0.27 per share, or approximately 20.93%, to close at $1.02 per share on January 12, 2024.

---

[31]    Dean Seal, *SEC Charges Future FinTech Group CEO Huang With Manipulative Trading*, MARKETSCREENER (Jan. 11, 2024, 5:28 PM), https://www.marketscreener.com/quote/stock/FUTURE-FINTECH-GROUP-INC-35806834/news/SEC-Charges-Future-Fintech-Group-CEO-Huang-With-Manipulative-Trading-45727018/

197.    Accordingly, as a result of their purchases of Future FinTech's publicly traded securities during the Class Period, Plaintiff and other members of the Class suffered economic losses and damages.

## IX.    CLASS ACTION ALLEGATIONS

198.    Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all persons and entities that purchased or otherwise acquired Future FinTech securities during the Class Period and were damaged thereby on the revelations of the alleged corrective disclosures (the "Class").

199.    Excluded from the Class are Defendants named herein, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

200.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Future FinTech securities were actively traded on the Nasdaq stock exchange.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are at least hundreds of members in the proposed Class.  Members of the Class may be identified from records maintained by Future FinTech or its transfer agent and may be notified of

the pendency of this action by mail, using a form of notice customarily used in securities class actions.

201.   Plaintiff's claims are typical of the claims of the Class because Plaintiff and all members of the Class were similarly affected by Defendants' unlawful conduct as complained of herein.

202.   Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the Class.

203.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. The questions of law and fact common to the Class include, *inter alia*:

a.   Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   Whether Defendants' publicly disseminated statements made during the Class Period contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c.    Whether and to what extent Defendants' material untrue statements and/or omissions of material facts caused the market price of Future FinTech's securities to be artificially inflated during the Class Period;

d.    Whether Defendants acted with the requisite level of scienter in omitting and/or misrepresenting material facts;

e.    Whether Defendants were controlling persons of Future FinTech;

f.    Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

g.    Whether Class members have sustained damages, and if so, the proper measure of damages.

204.    Plaintiff knows of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

205.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable.  In addition, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

## X.    CONTROL PERSON LIABILITY

206.   The Individual Defendants, because of their positions with Future FinTech, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, advertisements, promotional materials, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each Individual Defendant possessed the power to direct or cause the direction of the management and policies of Future FinTech. Each Individual Defendant had a duty to promptly disseminate complete, accurate, and truthful information with respect to the possibility of Future FinTech being delisted from Nasdaq and Huang's beneficial ownership of Future FinTech stock. Each Individual Defendant was provided with copies of the Company's SEC filings and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each Individual Defendant knew or recklessly disregarded that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations and omissions which were being made were then materially false and/or misleading.

207.   Indeed, Huang testified that he reviews and ultimately signs and approves Future FinTech's filings and press releases.  *See* Ex. B at 66:23–25, 72:21–73:6, 74:2–7.

## XI.   THE FRAUD ON THE MARKET PRESUMPTION

208.   The false and/or misleading statements alleged herein were material and public and, at all relevant times, the market for Future FinTech's securities was an efficient market for the following reasons, among others:

a.   Future FinTech's securities were listed on Nasdaq, a highly efficient market;

b.   As a registered and regulated issuer of securities, Future FinTech filed periodic reports with the SEC, in addition to frequent voluntary dissemination of information;

c.   Future FinTech regularly communicated with investors through established market communication mechanisms, including through regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d.   The market reacted to public information disseminated by Future FinTech; and

77

e.     Many analysts followed and covered Future FinTech's business and wrote reports which affected the marketplace.

209.   As a result of the above, the market for Future FinTech's securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' market prices.  The historical daily trading prices and volumes of Future FinTech securities are incorporated herein by reference.

210.   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue Future FinTech's securities. Without knowledge of the misrepresented or omitted facts, Plaintiff and other Class members purchased Future FinTech securities between the time that Defendants made the material misrepresentations and omissions and the time that the truth or concealed risk was revealed, during which time the price of Future FinTech's securities was artificially inflated by Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## XII.   THE *AFFILIATED UTE* PRESUMPTION

211.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this

action involves Defendants' failure to disclose material adverse information regarding Huang's price manipulation and Huang's ownership of Future FinTech stock—information Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII.  NO STATUTORY SAFE HARBOR

212.   The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Amended Class Action Complaint .

213.   First, the false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

214.   Second, many of the false and misleading statements herein were not identified as forward-looking statements.

215.   Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained

statements of present or past facts and so are not entitled to protection under the safe harbor.

216.   Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such statements were also not accompanied by cautionary language that was meaningful because such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press releases, SEC filings, or other public statements described herein were general, "boilerplate" statements of risk that would affect any financial and digital technology service company, and misleadingly contained no factual disclosure of any of the specific details concerning Huang's price manipulation, or similar important factors that would give investors adequate notice of such risks.

217.   Fifth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each statement was authorized and/or approved by an

executive officer of Future FinTech who actually knew that each such statement was false or misleading when made.

## XIV.  CAUSES OF ACTION

### COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

218.   Plaintiff re-alleges each allegation above as if fully set forth herein.

219.   This Count is brought under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, against all Defendants.

220.   During the Class Period, Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class in an effort to maintain artificially high market prices for Future FinTech's securities in violation of §10(b) of the Exchange Act and Rule 10b-5(a)–(c) promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

221.   The acts and scienter of Defendants and other Company employees are imputed to the Company under the principles of agency and *respondeat superior*.

222.   Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about Huang's price manipulation and ownership of Future FinTech stock as reflected in the misrepresentations and omissions set forth above.

223.   Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

224.   As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, and Huang's manipulative trading alleged herein, Plaintiff and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

225.   At the time of the misrepresentations and/or omissions and manipulative trading, Plaintiff and other Class members purchased Future FinTech

securities without knowing about their falsity.  In doing so, Plaintiff and other Class members relied on the integrity of the market price for Future FinTech securities that was artificially inflated due to the false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements.

226.   Plaintiff and other Class members were damaged as a result of Defendants' false and/or misleading statements and misrepresentations and omissions of material facts.  Plaintiff and other Class members would not have purchased Future FinTech securities at the prevailing prices had they known the truth about the matters discussed above.

227.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other Class members have suffered damages in connection with their purchases or acquisitions of Future FinTech securities.

## COUNT II

### Violation of Section 9(a)(2), Brought Under Section 9(f) of the Exchange Act Against Defendant Huang

228.   Plaintiff re-alleges each allegation above as if fully set forth herein.

229.   By conducting the manipulative trading in Future FinTech shares alleged herein, Huang, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, or any facility of any national securities

exchange, or for any member of a national securities exchange, with specific intent, effected, alone or with other persons, a series of transactions in Future FinTech stock that created the actual or apparent trading in such security, or raised or depressed the price of such security, for the purpose of inducing the purchase or sale of such security by others.

230.   Had Plaintiff and the other members of the Class known the truth regarding Future FinTech's true value and Huang's price manipulation, which was not disclosed by Huang, Plaintiff and other members of the Class would not have purchased or otherwise acquired Future FinTech shares or, if they had acquired such shares during the Class Period, would not have done so at the artificially inflated prices that they paid.

231.   By virtue of the foregoing, Huang violated Section 9(a)(2) and 9(f) of the Exchange Act, 15 U.S.C. § 78i(a)(2), (f).

232.   As a direct and proximate result of Huang's conduct as described herein, Plaintiff and other Class members have suffered significant damages and are entitled to such damages from Huang.

## COUNT III

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

233.   Plaintiff re-alleges each allegation above as if fully set forth herein.

234.   This claim is asserted against Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of all Class members.

235.   As alleged herein, the Individual Defendants caused Future FinTech to violate Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period, and concealing Huang's stock manipulation.

236.   Each Individual Defendant, by reason of his or her status as a senior executive officer and/or director of Future FinTech, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and other Class members, within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases, and other statements related to Plaintiff's and other Class members' investments in Future FinTech securities within the meaning of Section 20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

237.   The Individual Defendants controlled and had the authority to control the content of the Company's SEC filings, press releases, and other statements. Because of their close involvement in the everyday activities of the Company, and

because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

238.  The Individual Defendants knew or recklessly disregarded the fact that Future FinTech's representations were materially false and misleading and/or omitted material facts when made and are therefore culpable participants in the fraud.  In so doing, the Individual Defendants did not act in good faith.  By virtue of their high-level positions and their participation in and awareness of Future FinTech's operations and public statements, the Individual Defendants were able to and did influence and control Future FinTech's decision-making, including controlling the content and dissemination of the documents that Plaintiff and other Class members contend contained materially false and misleading information and on which Plaintiff and other Class members relied.

## XV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff on his own behalf, and on behalf of the Class, demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class Representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and statements alleged herein;

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert and consultant fees, and other costs;

D.      Awarding damages in favor of Plaintiff and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law; and

E.      Awarding such other and further relief as this Court may deem just and proper.

## XVI.  JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all triable claims.


Dated:  July 28, 2025                    Respectfully submitted,

                                         **FARUQI & FARUQI, LLP**

                                         By:____*/s/ Raymond N. Barto*____
                                         James M. Wilson, Jr. (admitted *pro hac vice*)
                                         Raymond N. Barto (#086182013)
                                         685 Third Avenue, 26th Floor
                                         New York, NY 10017
                                         Telephone: 212-983-9330
                                         Facsimile: 212-983-9331

Email: jwilson@faruqilaw.com
Email: rbarto@faruqilaw.com

Robert W. Killorin (admitted *pro hac vice*)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

Joseph T. Lukens (#048991992)
**FARUQI & FARUQI, LLP**
1617 JFK Blvd., Suite 1550
Philadelphia, PA 19103
Telephone: 215-277-5770
Facsimile: 215-277-5771
Email: jlukens@faruqilaw.com

*Attorneys for Lead Plaintiff Scott Present
and Lead Counsel for the putative Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 28, 2025, I caused true and correct copies

of the foregoing to be served on all counsel of record via CM/ECF.


Dated: July 28, 2025                    By: _____*/s/ Raymond N. Barto*_____
                                        Raymond N. Barto