James M. Wilson, Jr. (admitted *pro hac vice*)
Raymond N. Barto (#086182013)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com
Email: rbarto@faruqilaw.com

[additional counsel listed in signature block]

*Attorneys for Lead Plaintiff Scott Present*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DENISE LABELLE, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>      v.<br><br>FUTURE FINTECH GROUP INC., SHANCHUN HUANG, JING CHEN, and MING YI,<br><br>    Defendants. | No. 2:24-cv-00247-JXN-JSA<br><br>**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS SHANCHUN HUANG, MING YI, AND FUTURE FINTECH GROUP INC.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(5) AND 12(b)(6)**<br><br><u>CLASS ACTION</u> |

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................1

II.    SUMMARY OF FACTUAL ALLEGATIONS ..............................................7

       A.    Background of FTFT And Its Introduction Of Huang ..........................7

       B.    Huang's Manipulative Stock Scheme And Its Impact On FTFT ..........7

       C.    Huang's HSBC Account Is Terminated ...................................................9

       D.    Defendants Knowingly Misled The Market About Huang's
             Manipulative Conduct ...........................................................................10

       E.    The Truth Is Disclosed To The Market ................................................11

III.   DEFENDANTS WERE PROPERLY SERVED ..........................................12

       A.    The Hague Convention Is Inapplicable Under These
             Circumstances ......................................................................................13

       B.    Plaintiff Properly Effectuated Alternative Service On Huang
             And Yi Pursuant To Rule 4(f)(3) .........................................................15

IV.    12(b)(6) LEGAL STANDARD ...............................................................16

V.     PLAINTIFF PROPERLY BOLSTERED THE ALLEGATIONS
       FROM HIS AC WITH INFORMATION FROM THE SEC
       COMPLAINT ......................................................................................16

VI.    PLAINTIFF ADEQUATELY ALLEGES HUANG'S MARKET
       MANIPULATION UNDER SECTIONS 9(a)(2) & 9(f) AND
       SCHEME LIABILITY UNDER RULE 10b-5(a) & (c) ...............................18

VII.   THE AC ADEQUATELY PLEADS MATERIALLY FALSE AND
       MISLEADING STATEMENTS UNDER RULE 10b-5(b) ........................23

       A.    Statements About FTFT's Nasdaq Compliance ..................................23

       B.    Statements About FTFT's Internal Controls .......................................26

       C.    Statements In SOX Certifications ........................................................28

i

D.    Statements About Huang's Hiring ........................................................29

VIII.  THE AC ADEQUATELY PLEADS SCIENTER ........................................30

A.    Defendants Had Knowledge Of And Access To Information
About Huang's Manipulative Trading ..................................................30

B.    Defendants Had Motive And Opportunity To Commit Securities
Fraud....................................................................................................34

C.    Other Circumstantial Evidence Supports Defendants' Scienter .........36

IX.   PLAINTIFF ADEQUATELY PLEADS LOSS CAUSATION....................37

X.    PLAINTIFF STATES 20(a) CLAIMS .......................................................40

CONCLUSION .............................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*In re Able Lab'ys Sec. Litig.*,
  2008 WL 1967509 (D.N.J. Mar. 24, 2008) ........................................................31

*In re Advanta Corp. Securities Litigation*,
  180 F.3d 525 (3d Cir. 1999) ...........................................................................35

*In re Aetna, Inc. Securities Litigation*,
  617 F.3d 272 (3d Cir. 2010) ...........................................................................26

*Aldossari ex rel. Aldossari v. Ripp*,
  2021 WL 259957 (E.D. Pa. Jan. 26, 2021).......................................................16

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021).................................................................33

*In re Amgen Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ...................................................32

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ..............................................................................21

*Bell v. Ostrow*,
  45 F. App'x 152 (3d Cir. 2002) ........................................................................16

*Braverman Kaskey, P.C. v. Toidze*,
  599 F. App'x 448 (3d Cir. 2015) ......................................................................13

*Celgene Corp. v. Blanche Ltd.*,
  2017 WL 1282200 (D.N.J. Mar. 10, 2017) .......................................................14

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ............................................................................25

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  2018 WL 3772675 (D.N.J. Aug. 8, 2018) .................................................28, 36

*Cohen v. Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010) ..............................................................20

*Cont'l Gen. Ins. Co. v. Olafsson*,
  2024 WL 4263211 (D.N.J. Sept. 23, 2024) ........................................................40

*In re CorMedix Inc. Sec. Litig.*,
  2024 WL 1214382 (D.N.J. Mar. 21, 2024) ........................................................40

*In re CRM Holdings, Ltd. Sec. Litig.*,
  2013 WL 787970 (S.D.N.Y. Mar. 4, 2013) ........................................................17

*D.E.&J. Ltd. P'ship v. Conaway*,
  133 F. App'x 994 (6th Cir. 2005) ......................................................................39

*De la Fuente v. DCI Telecomms., Inc.*,
  259 F. Supp. 2d 250 (S.D.N.Y. 2003) ..............................................................5, 6

*De Vito v. Liquid Holdings Grp., Inc.*,
  2018 WL 6891832 (D.N.J. Dec. 31, 2018) ........................................................38

*Del. Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*,
  606 F. Supp. 3d 124 (E.D. Pa. 2022) ................................................................29

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ........................................................................................6, 37

*In re DVI, Inc. Sec. Litig.*,
  2010 WL 3522086 (E.D. Pa. Sept. 3, 2010) ......................................................37

*In re Enzymotec Sec. Litig.*,
  2015 WL 8784065 (D.N.J. Dec. 15, 2015) ........................................................28

*EOI Corp. v. Med. Mktg. Ltd.*,
  172 F.R.D. 133 (D.N.J. 1997) ............................................................................14

*EP MedSystems, Inc. v. EchoCath, Inc.*,
  235 F.3d 865 (3d Cir. 2000) ..............................................................................23

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
  2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ..................................................17

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
  2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ................................................37

iv

*GFL Advantage Fund, Ltd. v. Colkitt*,
  272 F.3d 189 (3d Cir. 2001) ....................................................................22

*Guardian Life Ins. Co. of Am. v. Est. of Walter Matesic*,
  2016 WL 3763340 (D.N.J. July 14, 2016) ..........................................15

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms.*
  *Indus. Ltd.*,
  2022 WL 889158 (E.D. Pa. Mar. 25, 2022) ...................................37, 39

*Howard v. Arconic Inc.*,
  2021 WL 2561895 (W.D. Pa. June 23, 2021) .....................................39

*Hull v. Glob. Digital Sols., Inc.*,
  2017 WL 6493148 (D.N.J. Dec. 19, 2017).........................................39

*IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*,
  723 F. Supp. 3d 1053 (D. Kan. 2024)................................................17

*In re Initial Pub. Offering Sec. Litig.*,
  399 F. Supp. 2d 261 (S.D.N.Y. 2005) ...............................................39

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ........................................................30, 34

*Kennilworth Partners L.P. v. Cendant Corp.*,
  59 F. Supp. 2d 417 (D.N.J. 1999)......................................................34

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) .............................................................39

*Levon v. CorMedix Inc.*,
  797 F. Supp. 3d 381 (D.N.J. 2025)...............................................23, 30

*Lipow v. Net1 UEPS Technologies, Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015) ...............................................33

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976) .............................................................16

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ............................................................40

v

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019) .......................................................................17

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024) ...........................................................................................26

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
  2011 WL 3444199 (D.N.J. Aug. 8, 2011) ............................................................34

*In re Merrill Lynch & Co., Inc. Rsch. Reports Sec. Litig.*,
  218 F.R.D. 76 (S.D.N.Y. 2003) ...........................................................................17

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ............................................................................40

*Monk v. Johnson & Johnson*,
  2011 WL 6339824 (D.N.J. Dec. 19, 2011)...........................................................29

*Nanopierce Techs, Inc. v. Southridge Cap. Mgmt.*,
  2008 WL 1882702 (S.D.N.Y. Apr. 21, 2008) ......................................................21

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ......................................................................39

*In re Navient Corp. Sec. Litig.*,
  2019 WL 7288881 (D.N.J. Dec. 30, 2019)......................................................39, 40

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................................36

*Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
  2020 WL 3268531 (S.D.N.Y. June 17, 2020) ......................................................31

*In re Olympia Brewing Co. Sec. Litig.*,
  613 F. Supp. 1286 (N.D. Ill. 1985).......................................................................20

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 619 (S.D.N.Y. 2014) ...............................................................16, 17

*In re PMA Cap. Corp. Sec. Litig.*,
  2005 WL 1806503 (E.D. Pa. July 27, 2005) ........................................................28

*In re ProQuest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007) ...............................................................33

*In re Radian Securities Litigation*,
612 F. Supp. 2d 594 (E.D. Pa. 2009)...................................................................35

*Rahman v. Kid Brands, Inc.*,
736 F.3d 237 (3d Cir. 2013) ...............................................................................35

*In re RenovaCare Securities Litigation*,
2024 WL 2815034 (D.N.J. June 3, 2024)........................................................21, 22

*RSM Prod. Corp. v. Fridman*,
643 F. Supp. 2d 382 (S.D.N.Y. 2009) .................................................................17

*S.E.C. v. Fiore*,
416 F. Supp. 3d 306 (S.D.N.Y. 2019) .................................................................22

*S.E.C. v. Gallagher*,
2023 WL 6276688 (S.D.N.Y. Sept. 26, 2023) ................................................20, 21

*S.E.C. v. Hwang*,
692 F. Supp. 3d 362 (S.D.N.Y. 2023) .............................................................22, 23

*S.E.C. v. Lek Sec. Corp.*,
276 F. Supp. 3d 49 (S.D.N.Y. 2017) ...................................................................21

*S.E.C. v. Shanchun Huang*,
2026 WL 100752 (S.D.N.Y. Jan. 14, 2026) ...................................................*passim*

*In re Sadia, S.A. Sec. Litig.*,
643 F. Supp. 2d 521 (S.D.N.Y. 2009) .................................................................29

*Sapssov v. Health Mgmt. Assoc., Inc.*,
608 F. App'x 855 (11th Cir. 2015) ......................................................................40

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
2016 WL 466958 (M.D. Pa. Feb. 8, 2016) .........................................................26

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
2016 WL 7117455 (M.D. Pa. Dec. 7, 2016) ........................................................40

*Set Cap. LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021) ...............................................................21

*Sherman v. Abengoa, S.A.*,
   156 F.4th 152 (2d Cir. 2025) ............................................................17

*In re Sipex Corp. Securities Litigation*,
   2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) ...................................36

*Smart Study Co. v. Acuteye-Us*,
   620 F. Supp. 3d 1382 (S.D.N.Y. 2022) .............................................14

*Snyder v. Swanson*,
   371 F. App'x 285 (3d Cir. 2010) ......................................................16

*Sullivan & Long, Inc. v. Scattered Corp.*,
   47 F.3d 857 (7th Cir. 1995) ..............................................................20

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) .............................................................34

*Tellabs, Inc. v. Makor Issues & Rts, Ltd.*,
   551 U.S. 308 (2007)..............................................................5, 30, 34

*Trane Co. v. O'Connor Sec.*,
   561 F. Supp. 301 (S.D.N.Y. 1983) ...................................................21

*Tyson v. Coinbase Glob., Inc.*,
   2024 WL 5126766 (D.N.J. Dec. 16, 2024).......................................14

*U.S. Commodity Futures Trading Comm'n v. Wilson*,
   27 F. Supp. 3d 517 (S.D.N.Y. 2014) ................................................20

*U.S. S.E.C. v. Smith*,
   2005 WL 2373849 (S.D. Ohio Sept. 27, 2005) .................................35

*United States v. Crop Growers Corp.*,
   954 F. Supp. 335 (D.D.C. 1997).......................................................25

*In re Urb. Outfitters, Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015).................................................34

*Utesch v. Lannett Co., Inc.*,
  385 F. Supp. 3d 408 (E.D. Pa. 2019)......................................................17

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
  2017 WL 1658822 (D.N.J. Apr. 28, 2017).............................................38

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) ....................................................25

*Vanderhoef v. China Auto Logistics Inc.*,
  2019 WL 6337908 (D.N.J. Nov. 26, 2019) ............................................15

*Volkswagenwerk Aktiengesellschaft v. Schlunk*,
  486 U.S. 694 (1988).................................................................................14

*In re Wilmington Tr. Sec. Litig.*,
  29 F. Supp. 3d 432 (D. Del. 2014)...........................................................38

*Zhengyu He v. China Zenix Auto International Ltd.*,
  2020 WL 3169506 (D.N.J. June 12, 2020)..........................................24, 25

*Zuckerman v. Smart Choice Auto. Grp., Inc.*,
  2000 WL 33996254 (M.D. Fla. Aug. 29, 2000).....................................35

**Statutes**

15 U.S.C. §  78i.............................................................................................19

15 U.S.C. § 78i(a)(2).....................................................................................18

15 U.S.C. § 78j(b) .........................................................................................22

**Other Authorities**

17 C.F.R. § 229.308(a)(3) ............................................................................26

17 C.F.R. § 240.13a-15(f).............................................................................26

Fed. R. Civ. P. 15(a)(2).................................................................................40

*In re Dep't of Mkt Regulation v. Respondent*,
  No. CMS030257, NASD Redacted Decision (Oct. 12, 2005) ..............21

Lead Plaintiff Scott Present ("Plaintiff") respectfully submits this brief in opposition to the Defendants'[1] motion to dismiss.  ECF No. 65.[2]

## I.    INTRODUCTION

This textbook case of securities fraud centers around a brazen stock manipulation scheme whereby Defendant Huang made large undisclosed transactions in FTFT's publicly-traded stock to artificially increase the market price of and induce investors to buy FTFT stock at inflated prices.  The scheme worked initially.  In addition to saving the Company from being delisted from the Nasdaq by keeping the stock price above $1.00, Huang reaped hundreds of thousands of dollars from his undisclosed transactions, which he used to pay for his personal expenses and to make loans to the struggling Company.  Defendants knew of or recklessly disregarded this blatant market manipulation but failed to disclose it, while making false and misleading representations to investors about FTFT's internal controls, the regulatory risks FTFT faced, and Huang's hiring and

---

[1]    For the purposes of this brief, "Defendants" are Future FinTech Group Inc. "FTFT" or the "Company"), Shanchun Huang ("Huang"), Ming Yi ("Yi"), and Jing Chen ("Chen").  Chen has not yet been served, but Plaintiff's allegations against her are still relevant as part of FTFT's liability under *respondeat superior* principles.

[2]    All internal citations, internal quotation marks and footnotes are omitted and all emphases are added.  "AC" or "Amended Complaint" refers to Plaintiff's Amended Class Action Complaint.  ECF No. 49.  Unless otherwise noted, all references to "¶____" are to the AC.  All capitalized terms have the same meaning as they have in the Amended Complaint.  "MTD" refers to the Memorandum of Law in Support of the Motion to Dismiss.  ECF No. 65-1.

trading history.

The truth about Defendants' investor fraud was finally revealed to the market through a bombshell announcement on January 11, 2024, by the SEC which revealed the details of the scheme and "charged Shanchun Huang with manipulative trading in the stock of Future FinTech Group Inc., using an offshore account shortly before he became Future FinTech's CEO in 2020" and "belatedly fil[ing] a misleading initial form representing that he owned no Future FinTech stock." ¶¶ 142-43 (the "SEC Action").  Due to the disclosures of Defendants' fraud, FTFT's stock price plummeted by 20.93% or $0.27 per share.  ¶ 146.

Plaintiff alleges that Huang engaged in manipulative stock transactions that violated §§ 9(a), (f) and 10(b) of the Exchange Act.  Those allegations are bolstered by the SEC Complaint and evidence uncovered by the SEC including Huang's own sworn testimony in that case.  *See* AC Exs. A-H, J-M.  Indeed, the Honorable Denise Cote recently rejected all of Huang's arguments to dismiss the SEC's allegations against Huang because "[n]one of these arguments has merit." *See S.E.C. v. Shanchun Huang*, 2026 WL 100752, at *2 (S.D.N.Y. Jan. 14, 2026).

Plaintiff alleges that Huang, FTFT, Yi, and Chen also are liable under Section 10(b) and 20(a) for issuing false and misleading statements.

Defendants seek dismissal on two grounds: for insufficient service of process on Huang and Yi under Fed. R. Civ. P. ("Rule") 12(b)(5) and for failure to

2

state a claim under Rule 12(b)(6) as to all Defendants.

Defendants' Rule 12(b)(5) argument for dismissal—that Huang's address was known and obvious and that Plaintiff was therefore required to follow the Hague Convention—is completely untenable.  As described in detail in his Motion for Alternative Service, ECF Nos. 31-32, Plaintiff went to great lengths and expense to locate and serve Huang and Yi pursuant to the Hague Convention, but they were nowhere to be found.  Plaintiff even contacted Huang's counsel in the SEC Action, now also representing him here, who declined to assist Plaintiff in serving their client.  FTFT's "corporate headquarters" in New York City did not help either, as it is not staffed and appears to be nothing more than a fictitious address.  Nor could Huang be found at his last known London addresses.  Indeed, Plaintiff's process server in London was informed that the property was not occupied by Huang and those properties had each been sold or repossessed.  *See* Affidavit of Glenda Fichter, ECF No. 32 ¶¶ 6(a)-(d).  While Defendants ***do not dispute any of this***, they are now effectively asking the Court to reverse its order granting leave for substitute service.  *See* ECF No. 37 ("Service Order").  The Court should decline to do so.

Defendants' Rule 12(b)(6) argument similarly lacks merit.  They improperly ask the Court to reject Plaintiff's well-pled allegations that Huang: (i) actually engaged in the alleged trading activity; (ii) injected false information into the

3

marketplace; and (iii) knew about the trades at issue at the time they were made. MTD 2. Judge Cote already rejected these very arguments in the SEC Action as lacking merit, and Defendants have provided no reason that this Court should reach a different conclusion. Indeed, some of the factual contentions made by Huang's counsel in their legal brief—including that Plaintiff has engaged in "enhanced plagiarizing" to "fabricate[]" a presumption of scienter—are belied by the evidence cited in and attached to the AC, including Huang's own testimony. *Id.* at 7. For example, Defendants rehash the same speculative argument made in the SEC Action about whether certain FTFT trades were possibly made by someone other than Huang, but Huang testified, and the documentary evidence confirms, that he was the sole owner of the HSBC (Hongkong and Shanghai Banking Corporation Limited, a London-headquartered global bank) account in which all of the trades were made. ¶ 42; AC Ex. B 55:6-18. Those trades began shortly after he was approached about becoming FTFT's CEO, were made in patterns typical of manipulative activity, and resulted in the Company regaining compliance with Nasdaq's minimum $1 bid requirement. The trading was so suspicious that HBSC notified Huang that they could no longer bank with him. ¶ 99.

At the motion to dismiss stage, all reasonable inferences are drawn in Plaintiff's favor. That Huang engaged in, and that he and the other Defendants knew of the transactions under these circumstances, is "at least as compelling" as

4

any opposing inference that some unidentified person had access to and could trade in Huang's account (which is irrelevant in any event for purposes of Plaintiff's allegations).[3] *Tellabs, Inc. v. Makor Issues & Rts, Ltd.*, 551 U.S. 308, 324 (2007). The court in the SEC Action rejected these same arguments in upholding the SEC's 9(a)(2) claim and Rule 10b-5(a) and (c) claims because "[n]one of these arguments has merit." *Huang*, 2026 WL 100752, at *2.

Additionally, Plaintiff adequately alleges that Defendants made false and misleading statements about FTFT's internal controls, compliance with Nasdaq's requirements, the regulatory risks FTFT faced, and Huang's hiring and trading history, while omitting Huang's manipulative trading. Defendants' only argument on this claim is that Huang's trading was not manipulative, so it did not need to be disclosed. That argument fails for the reasons explained herein.

Defendants' desperate attempt to have the Court disregard well pled allegations based on evidence contained in the SEC Complaint—***evidence that enabled the SEC to defeat a motion to dismiss***—fares no better. "It would have been irresponsible for plaintiff to have ignored the SEC's highly relevant allegations and findings." *De la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d

---

[3]   Whether someone else made the FTFT trades is not relevant—they were made in Huang's account over which he had control. *Huang*, 2026 WL 100752, at *2. The trades benefitted him personally and benefitted FTFT and Defendants were at least reckless in issuing the challenged statements to investors without disclosing these transactions.

250, 260 (S.D.N.Y. 2003).  In any event, Plaintiff's allegations do not rely solely on the SEC Complaint but also on Huang's deposition testimony, public filings, and trading records.

Moreover, the manipulative scheme and the false and misleading statements alleged would clearly have been material.  Regardless of whether Huang's undisclosed transactions violated statutory provisions, their timing, frequency, and impact on the Company raised the risk of government regulatory action.  Any reasonable investor would want to know that the newly appointed CEO owned a significant number of the Company's shares and was engaging in manipulative stock transactions.  His appointment was presented as an opportunity for him to lead FTFT's "next stage of growth" with no mention of the underlying fraudulent tactics.  ¶¶ 121, 123.  This information was especially significant given the risk of Nasdaq delisting that the Company faced.  When FTFT regained compliance with that threshold, Defendants' misrepresentations and omissions deprived investors of critical context regarding how that compliance was achieved.

Plaintiff has also sufficiently pled loss causation, as he has provided "defendants with notice of what the relevant economic loss [or] the causal connection might be[.]"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).  Specifically, he alleges that the January 11, 2024 SEC press release announcing Huang's charges and the accompanying SEC Complaint detailing the

6

manipulative stock scheme negatively impacted FTFT's share price.

## II.    SUMMARY OF FACTUAL ALLEGATIONS

### A.    Background of FTFT And Its Introduction Of Huang

FTFT is a former fruit juice company that was rebranded in 2017 as a blockchain and e-commerce company.  ¶ 2.  The rebranding was a failure, and in late 2019, Nasdaq informed the Company that because the closing bid price for its stock was below $1 for 30 trading days, it no longer met the minimum bid price for continued listing on the Nasdaq.  ¶ 4.  FTFT had 180 days to meet the minimum bid price requirement or face delisting.  *Id*.  FTFT assured investors that it would "actively monitor[] the bid price . . . and consider all available options to resolve the deficiency and regain compliance."  ¶ 6.

Unbeknownst to investors, one of the options being considered was bringing Huang on as the Company's CEO, even though he had no prior experience as an executive of a company trading on an American stock exchange.  ¶ 7.  Huang was approached by his friend, the founder and then-CEO of FTFT, Yongke Xue, about becoming CEO sometime between late 2019 to early 2020, and the Company made the appointment official on March 4, 2020, formally announcing it on March 10, 2020.  ¶¶ 7, 10, 121.

### B.    Huang's Manipulative Stock Scheme And Its Impact On FTFT

Around the time Huang was approached for the CEO job, he devised a scheme to artificially inflate FTFT's stock price to prevent delisting by purchasing

large volumes of FTFT stock in short time frames, to create the illusion of market demand for the stock.  ¶ 96.  For context, Huang's HSBC securities account, *which he solely owned, had no stock trades for at least four months prior to January 2020, and then began trading in only FTFT stock*.  ¶¶ 43, 45.  Then the scheme ramped up.  When the scheme concluded, Huang purchased over 667,000 FTFT shares and sold 575,500 in approximately 390 transactions.  ¶ 47.

Part of Huang's "strategy" involved placing buy orders with escalating limit prices to ensure that the price he paid for FTFT's stock would increase over time. ¶¶ 11, 66, 71, 77, 154.  It also entailed regularly purchasing large quantities of FTFT shares above the National Best Bid and Offer ("NBBO") or market price within short time windows, effectively "buying at the top of the market" and foregoing more favorable execution prices.  ¶¶ 11, 53, 70-71, 76-80.  This created the illusion that FTFT's stock was trading in high volume and at prices higher than its true value.

For example, on January 27, 2020, Huang bought 91,000 shares in a 23-minute span in 13 block purchase orders that began at a limit price of $0.81 and ended at $0.90.  ¶¶ 63-67.  Such trading dominated the Company's daily trading activity, constituting 42% of its reported volume.  *Id.*  Over the course of that day, FTFT's stock rose from an opening price of $0.79 per share to a closing price of $0.8398 per share.  *Id.*  The next day, Huang placed buy orders for approximately

8

31,000 shares at a $0.87 limit price (the top of the NBBO spread), with nearly all orders placed at escalating prices.  ¶¶ 68-73.

Huang continued this aggressive strategy into February.  On February 6, 2020, Huang purchased 103,000 shares of FTFT, constituting 60% of the reported daily trading volume and raising the stock price from an opening price of $0.89 per share to a closing price of $0.9141.  ¶¶ 82-86.

Huang first began selling shares of FTFT on March 23, 2020, after he became CEO for a salary of $1, when he sold 10,000 shares at a price of $1.01, netting proceeds of $9,946.77.  ¶ 87.  The same day, Huang loaned FTFT $30,000.  ¶ 88.  Thereafter, he purchased and sold around 135,200 and 555,000 FTFT shares, respectively, through his offshore HSBC securities account, and loaned FTFT another $259,000 with the proceeds.  ¶¶ 48-49, 89-97.

As a result of Huang's manipulative stock transactions and Defendants' cover up of these manipulative transactions, FTFT regained compliance with Nasdaq's $1 minimum bid rule as of April 14, 2020, ¶¶ 96, 129, and FTFT's stock reached a peak of $11.29 per share on January 8, 2021.  ¶ 18.

### C.   Huang's HSBC Account Is Terminated

On February 8, 2021, HSBC sent Huang a letter, informing him that it was "committed to the highest standards in its controls against financial crimes" and, after a "comprehensive review" of his account, they would no longer be able to

provide him with banking services.  ¶ 99.

Huang's account was then liquidated, including 107,497 shares of FTFT at a price of $5.818 per share for total proceeds of $625,435.86.  ¶ 100.  The account was closed one week later.  *Id.*

### D.    Defendants Knowingly Misled The Market About Huang's Manipulative Conduct

Throughout the Class Period and against the backdrop of Huang's manipulative stock scheme, Defendants falsely proclaimed FTFT's compliance with Nasdaq's listing rules and touted Huang's hiring while omitting any mention of Huang's manipulative scheme and its impact.  ¶¶ 121-22, 129-30.  For example, the SEC requires corporate officers to file a Form 3 within 10 days of employment to disclose the amount of company shares they own.  ¶ 14.  Not only did Huang file this form over a year late, he falsely stated therein that he did not own any shares when he became CEO—when in reality he owned 500,379 shares at that time.  ¶¶ 55, 114-15, 119-20.

Defendants also repeatedly failed to disclose deficiencies in their internal controls in SEC filings and separately affirmed their effectiveness in SOX certifications, even though the weaknesses allowed Huang to devise and execute the deceptive and manipulative scheme.  ¶¶ 121-38.  In fact, Defendants ominously warned the market about how "U.S.-listed China-based companies" were facing "scrutiny, criticism and negative publicity," in part through SEC investigations, *yet*

*failed to disclose* the specific ongoing SEC investigation into Huang's manipulative stock transactions.  ¶¶ 136-37.

At the time Defendants made the foregoing statements, they were aware of the true reasons FTFT regained compliance with Nasdaq's $1 minimum bid requirement for continued listing: Huang's manipulative stock transactions created the illusion of demand and artificially inflated the Company's stock price.  Huang was aware of the concealed scheme for the obvious reason that he was its mastermind and primary actor.  Huang thereafter became the subject of an SEC investigation into his manipulative trading and was deposed on April 26, 2021.  ¶ 175.  Chen and Yi were also aware of or recklessly disregarded Huang's conduct during their respective tenures as CFO.  ¶¶ 162-69.

E.    **The Truth Is Disclosed To The Market**

The house of cards built on Defendants' lies collapsed on January 11, 2024, when the SEC posted a press release on its website entitled, "SEC Charges Future FinTech CEO Shanchun Huang With Fraud and Disclosure Failures."  ¶ 142.  The press release announced:

> Huang [was charged] with *manipulative trading* in the stock of Future FinTech Group Inc., using an offshore account shortly before he became Future FinTech's CEO in 2020. . . . Huang allegedly bought more than 530,000 shares of Future FinTech over a two-month period and repeatedly traded at a volume so large that his trades constituted a high percentage of the daily volume of Future FinTech stock transactions. Huang also allegedly placed multiple buy orders in short timeframes, placed limit buy orders with escalating limit prices from

11

one order to the next, and made trades that generally would not make economic sense for an investor seeking to buy the stock at the lowest available price. The SEC's complaint alleges that Huang's trades were intended to, and at times ***did***, ***push the Future FinTech stock price up***.

***

[I]n March 2021, after he no longer owned any Future FinTech stock, Huang belatedly filed a misleading initial form representing that he owned no Future FinTech stock.

*Id.* Attached to the press release was the SEC Complaint with more detailed allegations about Huang's misconduct. ¶¶ 142-43; AC Ex. A ¶¶ 1-3, 8.

This news shocked the market, causing FTFT's shares to fall by $0.27 per share, or approximately 20.93%, to close at $1.02 per share on January 12, 2024. ¶¶ 18, 146. This drop represented a 98% decline from the stock's peak on January 8, 2021. ¶ 18.

## III.    DEFENDANTS WERE PROPERLY SERVED

Huang's and Yi's motion to dismiss for insufficient service of process should be rejected out of hand.

As described in depth in his Motion for Extension (ECF Nos. 29, 29-1, 29-2) and Motion for Alternative Service ("Alt. Service Mot.") (ECF No. 31-1), after a thorough investigation, Plaintiff concluded that Huang, Yi, and Chen live outside of the U.S. Alt. Service Mot. 1-2. Plaintiff initially attempted to effectuate service of process pursuant to the Hague Convention. *Id.* at 2-3.

12

Plaintiff devoted substantial resources and time to ascertaining Huang's address in England and Yi's and Chen's addresses in China to serve them pursuant to Rule 4(f)(1).  As explained in further detail below, Plaintiff was unsuccessful in doing so and moved the Court for alternative service under Rule 4(f)(3).  *See* Alt. Service Mot.  Magistrate Judge Allen granted Plaintiff's motion with respect to Huang and Yi, and Plaintiff thereafter served them accordingly.  *See* ECF Nos. 37-38, 40.

### A.   The Hague Convention Is Inapplicable Under These Circumstances

Defendants effectively seek to reverse Judge Allen's well-reasoned eight-page single-spaced decision holding that Plaintiff need not serve Huang and Yi in accordance with the Hague Convention without contesting the facts on which that decision is based.  MTD 16-17.  After reviewing the extensive factual record of Plaintiff's efforts to locate Huang and Yi, Judge Allen correctly found that their addresses are "unknown" and that the Hague Convention, therefore, is inapplicable.  *See* Service Order 3 (citing *Braverman Kaskey, P.C. v. Toidze*, 599 F. App'x 448, 452 (3d Cir. 2015)).[4]  And while Defendants insist the Court "erred gravely," MTD 4,[5] an individual's "address may be considered unknown for the

---

[4]   Defendants imply that *Braverman* requires more attempts at service than Plaintiff made, MTD 18, but *Braverman* sets forth no such rule.

[5]   Defendants cite to ¶ 109 of the AC to say that Huang's address is known

purpose of the Hague Convention" if "[p]laintiff identified an address . . . [and] its investigators determined that [the individual] maintains no actual presence at the address." *Celgene Corp. v. Blanche Ltd.*, 2017 WL 1282200, at *3 (D.N.J. Mar. 10, 2017).[6] That is exactly what happened here. Indeed, Judge Allen found that "despite P[laintiff]'s diligence and good faith efforts, P[laintiff] has been unable to confirm current addresses for Huang and Yi in the United Kingdom and China, respectively." Service Order 8.

Importantly, Defendants nowhere dispute Plaintiff's efforts and the information underlying the Motion for Alternative Service—namely that Huang did not live at the only two addresses found for him and that Yi could not be located. Rather, they vaguely claim, without any factual support, that Huang lives in London and Yi resides in China. MTD 16, 18.

In similar situations, courts in the Third Circuit have held that alternative service is permitted. *See, e.g.*, *Tyson v. Coinbase Glob., Inc.*, 2024 WL 5126766, at *3 (D.N.J. Dec. 16, 2024) (permitting alternative service for "[p]laintiff [who]

---

(MTD 16), yet that paragraph says nothing about Huang's address at the time Plaintiff sought to serve him.

[6]    Because the Court has already found the Hague Convention inapplicable, Defendants' authorities claiming improper service under it are likewise inapplicable. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988) (MTD 16-17); *EOI Corp. v. Med. Mktg. Ltd.*, 172 F.R.D. 133, 142 (D.N.J. 1997) (MTD 17); *Smart Study Co. v. Acuteye-Us*, 620 F. Supp. 3d 1382, 1397 (S.D.N.Y. 2022), *aff'd sub nom. Smart Study Co. v. Shenzhenshixindajixieyouxiangongsi*, 164 F.4th 164 (2d Cir. 2025) (MTD 19).

14

has not been able to identify physical addresses" of the parties to be served);

*Guardian Life Ins. Co. of Am. v. Est. of Walter Matesic*, 2016 WL 3763340, at \*2

(D.N.J. July 14, 2016) (finding plaintiff's "multiple [unsuccessful] attempts to

serve [defendant] at her last known address" satisfied the diligence requirement

and warranted alternative service).

### B.  Plaintiff Properly Effectuated Alternative Service On Huang And Yi Pursuant To Rule 4(f)(3)

Plaintiff properly effected substitute service on Huang and Yi pursuant to

Judge Allen's order by serving copies of the Complaint on: (1) Huang's counsel in

the SEC Action, Dickinson Wright; (2) the Company's counsel in a related action

in the same district, FisherBroyles, LLP; and (3) Cogency, the Company's

registered agent in Florida.  Service Order 8.  Judge Allen reasoned that, contrary

to Defendants' contentions, "a corporation's attorney and a corporation are likely

to advise a chief officer that a lawsuit is pending against him" and that such service

was therefore "reasonably calculated" to apprise Defendants of this Action.  *Id.* at

8.  This ruling is consistent with the reasoning adopted by courts in the Third

Circuit that "service pursuant to Rule 4(f)(3) is proper when effectuated on a

foreign individual's U.S. counsel if there is regular contact between the two,

*regardless* of whether [counsel has] been explicitly provided the authority to do

so."  *Vanderhoef v. China Auto Logistics Inc.*, 2019 WL 6337908, at \*4 (D.N.J.

Nov. 26, 2019).  This approach is grounded in the understanding that a party's

15

counsel in a pending lawsuit "will know how to locate the [foreign defendant] to make him aware of th[e] suit." *Aldossari ex rel. Aldossari v. Ripp*, 2021 WL 259957, at \*3 (E.D. Pa. Jan. 26, 2021).  Defendants cite nothing to the contrary, solely relying upon *Snyder v. Swanson*, 371 F. App'x 285, 287 (3d Cir. 2010).  But that case is inapposite because, unlike here, the party attempting service "made no attempts to effect proper service" and did not move for an order to effect alternative service on defendant's counsel.  371 F. App'x at 286.

Accordingly, the Defendants' 12(b)(5) motion should be denied.

## IV.    12(b)(6) LEGAL STANDARD

In evaluating a motion to dismiss, a court must accept the truth of the facts alleged and draw all reasonable inferences in the plaintiff's favor.  *Bell v. Ostrow*, 45 F. App'x 152, 153 (3d Cir. 2002).

## V.    PLAINTIFF PROPERLY BOLSTERED THE ALLEGATIONS FROM HIS AC WITH INFORMATION FROM THE SEC COMPLAINT

There is nothing improper about Plaintiff having bolstered his allegations with information from the SEC's investigation and resulting Complaint. Defendants' argument to the contrary rests on a tortured reading of *Lipsky v. Commonwealth United Corp.* (MTD 35), which addressed the use of a consent decree for collateral estoppel purposes and did not endorse the broader proposition that allegations drawn from SEC proceedings may never be cited to support a complaint.  551 F.2d 887, 893 (2d Cir. 1976); *In re OSG Sec. Litig.*, 12 F. Supp. 3d

16

619, 620 (S.D.N.Y. 2014) ("no Second Circuit precedent indicates such a broad rule" that a complaint may never reference allegations from a separate proceeding that has not been decided on the merits).

Rather, the "clear weight of authority" holds that a plaintiff may bolster his own allegations and investigatory findings with allegations made in other related actions. *IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*, 723 F. Supp. 3d 1053, 1059 (D. Kan. 2024); *see also Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 419 n.7 (E.D. Pa. 2019) (allowing plaintiff to rely on a state Attorney General's complaint); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 494 (D. Del. 2019) (refusing to "deeply discount or decline to consider" allegations from government complaints).[7]

Furthermore, Plaintiff's use of allegations from the SEC Complaint is also proper because the SEC Complaint is supported by records from Huang's financial institution, including account statements that show the transactions at issue, and Huang's sworn deposition testimony from the SEC Action. *See Sherman v. Abengoa, S.A.*, 156 F.4th 152, 166 (2d Cir. 2025) (permitting use of reports and

---

[7]   Defendants' out-of-circuit cases all involved a motion to strike references to unadjudicated third-party complaints, relief not sought here. *See In re Merrill Lynch & Co., Inc. Rsch. Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003); *In re CRM Holdings, Ltd. Sec. Litig.*, 2013 WL 787970, at *5 (S.D.N.Y. Mar. 4, 2013); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010); *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009).  MTD 35-36.

allegations from another proceeding because it "did not merely consist of conclusory assertions" and included various supporting documents).

Defendants complain that Plaintiff "whitewashes" the SEC's allegations by omitting certain hedging words to describe information about Huang's credit card charges and location at certain times to support the allegation that Huang was the one making the trades.  MTD 7-8.  This argument is meritless. While the SEC prefaced certain allegations with the words "appear" or "appear to indicate" with respect to where Huang was physically on dates that certain transactions were affected, the SEC also made similar allegations without those conditional terms. *See, e.g.,* SEC Complaint ¶ 90.  In any event, Judge Cote held that Huang's argument that someone else made some trades does not matter because ***Huang controlled the account, which "is more than sufficient to plead Huang's knowing involvement in the trading at issue."***  *Huang*, 2026 WL 100752, at *2.

## VI.    PLAINTIFF ADEQUATELY ALLEGES HUANG'S MARKET MANIPULATION UNDER SECTIONS 9(a)(2) & 9(f) AND SCHEME LIABILITY UNDER RULE 10b-5(a) & (c)

Huang's market manipulation violated §§ 9(a)(2), 9(f), and Rule 10b-5(a) & (c).  Section 9(a)(2) of the Exchange Act prohibits "effect[ing] . . . a series of transactions in any security registered on a national securities exchange . . . for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2).  As the court in the SEC Action found, "patterns of Huang's trading . . .

18

intended to mislead the market and drive the price of [FTFT]'s stock higher than it would otherwise have been . . . ."  *Huang*, 2026 WL 100752, at *2.  Plaintiff adequately pleads market manipulation under Section 9(a)(2) (brought under Section 9(f))[8] for the same reasons.

Specifically, Huang began purchasing shares of FTFT around the time he was approached about becoming the Company's CEO and when the Company received notice that it had fallen below Nasdaq's $1 minimum bid requirement. ¶¶ 1, 7, 44, 153.  Over the ensuing calendar year, Huang used a single HSBC account to purchase over 667,000 shares of FTFT, mostly made through high-volume trades in short windows, that dominated the Company's trading activity. ¶¶ 47, 60-86.  Indeed, on seven days in 2020, Huang's purchases made up 26% or more of FTFT's trading volume, with one of those days constituting 60% of its daily trading volume.  ¶¶ 11, 63, 68, 74, 83.  These trades were routinely followed by increases in FTFT's share price.  ¶¶ 63-86.  And when Huang turned a profit by selling the shares at their increased price, he immediately used the proceeds to fund personal expenses and loan the Company money to cover its operating expenses. ¶¶ 48, 101, 165-66.  *Huang*, 2026 WL 100752, at *3 ("the . . . description of [Huang's] use of manipulative trading techniques is sufficient to support an

---

8       Section 9(f) establishes a cause of action for Section 9(a).  15 U.S.C. § 78i.

19

inference of fraudulent intent").[9]

Additionally, the majority of Huang's trades included limit buy orders with escalating limit prices, meaning Huang submitted orders to buy FTFT stock at specified prices that increased over time.  ¶¶ 11, 52, 66, 77.  Huang's trading records also show that he regularly purchased FTFT shares above the "NBBO" or market price.  ¶¶ 11, 53, 70-71, 76-80, 154; *see also U.S. Commodity Futures Trading Comm'n v. Wilson*, 27 F. Supp. 3d 517, 533 (S.D.N.Y. 2014) (finding sufficient allegations for market manipulation where the defendant intentionally injected above-market bids for futures contract).

Defendants argue that because Huang did not make any "wash sales, matched orders, or rigged prices," his conduct does not fall within the scope of market manipulation under § 9(a).  MTD 23.  But § 9(a) encompasses any "open-market activity," including ones that are not expressly prohibited, such as "short sales and large or carefully timed purchases or sales of stock."  *S.E.C. v.*

---

[9]     Thus, Defendants' authorities are unpersuasive. *See, e.g.*, *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424-25 (S.D.N.Y. 2010) (plaintiffs argued defendants' "naked short selling" created "phantom shares" that depressed the stock price, but the SEC had explicitly rejected that possibility); *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 862 (7th Cir. 1995) (defendants' legal arbitrage drove prices closer to their true value where price was artificially inflated for other reasons); *In re Olympia Brewing Co. Sec. Litig.*, 613 F. Supp. 1286, 1289, 1296 (N.D. Ill. 1985) (at summary judgment stage, plaintiff could not show "how short selling could cause a 50% price decline in the shares of an actively traded public corporation").  MTD 24.

*Gallagher*, 2023 WL 6276688, at \*14 (S.D.N.Y. Sept. 26, 2023).  Manipulation is "a term of art" and "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021).  Accordingly, "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent," *Gallagher*, 2023 WL 6276688, at \*14.  Manipulative intent is "normally inferred from the circumstances of the case." *S.E.C. v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 62 (S.D.N.Y. 2017).  As Defendants' own authority, *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007), states, "in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation."[10]  MTD 23.

For example, *In re RenovaCare Securities Litigation*, 2024 WL 2815034 (D.N.J. June 3, 2024), defendants "engaged in trading activity intended to manipulate RenovaCare's share price and induce others to purchase or sell it"

---

[10]     Defendants' other authorities are not to the contrary.  *Nanopierce Techs, Inc. v. Southridge Cap. Mgmt.*, 2008 WL 1882702, at \*2 (S.D.N.Y. Apr. 21, 2008) (at summary judgment, finding "unusually large sales" insufficient without manipulative intent); *Trane Co. v. O'Connor Sec.*, 561 F. Supp. 301, 305 (S.D.N.Y. 1983) (trading not done for the purpose of creating "an artificial demand" for stock or "to induce public investment" to plaintiff's "detriment"); *In re Dep't of Mkt Regulation v. Respondent*, Complaint No. CMS030257, NASD Redacted Decision at 7 (Oct. 12, 2005) (trading motivated by a valid economic rationale).  MTD 24-25.

because they "began aggressively buying RenovaCare stock at historically high prices to artificially inflate the market" which had the effect of driving its share price to "an all-time high." *Id.* at *17.[11]

Defendants also argue that Huang did not manipulate the stock because he did not "ma[k]e, or even direct[], any of the alleged trades." MTD 5-6. But that claim is not supported by the evidence. The court in the SEC Action rejected the same argument, finding the fact "that Huang was the sole account holder and used the proceeds from the trading in [FTFT] to fund personal expenses and a loan to the company" to be "***more than sufficient*** to plead Huang's knowing involvement in the trading at issue." *Huang*, 2026 WL 100752, at *2.

This same activity violates Rule 10b-5(a) & (c), which make it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b). By "initiat[ing]" a manipulative and deceptive scheme by placing "multiple offers [for] . . . stock on the same day, and within a short period of time, often at increasing purchase prices to artificially inflate the stock price . . . . to deceive potential investors," Huang also violated these provisions. *S.E.C. v. Fiore*, 416 F. Supp. 3d 306, 316, 327 (S.D.N.Y. 2019); *see also S.E.C. v. Hwang*, 692 F.

---

[11]     Conversely, *GFL Advantage Fund, Ltd. v. Colkitt,* 272 F.3d 189, 207 (3d Cir. 2001) involved an alleged manipulator who "lawfully engage[d] in short sales" absent any indicia of deceptive practices. MTD 29.

Supp. 3d 362, 373, 381 (S.D.N.Y. 2023) (finding scheme liability where defendants' "high trading volume created upward pressure on the share prices and often caused them to increase").

**VII.   THE AC ADEQUATELY PLEADS MATERIALLY FALSE AND MISLEADING STATEMENTS UNDER RULE 10b-5(b)**

Section 10(b) and Rule 10b-5(b) promulgated thereunder prohibit not only literally false statements, but also omissions of material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 871 (3d Cir. 2000).  This means that once a company has chosen to speak on an issue, it cannot omit material facts related to that issue so as to make its disclosure misleading.  *See Levon v. CorMedix Inc.*, 797 F. Supp. 3d 381, 407 (D.N.J. 2025) (Neals, J.).

**A.    Statements About FTFT's Nasdaq Compliance**

During the Class Period, Defendants made misleading statements about FTFT's compliance with Nasdaq's listing rules.  For example, they stated in relevant part:

> In recent years, our Common Stock has been in danger of being delisted from the NASDAQ Stock Market ("NASDAQ").
>
> *           *           *
>
> On November 4, 2019, the Company received a letter from the Nasdaq notifying the Company that, because the closing bid price for the Company's common stock listed on Nasdaq was below $1.00 for 30 consecutive trading days, the Company no longer meets the

23

minimum bid price requirement for continued listing on Nasdaq under Nasdaq Marketplace Rule 5550(a)(2), which requires a minimum bid price of $1.00 per share. On April 14, 2020, the Company received a written notification from the Nasdaq indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.

¶ 129. These statements were made in the 2020, 2021, and 2022 Annual Reports (signed by Huang and Yi), and responses to SEC letters signed by Huang in late 2022 and early 2023. ¶¶ 129-30, 133. FTFT, Huang, and Chen also made additional statements during the Class Period regarding FTFT's compliance with Nasdaq listing rules. *See* ¶¶ 124-25 (stating, *inter alia*, that "[i]n recent years, [FTFT's] Common Stock has been in danger of being delisted from the [Nasdaq]," and that FTFT may be subject to delisting for failing to meet the minimum stockholders' equity requirement). These statements were misleading because they omitted the manipulative trading that Huang undertook in order to artificially inflate the price of the Company's stock to above $1.00 per share to prevent Future FinTech's delisting from Nasdaq, for his personal gain, and to induce investors to purchase Future FinTech stock. ¶¶ 128, 132, 135.

This is strikingly similar to *Zhengyu He v. China Zenix Auto International Ltd.*, 2020 WL 3169506 (D.N.J. June 12, 2020). There, plaintiffs alleged that defendants' statements about a company regaining compliance with the NYSE's minimum price threshold were misleading because they failed to "inform investors that the Company regained compliance through improper trading by Company

24

employees." *Id.* at *5.  The court agreed, finding that "[i]nstead of concluding that the [c]ompany's share price rebounded naturally or fortuitously, an investor would have been alarmed that the share price rebounded through improper means." *Id.* So too, here.

Thus, contrary to  Defendants' contention, Defendants were required to disclose, at a minimum, how Huang's trading impacted the Company's share price—even if Huang's trading activity did not fit the legal definition of market manipulation or the conduct was "uncharged [or] unadjudicated"—MTD 26-27, because Defendants' statements "put[] . . . the cause of [the Company's] financial success at issue" but failed to "disclose information concerning the source of [that] success . . . ." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401-02 (S.D.N.Y. 2005).

None of Defendants' cases hold otherwise.  *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (UBS "disclos[ed] its involvement in multiple legal proceedings and government investigations" and its potential exposure); *United States v. Crop Growers Corp.*, 954 F. Supp. 335, 347 (D.D.C. 1997) (SEC regulations did not create duty to disclose absent statements putting topics in play).[12]  MTD 27.

---

[12]    Defendants' argument that there is no private right of action for "reporting error[s] under Section 78p" or "fail[ing] to make an obligatory filing under Section

## B.     Statements About FTFT's Internal Controls

Defendants made false and misleading statements about FTFT's internal controls. Internal controls are intended "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]" 17 C.F.R. § 240.13a-15(f). Management cannot "conclude that the registrant's internal control over financial reporting is effective if there are . . . material weaknesses[.]" 17 C.F.R. § 229.308(a)(3). Internal controls are material to investors. *See Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 466958, at *2 (M.D. Pa. Feb. 8, 2016).

In the Company's Annual Reports for 2020, 2021, and 2022, and the 2021 Amendment, each signed by Huang and Yi, and the SEC Letters signed by Huang, Defendants stated that the Company's "internal controls *may be* determined not to

---

16" is a red herring. MTD 9-10, 27. Plaintiff has not made a claim under Section 16. ¶¶ 218-38. Rather, Plaintiff alleges that Huang's Form 3 supports the violation of Rule 10b-5(b) because the Form 3 falsely represented that he owned no FTFT shares as of March 4, 2020, even though he did. *In re Aetna, Inc. Securities Litigation*, 617 F.3d 272, 277 (3d Cir. 2010) (MTD 28) is inapplicable because the alleged omissions included cautionary language that the court found "provides clear warning to investors" about risks that had not yet materialized. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024) (MTD 26) is likewise off target; there the Court found that there is no 10b-5(b) violation for failing to disclose information required by an SEC regulation unless a misleading statement triggered a duty to disclose that information. Here, by contrast, Huang affirmatively lied in his Form 3 by representing that he did not own FTFT stock.

26

be effective[.]"  ¶¶ 136-37.  The filings also discussed the increased "sector-wide "scrutiny, criticism and negative publicity involving U.S.-listed China-based companies" and how many of these companies have been subject to "SEC enforcement actions" and "internal and external investigations[.]"  ¶¶ 136-37.  The filing also noted that FTFT received a subpoena from the SEC, requesting documents and information related to the "Company's accounting procedures, management oversight, and the sale of HeDeTang Holdings (HK) Ltd. to New Continent International Co., Ltd."  *Id.*

These statements were false and misleading when made.  The Company's internal control deficiencies were not a contingency.  FTFT already had widespread control problems that enabled Huang to engage in stock transactions to manipulate the Company's share price.  ¶¶ 51-97.  At this time, the SEC was already investigating Huang for fraudulent stock manipulation—a fact known to Huang and Yi by the time the first challenged internal control statement was made on April 15, 2021, ¶ 136, because Huang was deposed only 11 days later on April 26, 2021 and was represented by FTFT's lawyers.  ¶¶ 16, 44.  By discussing "SEC enforcement actions and . . . internal and external investigations into those allegations" in general terms, and attributing them exclusively to "scrutiny, criticism, [or] negative publicity involving U.S.-listed China-based companies," Defendants materially understated the level of regulatory and compliance risk

facing the Company.  *See, e.g.*, *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *33 (D.N.J. Aug. 8, 2018) (finding internal control statements false and misleading because of ongoing corruption within company); *In re PMA Cap. Corp. Sec. Litig.*, 2005 WL 1806503, at *10 n.8 (E.D. Pa. July 27, 2005) ("[I]t is a violation of securities laws to fail to disclose the true facts regarding the adequacy of your internal controls").[13]

### C.    Statements In SOX Certifications

The SOX certifications made in the Company's 2019, 2020, 2021, and 2022 Annual Reports and the 2021 Amendment, each signed and certified by Huang and some by Yi and Chen, state that they did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements . . . not misleading . . . .," and that they have disclosed "[a]ny fraud whether or not material, that involves management . . . ."  ¶¶ 126-27, 131, 134, 138.

However, these documents did contain false and misleading statements regarding the adequacy of FTFT's internal controls and Nasdaq compliance for the reasons explained above, and the manipulative trading scheme was not disclosed. *See* § VII.A-B, *supra*; *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015) (holding SOX certifications actionably misleading where

---

[13]    Defendants' argument that "Plaintiff admits that FTFT disclosed" the manipulative trading investigation by making the statements in ¶¶ 136-37, MTD 30, is therefore inaccurate.

internal controls were not effective and allowed defendants to engage in the fraudulent behavior); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 532-33 (S.D.N.Y. 2009) (sustaining claims based on SOX certification because it "plainly required Sadia's certifying officers to disclose: [a]ny fraud, whether or not material, that involves management").

### D.    Statements About Huang's Hiring

Defendants made misleading statements about Huang's hiring.  On March 10, 2020, FTFT announced Huang as the Company's new CEO, simultaneously touting his professional pedigree which they said brought the "right mix of talent, experience and success to lead the Company's next stage of growth."  ¶¶ 121-22. It also stated that "[t]he Board believes that Mr. Huang's significant business experience will be an asset to the Company and the Board."  ¶ 122.

Having chosen to speak about Huang's background and what it purportedly meant for the Company, FTFT was required to speak fully and truthfully about those subjects.  *Monk v. Johnson & Johnson*, 2011 WL 6339824, at *23 (D.N.J. Dec. 19, 2011).  Touting Huang's talent, experience and success to lead the Company to its next stage of growth was misleading for omitting that Huang was manipulating the Company's stock at the time to induce investors to purchase FTFT stock.  ¶ 123.  *See, e.g.*, *Del. Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, 606 F. Supp. 3d 124, 135 (E.D. Pa. 2022) (defendants "laudatory statements" about

29

a CEO's leadership and experience were misleading because they failed to disclose his criminal tax fraud investigation).

## VIII.   THE AC ADEQUATELY PLEADS SCIENTER

To plead scienter, the complaint must "allege facts giving rise to a strong inference of either reckless or conscious behavior." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009).  Recklessness includes "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 267 n.42.  "Conscious behavior exists where a plaintiff specifically alleges defendants' knowledge of facts or access to information contradicting their public statements." *Levon*, 797 F. Supp. 3d at 417.  The Court must review the AC's allegations holistically to determine if Plaintiff has alleged a strong inference of scienter.  *Avaya*, 564 F.3d at 267-68. The inference must be "cogent" and "*at least as likely* as any plausible opposing inference[;]" thus, a tie goes to the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324, 328 (2007).  The scienter of FTFT's agents and employees are imputed to FTFT under *respondeat superior*.  *See Avaya*, 564 F.3d at 251-52.

### A.   Defendants Had Knowledge Of And Access To Information About Huang's Manipulative Trading

The AC adequately alleges that Defendants made various statements while having knowledge of facts or access to information that contradicted them.  First,

30

Huang necessarily knew he was trading in FTFT stock: he was the sole account holder and only person with authority over the account.  ¶ 152; Exs. C & F.  In fact, Judge Cote has already held that the fact that Huang had sole control over his account "***is more than sufficient to plead Huang's knowing involvement in the trading at issue***."  *Huang*, 2026 WL 100752, at *2.  But even if (as implausibly suggested by Defendants) Huang did not personally execute any of the manipulative trades, he received a letter from HSBC informing him that it was terminating his account for suspicion of unlawful activity.  ¶¶ 99, 156.  This alone "was enough to put [Huang] on notice that problems . . . could exist and should be investigated."  *In re Able Lab'ys Sec. Litig.*, 2008 WL 1967509, at *15 n.20 (D.N.J. Mar. 24, 2008); *Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *19 (S.D.N.Y. June 17, 2020) ("where correspondence is addressed to a specific person, the inference that that person received the correspondence is strong.").

Even setting aside that the trades were made from Huang's account, the circumstances otherwise strongly support Huang's knowledge.  Huang's failure to timely (and accurately) file a Form 3 with the SEC was, for example, found by the court in the SEC Action to be "powerful evidence that he acted with the requisite scienter."  *Huang*, 2026 WL 100752, at *3.  And the multiple loans Huang made to FTFT also support his knowledge of the manipulative stock transactions and its

31

impact on FTFT's share price.  ¶¶ 165-69; Ex. B at 33:22-33:11; *Huang*, 2026 WL 100752, at *2 (finding use of "the proceeds from the trading in [FTFT] to fund personal expenses and a loan to the company" supported Huang's "knowing involvement in the trading at issue").

Chen, as FTFT's CFO from May 21, 2019 to November 30, 2020, was likewise necessarily aware of the delisting notice received in November 2019 and the Company's efforts to prevent delisting.  ¶¶ 158-60.  For example, after receiving the notice of delisting, the Company announced that it "intend[ed] to continue actively monitoring the bid price for its common stock between now and [May 4, 2020] and will consider all available options to resolve the deficiency and regain compliance with the Minimum Bid Price Requirement."  ¶ 159.  Given her role, Chen would have been involved in this monitoring and the options available to prevent delisting.  ¶ 160.  Additionally, considering that Huang had no other incentive to start trading in FTFT when he did, was paid only $1 in salary, and loaned FTFT hundreds of thousands of dollars, it is highly likely that Chen was aware of his trading and why he was doing it.  ¶ 161.

Yi, who replaced Chen as FTFT's CFO in November 2020, would also have known about Huang's manipulative stock transactions.  ¶ 162.  In January 2021 FTFT repaid Huang's loan, which was information that "fell squarely within his bailiwick" as CFO.  ¶ 168.  *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at

32

*12 (C.D. Cal. Aug. 4, 2014).  Additionally, the SEC's investigation into Huang's conduct was ongoing for *at least a year* before Yi's first alleged misstatement was made.  ¶ 130.  Huang and FTFT were represented by the same counsel in the SEC Action, and that counsel was present at Huang's deposition.  ¶ 16.  As the investigation concerned conduct implicating FTFT's ability to maintain its Nasdaq listing, it was an issue a CFO would monitor and understand.  *See Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 233 (E.D. Pa. 2021) (finding it implausible that defendants would not have been aware of ongoing investigation into company given its "serious ramifications").[14]

Additionally, the SEC filings and SOX certifications Huang and Yi signed confirms that they not only had access to this information but also had a duty to monitor it.  ¶¶ 136-38.  Defendants were therefore, at a minimum, reckless for failing to confirm the accuracy of the SEC filings and SOX certifications they signed and affirmed.  *See, e.g.*, *In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) (false SOX certifications "provide evidence either that [defendant] knew about the improper accounting practices or, alternatively, knew

---

[14]     *Lipow v. Net1 UEPS Technologies, Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015), on which Defendants rely, held that a plaintiff could not infer scienter based on government investigations *alone*.  MTD 30.  Here, the pendency of a government investigation is only one piece of a much larger scienter puzzle.

that the controls he attested to were inadequate").[15]

### B.   Defendants Had Motive And Opportunity To Commit Securities Fraud

Although not required in order to plead scienter, *Tellabs*, 551 U.S. at 325, the AC is replete with allegations that Defendants had motive and opportunity to commit securities fraud.  Motive entails allegations that defendants stood to gain a "concrete and personal benefit" from the allegedly false or misleading statements. *Avaya*, 564 F.3d at 278.

Huang and Yi's motives can be readily inferred through their compensation structure, which was primarily stock based.  In 2021, Huang was paid a salary of only $1 to be FTFT's CEO, while the value of his stock awards was $1,405,000. ¶ 164; *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 654 n.5 (E.D. Pa. 2015) (finding the fact that defendant's "salary is a dollar a year and that his main form of compensation is from stock sales" was indicative of scienter).  Likewise, Yi was paid a salary of $48,000 in 2021 while his stock options were valued at $56,200. ¶ 164; *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d

---

[15]   Defendants' authorities involve much weaker scienter allegations. *See, e.g.*, *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2011 WL 3444199, at *28 (D.N.J. Aug. 8, 2011) (plaintiff's scienter allegations limited to defendant public discussion on topics at issue) (MTD 30); *Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417, 428 (D.N.J. 1999) (scienter allegations based only on defendants' Form 10-K signatures and roles without "more specific allegations linking their positions to their knowledge") (MTD 31).

Cir. 2006) (finding scienter where profits realized from stock sales were substantial in comparison to defendant's total compensation).  For Huang and Yi to get any real stock-based compensation, FTFT's Nasdaq listing needed to be maintained.

The timing of Huang's manipulative stock transactions—beginning shortly after the Company received the notice of delisting—also supports Defendants' motive.  *Zuckerman v. Smart Choice Auto. Grp., Inc.*, 2000 WL 33996254, at *5 (M.D. Fla. Aug. 29, 2000) (motive to commit securities fraud found based on desire to avoid delisting by Nasdaq).

Huang also took advantage of FTFT's improved share price by selling his stock for significant proceeds, and quickly using the proceeds to fund personal expenses and make interest-free loans to the Company "so they could pay the rent, [and] pay the employees."  ¶¶ 8, 87-88, 101, 165-68; *see, e.g.*, *U.S. S.E.C. v. Smith*, 2005 WL 2373849, at *2, *8 (S.D. Ohio Sept. 27, 2005) (proceeds from stock sales "used to pay the expenses of [defendant's] other businesses or to cover [defendant's] personal expenses" supported motive to commit securities fraud).

These are not the "[b]lanket assertions of motive . . . generally possessed by most corporate officers" rejected in *In re Radian Securities Litigation*, 612 F. Supp. 2d 594, 608 (E.D. Pa. 2009), *In re Advanta Corp. Securities Litigation*, 180 F.3d 525, 535 (3d Cir. 1999), and *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013), but particular allegations that Defendants "benefitted in some

35

concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000).

C. **Other Circumstantial Evidence Supports Defendants' Scienter**

The Company's remedial actions coupled with Huang's untimely departure also support Defendants' scienter. For example, *In re Sipex Corp. Securities Litigation*, 2005 WL 3096178 (N.D. Cal. Nov. 17, 2005), after an announcement about financial reporting errors, the company approved annual ethics and compliance training for all employees and required its finance-related activities be performed only by the finance department. *Id.* at *1. The court found "[s]uch house-cleaning and reforms do not follow innocent mistakes" but "[r]ather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls." *Id.*

Here, in response to the news regarding the SEC Action brought against Huang, the Company "imposed restrictions on [Huang] to trade in the Company's stock" and agreed to "provide training to Company officers, directors and employees as to appropriate trading practices under the insider trading policy of the Company." ¶ 178. Several months after these measures were taken, Huang resigned from his role as director of the board, CEO, and President of FTFT. *Id.* ¶ 180. *Cognizant*, 2018 WL 3772675, at *30 (holding that a resignation can support scienter when accompanied by disclosure of misconduct).

36

Additionally, given their education and experience at companies in the "financial service and investment industry," ¶¶ 121, 171-72, 174, it should have been readily apparent to Huang, Chen, and Yi, that a yearlong manipulative scheme operated to maintain the Company's listing on Nasdaq.  *See, e.g.*, *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522086, at *8 (E.D. Pa. Sept. 3, 2010) (finding board members who were "sophisticated people" and "all come out of the . . . bank," should have recognized the ongoing fraudulent activity); *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2022 WL 889158, at *15 (E.D. Pa. Mar. 25, 2022) (finding defendant's "more than 30 years'[of] experience . . . further support[ed] an inference of scienter[.]").

Huang's violation of FTFT's Insider Trading Policy by failing to file a timely Form 3, and then belatedly filing one a year later that contained a blatant lie, also supports scienter.  ¶¶ 110-20, 181-82; Ex. O at 5; *see, e.g.*, *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 WL 1335803, at *31-32, *57-58 (M.D. Tenn. Mar. 31, 2011) (considering defendants' violations of company's insider trading policy as evidence of scienter).

## IX.   PLAINTIFF ADEQUATELY PLEADS LOSS CAUSATION

As the Supreme Court instructs, alleging loss causation "should not prove burdensome" as a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms.,*

*Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Because of this, "loss causation . . . need only satisfy the requirements of Rule 8(a)(2)." *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at \*12 (D.N.J. Apr. 28, 2017).

Loss causation can be pled under one of two theories.  First, under the corrective disclosure theory, loss causation is adequately pled where the "defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiffs [sic] economic loss." *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 450 (D. Del. 2014).  Alternatively, under the materialization of the risk approach, the plaintiff need only show that in revealing the truth, the defendant exposed the materialization of an undisclosed risk that resulted in the loss. *Id.*  Despite this, courts have recognized that "[t]he ultimate loss causation inquiry under either the corrective disclosure theory or the materialization of a concealed risk theory is the same: whether a misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at \*39 n.37 (D.N.J. Dec. 31, 2018).

Loss causation is adequately pled under either theory.  Plaintiff alleges that the previously undisclosed truth—specifically, Huang's manipulative trading activity artificially inflating FTFT's share price, Huang's ownership of FTFT stock, and the Company's inadequate controls—was revealed to the market on

38

January 11, 2024, when the SEC disclosed the charges brought against Huang in the SEC Action.  ¶¶ 16, 18, 142, 190, 192.  The announcement was followed by a 20.93% decline in FTFT's share price.  ¶¶ 146, 196.  This is sufficient to plead loss causation.  *Howard v. Arconic Inc.*, 2021 WL 2561895, at *17 (W.D. Pa. June 23, 2021) (materialization of a previously undisclosed risk, followed by a decline in share price, satisfies loss causation).[16]

Defendants argue that potential charges or an SEC subpoena cannot constitute a corrective disclosure, but the AC does not allege vague potential SEC charges, it identifies concrete "[c]harges" brought against Huang and an attached SEC Complaint as the corrective disclosures.  ¶¶ 142-43.  To be clear, government charges and a civil complaint that "provide[] the market with information regarding the scheme," are the type of corrective disclosures courts find supportive of loss causation.  *Teva*, 2022 WL 889158, at *19; *Hull v. Glob. Digital Sols., Inc.*, 2017 WL 6493148, at *15 (D.N.J. Dec. 19, 2017); *In re Navient Corp. Sec. Litig.*,

---

[16]     Defendants' authorities are inapt.  *See e.g.*, *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 561 (D.N.J. 2010) (disclosures included "negative financial results" that did not reveal "the alleged fraud"); *D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 999-1000 (6th Cir. 2005) (plaintiff "did not plead that the alleged fraud became known to the market on any particular day"); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) (corrective disclosure did not reveal falsity of defendants' alleged misleading recommendations); *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) (the alleged corrective disclosures involved "failures to meet forecasts" and did not reveal any "fraudulent scheme").  MTD 33-34.

2019 WL 7288881, at *12-13 (D.N.J. Dec. 30, 2019).[17]

Defendants' argument that Plaintiff may not rely on the SEC complaint fails for the reasons explained in § V, *supra*.  MTD 35-37.

## X.    PLAINTIFF STATES 20(a) CLAIMS

As Plaintiff has pled a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) promulgated thereunder, he has adequately alleged control person liability under Section 20(a).  *Cont'l Gen. Ins. Co. v. Olafsson*, 2024 WL 4263211, at *12 (D.N.J. Sept. 23, 2024).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in full.  If this Court grants the motion, Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15(a)(2).  *See In re CorMedix Inc. Sec. Litig.*, 2024 WL 1214382, at *1 (D.N.J. Mar. 21, 2024) (Neals, J.).

Dated:  March 23, 2026                Respectfully submitted,

                                     **FARUQI & FARUQI, LLP**
                                     By:     */s/ Raymond N. Barto*
                                     James M. Wilson, Jr. (admitted *pro hac vice*)

---

[17]    Because the corrective disclosure here involves formal charges and an SEC Complaint, not an investigation or subpoena, Defendants' authorities bear no relevance.  *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 7117455, at *11 (M.D. Pa. Dec. 7, 2016); *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), *as amended* (Sept. 11, 2014); *Meyer v. Greene*, 710 F.3d 1189, 1192-93 (11th Cir. 2013); *Sapssov v. Health Mgmt. Assoc., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015).

40

Raymond N. Barto (#086182013)
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com
Email: rbarto@faruqilaw.com

Robert W. Killorin (admitted *pro hac vice*)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

Joseph T. Lukens (#048991992)
**FARUQI & FARUQI, LLP**
1617 JFK Blvd., Suite 1550
Philadelphia, PA 19103
Telephone: 215-277-5770
Facsimile: 215-277-5771
Email: jlukens@faruqilaw.com

*Attorneys for Lead Plaintiff Scott Present*
*and Lead Counsel for the putative Class*

41

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 23, 2026, I caused true and correct copies of the foregoing to be served on all counsel of record via email.


Dated: March 23, 2026                    By:   */s/ Raymond N. Barto*
                                         Raymond N. Barto

42