**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DENISE LABELLE, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>FUTURE FINTECH GROUP, INC., SHANCHUN HUANG, JING CHEN, and MING YI,<br><br>Defendants. | Civil Action No. 24-247 (JXN)(JSA)<br><br>**OPINION** |

**NEALS**, District Judge

In 2017, Future FinTech Group, Inc. ("FTFT" or "Company") abruptly went from making fruit juice to financial technology. By 2019, FTFT stock fell below $1 per share and risked getting delisted from the Nasdaq Exchange ("Nasdaq"). FTFT hired a new CEO, Shanchun Huang ("Huang") to right the ship. Within months, FTFT's stock rose above $1 and stayed on the Nasdaq. According to Plaintiff Scott Present ("Plaintiff"), however, this was because Huang secretly bought massive amounts of FTFT stock at escalating prices to artificially boost share values. Four years later, the Securities and Exchange Commission ("SEC") sued Huang for market manipulation. FTFT shares dropped 20% the next day.

This class-action lawsuit against FTFT, Huang, CFO Ming Yi ("Yi"), and Yi's predecessor Jing Chen ("Chen") (collectively, "Defendants") followed. (ECF No. 49.) Defendants move to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure[1] 12(b)(5) and

[1] "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

12(b)(6). (ECF No. 65.) Plaintiff opposed (ECF No. 67), and Defendants replied (ECF No. 68). The Court has jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1331. Venue is proper pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). The Court has carefully reviewed the Amended Complaint and the parties' submissions and decides this matter without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' motion to dismiss is **DENIED**.

## I. BACKGROUND

### A. FTFT Unsuccessfully Moves from Fruit Juice to FinTech

FTFT previously made fruit juice under the name "SkyPeople Fruit Juice." (Am. Compl. ¶ 2, ECF No. 49.) Nasdaq listed SkyPeople Fruit Juice stock. *See SkyPeople Announces Corporate Name Change*, PR Newswire (June 9, 2017), https://perma.cc/7DAX-9NZB.[2] But in 2017, the company rebranded to FTFT, abandoning juice-making and pivoting to "blockchain e-commerce." (Am. Compl. ¶ 2.) FTFT's stock remained on the Nasdaq with a new ticker symbol. (*Id.* ¶ 25.)

According to Plaintiff, FTFT's reinvention failed. (*Id.* ¶ 3.) In August 2019, FTFT's stock price fell below $1 per share, in violation of Nasdaq Rule 5550(a)(2). (*See id.* ¶¶ 32, 37.) After FTFT stock slid to $0.65 in November 2019, Nasdaq gave FTFT 180 days to reach $1 per share "or face potential delisting." (*Id.* ¶¶ 37, 39.)

The risks of delisting "were existential." (*Id.* ¶ 6.) So, the Company assured investors it would "actively monitor[] the bid price for its common stock. . . and consider all available options

[2] "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). "However, an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion to dismiss into one for summary judgment.'" *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). SkyPeople's listing on the Nasdaq is unquestionably a matter of public record.

to resolve the deficiency and regain compliance." (*Id.*) One option was hiring Huang as CEO. (*Id.* ¶ 7.) FTFT's founder and then-CEO[3] approached Huang about the position in late 2019, or early 2020. (*Id.*) The Company officially appointed Huang on March 4, 2020, and publicly announced the change in a March 10, 2020 press release. (*Id.* ¶¶ 10, 121.)

**B. Huang Allegedly Inflates FTFT's Stock Price**

When FTFT approached Huang for the CEO job, Huang allegedly devised a scheme to boost FTFT's stock price and prevent delisting. (*See id.* ¶ 1.) According to Plaintiff, Huang bought high volumes of FTFT stock over short periods of time at escalating prices to create the illusion of market demand, boosting the Company's stock value by "approximately 100%." (*See id.* ¶¶ 1, 51–97.) The prices at which Huang bought FTFT stock "generally would not make economic sense for an investor who sought to buy the stock at the lowest available price." (*Id.* ¶ 53.)

Huang opened an HSBC securities account in December 2019. (*Id.* ¶ 42.) The account had no stock trades for at least four months before January 2020, around when FTFT approached Huang about the CEO job. (*Id.* ¶¶ 43, 45.) "From January 13, 2020, until Huang became CEO on March 4, 2020, Huang purchased 500,379 shares of [FTFT] in his account, with no sales." (*Id.* ¶ 55.) "Oftentimes, Huang placed multiple buy orders in short timeframes, pushing the stock price upward." (*Id.* ¶ 61.) And "[o]n seven days in 2020 (January 27–28; February 4, 6, and 14; March 16; and April 8), Huang's purchases of Future FinTech were 26% or more of Future FinTech's daily trading volume." (*Id.* ¶ 62.)

On January 27, 2020, FTFT stock opened at $0.79 per share. (*Id.* ¶ 64.) Huang then "placed [thirteen] block purchase orders, ranging in size from 2,000 to 20,000 shares, for a total of 91,000

[3] Yongke Xue.

shares in a [twenty-three]-minute span." (*Id.* ¶ 65.) Huang's trades "constituted 42% of" FTFT's reported trading volume that day. (*Id.* ¶ 63.) FTFT stock closed at $0.8398 per share. (*Id.* ¶ 67.)

The next day, Huang's trading "constituted 43%" of trading volume for FTFT stock. (*Id.* ¶ 68.) Within an hour of the Nasdaq opening, Huang bought 31,000 FTFT shares at escalating prices that met or exceeded the National Best Bid and Offer ("NBBO") spread, a measure of the highest price a buyer would offer for the stock, and the lowest price at which the seller would sell the stock. (*Id.* ¶¶ 53 n.15, 71.)

A week later, on February 4, 2020, Huang bought 60,800 FTFT shares—34% of FTFT's trading volume. (*Id.* ¶¶ 74, 77.) FTFT opened at $0.87 per share. (*Id.* ¶ 75.) It closed at $0.97 per share. (*Id.* ¶ 81.) On February 6, 2020, Huang bought 103,000 FTFT shares—60% of the stock's daily trading volume. (*Id.* ¶ 83.) Within nine minutes of Huang's purchases, FTFT's stock price rose from $0.89 to $1.05. (*Id.* ¶¶ 82, 84.)

Huang sold FTFT shares for the first time on March 23, 2020, when he sold 10,000 shares at $1.01 per share for $9,946.77 in total. (*Id.* ¶ 87.) The same day, Huang loaned FTFT $30,000. (*Id.* ¶ 88.) FTFT continued to borrow money from Huang to cover its operating expenses. (*Id.* ¶ 48.) Huang later bought and sold approximately 135,200 and 555,000 FTFT shares, respectively, and loaned FTFT another $259,000 with the proceeds. (*See id.* ¶¶ 48–49, 89–97.) FTFT repaid Huang's loan in January 2021. (*Id.* ¶ 50.)

FTFT shares stayed above $1.00 from late March to mid-April 2020. (*Id.* ¶¶ 87–96.) On April 16, 2020, FTFT filed a Form 8-K with the SEC and issued a press release announcing that FTFT "was back in compliance with Nasdaq Rule 5550(a)(2)." (*Id.* ¶ 96.) Between April 2020 and January 2021, Huang bought and sold more than 97,000 and 534,000 FTFT shares, respectively, through his HSBC account. (*Id.* ¶ 97.)

Huang stopped trading FTFT stock after HSBC froze his account on January 4, 2021. (*Id.* ¶ 98.) A month later, HSBC informed Huang it was "committed to the highest standards in its controls against financial crimes" and, after a "comprehensive review" of Huang's account, HSBC would no longer provide him banking services. (*Id.* ¶ 99.) In March 2021, Huang's account was liquidated, including 107,497 FTFT shares at $5.818 per share for $625,435.86 in total. (*Id.* ¶ 100.) The account closed one week later. (*Id.*)

Plaintiff claims Huang did not disclose his initial FTFT stock ownership or his subsequent transactions, both in violation of federal law. (*Id.* ¶¶ 110–20.) Section 12 of the Exchange Act requires every incoming director or officer of a publicly traded company to disclose how much of the company's stock they own within ten days of becoming a director or officer. *See* 15 U.S.C. § 78p(a). Directors and officers must also disclose when they buy or sell company stock. *Id.* The initial ownership statement is "filed on Form 3." 17 C.F.R. § 240.16a-3(a). Changes in stock ownership are "filed on Form 4." *Id.* Annual statements of ownership are "filed on Form 5." Though Huang became FTFT CEO in March 2020, he filed his Form 3 with the SEC a year later. (Am. Compl. ¶ 119.) Huang's Form 3 did not disclose "that he had owned shares in [FTFT] from the time he became CEO on March 4, 2020, through March 3, 2021, when he liquidated his shares." (*Id.* ¶ 120.) Huang never filed Form 4 or 5. (*Id.* ¶ 118.)

### C. Defendants Allegedly Conceal Huang's Scheme from the Market

Plaintiff alleges that, in filings, amendments, certifications, and correspondence with the SEC, Defendants failed to disclose Huang's stock manipulation scheme. (*Id.* ¶¶ 121–41.)

On March 10, 2020, FTFT issued a press release stating Huang "brings the right mix of talent, experience and success to lead the Company's next stage of growth." (*Id.* ¶ 121.) The same day, FTFT filed, and Huang signed, a Form 8-K with the SEC asserting Huang's "significant

business experience will be an asset to" FTFT. (*Id.* ¶ 122.) According to Plaintiff, this statement was materially misleading because it did not disclose Huang's intentional and manipulative trades to boost the price of FTFT stock. (*Id.* ¶ 123.)

On June 2, 2020, FTFT filed (and later amended) its 2019 Form 10-K with the SEC ("2019 Annual Report"), which Huang and then-CFO Chen signed. (*Id.* ¶ 124.) The 2019 Annual Report noted FTFT was in danger of being delisted, but its stock price now complied with Nasdaq Rule 5550(b)(1). (*Id.*) Huang and Chen signed Sarbanes-Oxley Act ("SOX") certifications affirming the 2019 Annual Report "fairly presents, in all material respects, the financial condition and results of operations of the Company." (*Id.* ¶ 126.) Huang and Chen also signed Rule 13a-14(a) certifications declaring the 2019 Annual Report "does not contain any untrue statement of a material fact or omit to state a material fact," and disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting." (*Id.* ¶ 127.) Yet the 2019 Annual Report, its Amendment, and its accompanying Certifications did not mention Huang's stock manipulation scheme. (*Id.* ¶ 128.)

FTFT's 2020, 2021, and 2022 Annual Reports, and their accompanying amendments and certifications, all signed by Huang and Yi, contained substantially similar language. (*Id.* ¶¶ 129–30.) Yet all those reports, amendments, and certifications omitted any reference to Huang's manipulative trading. (*Id.* ¶¶ 132–35.) The 2020, 2021, and 2022 Annual Reports and their accompanying certifications stated FTFT's "internal controls may be determined not to be effective," and that increased scrutiny of Chinese-owned companies could affect FTFT's business. (*Id.* ¶¶ 136–38.) But, according to Plaintiff, Defendants understated the level of regulatory and compliance risk FTFT faced, considering that Huang secretly manipulated the market to boost

FTFT's stock price. (*Id.* ¶ 139.) Further, Plaintiff claims Huang, in his correspondence with the SEC, never disclosed his stock trading scheme. (*Id.* ¶¶ 130, 137.)

For ease of reference, here is a table of who signed each of the alleged misstatements:

| | Huang | Chen | Yi |
|---|---|---|---|
| 2020 Press Release | X | | |
| 2020 8-K | X | | |
| 2019 Annual Report, Certifications, and Amendment | X | X | |
| 2020 Annual Report and Certifications | X | | X |
| 2021 Annual Report, Certifications, and Amendment | X | | X |
| 2022 Annual Report and Certifications | X | | X |
| Responses to SEC Letters | X | | |

(*Id.* ¶¶ 121–41.)

**D. The SEC Sues Huang; FTFT's Stock Price Implodes; This Lawsuit Begins**[4]

On January 11, 2024, the SEC sued Huang in the Southern District of New York ("SEC Action"). *See* Compl., *SEC v. Huang*, No. 24-238 (Jan. 11, 2024), ECF No. 1. The SEC Complaint alleges Huang (1) artificially inflated FTFT's stock price to avoid Nasdaq delisting; (2) committed securities fraud; and (3) did not report his FTFT stock ownership. *Id.* The SEC issued an accompanying press release on its website entitled, "SEC Charges Future FinTech CEO Shanchun Huang with Fraud and Disclosure Failures." (*See* Am. Compl. ¶ 142.) The SEC announced the lawsuit after the close of trading. (*Id.*) By the end of the next day, FTFT's share price fell 20.93%,

[4] The parties reference the SEC Action in their papers. The Court does so as well and provides additional background. The SEC Action is pending before the Honorable Denise Cote, U.S.D.J., who recently denied Huang's motion to dismiss the SEC's complaint. *See Sec. & Exch. Comm'n v. Huang*, No. 24-238, 2026 WL 100752, at *1 (S.D.N.Y. Jan. 14, 2026).

or $0.27 per share. (*Id.* ¶ 146.) Plaintiff[5] filed this lawsuit five days later. (*See* Compl., ECF No. 1.)

**E. Judge Allen Allows Alternative Service on Huang and Yi**

On January 10, 2025, Plaintiff moved for alternative service on Huang requesting leave to (1) serve Huang "via four corporate email addresses, by publication on a website that Plaintiff will create, and by substitute service on a U.S.-based law firm, Dickinson Wright . . . that represents Huang in another pending case"; (2) serve Yi by "corporate email, publication via website, and substitute service via the Company's registered agent in Florida, Cogency Global, Inc. ("Cogency"), and through the U.S. based law firm of FisherBroyles [("Fisher")]"; and (3) serve Chen "through the Crone Law Group P.C. [("Crone")], the registered agent for [her] allegedly new company, Bon Natural Life Ltd." (Service Order at 2, ECF No. 37.)

Magistrate Judge Allen granted the motion in part on June 13, 2025 ("Service Order"). (*See generally id.*) As a threshold issue, Judge Allen addressed whether Plaintiff needed to serve Huang, Yi, and Chen through the Hague Convention. (*Id.* at 3.) Judge Allen found "disagreement in this District on the question of whether a party must attempt service through the Hague Convention on a foreign defendant when that defendant's country is a signatory to the Convention," but concluded "service through the Hague Convention is not required" because "Plaintiff has not been able to locate an address for any of the Individual Defendants." (*Id.*)

Judge Allen denied the motion in its entirety as to Chen, finding "Plaintiff has not demonstrated due diligence in trying to locate and serve Chen through traditional means."[6] (*Id.* at 4.) Turning to Huang and Yi, Judge Allen noted other courts "have found that none of these

[5] Though Denise Labelle filed this lawsuit, Judge Allen appointed Scott Present as lead Plaintiff. (*See* Sept. 24, 2024 Order, ECF No. 24.)

[6] According to Plaintiff, Chen has not yet been served. (*See* Pl.'s Opp'n at 1 n.1, ECF No. 67.)

methods are prohibited by international agreement." (*Id.* at 5.) Judge Allen then concluded serving Huang or Yi by email or a published website was not reasonably calculated to provide notice. (*Id.* at 6–7.) Even so, Judge Allen found "service on Huang through [Dickinson Wright] is reasonably calculated to provide Huang with notice of this action, and thus, comports with due process" based on "the apparent attorney-client relationship" between Huang and Dickinson Wright. (*Id.* at 7.) Similarly, Judge Allen deemed service on Yi through Fisher and Cogency was "likely to advise a chief officer that a lawsuit is pending against him." (*Id.* at 7–8.) Judge Allen also determined Plaintiff made a good faith effort to serve Huang and Yi through traditional means. (*Id.* at 8.) Plaintiff attempted to serve Huang at his three London addresses and "confirmed that Huang does not presently occupy any of those addresses." (*Id.*) "As to Yi, Lead Counsel reviewed information from a TransUnion search report, a Lexis Accurint search report, and the Company's SEC filings and was still unable to identify an address for Yi." (*Id.*) No Defendant timely appealed the Service Order.

### F. Plaintiff Files an Amended Complaint; Defendants Move to Dismiss

Plaintiff filed an Amended Complaint on July 28, 2025. (*See* Am. Compl.) The Amended Complaint asserts claims for violations of: (1) Section 10(b) of the Exchange Act and Rule 10b-5, against all Defendants ("Count I"); (2) Section 9(a) of the Exchange Act, brought under Section 9(f), against Huang ("Count II"); and (3) Section 20(a) of the Exchange Act against Huang, Yi, and Chen (collectively, "Individual Defendants") ("Count III"). (*Id.* ¶¶ 218–38.)

Defendants[7] moved to dismiss under Rules 12(b)(5) and 12(b)(6). (*See* Mot. to Dismiss, ECF No. 65.) First, Defendants argue Plaintiff did not serve Huang or Yi pursuant to the Hague

[7] The Court notes that FTFT, Huang, and Yi filed the motion. Chen did not. Nevertheless, for ease of reference, the Court refers to the moving defendants (FTFT, Huang, and Yi) as Defendants.

Convention. (Defs.' Moving Br. at 15–20, ECF No. 65-1.) Defendants claim Judge Allen "erred gravely" in finding the Hague Convention did not govern service for either Huang or Yi. (*Id.* at 4, 15–20.) Next, Defendants contend that Plaintiff does not state Section 10(b), 9(a)(2), or 20(a) claims. (*Id.* at 22–40.) Plaintiff opposed (Pl.'s Opp'n, ECF No. 67), and Defendants replied. (Defs.' Reply, ECF No. 68). This motion is now fully briefed and ripe for the Court to decide.

## II. LEGAL STANDARD

### A. Rule 12(b)(5)

A party may move to dismiss for insufficient service of process. Fed. R. Civ. P. 12(b)(5). "[T]he party making the service has the burden of demonstrating its validity." *Laffey v. Plousis*, No. 05-2796, 2008 WL 305289, at *3 (D.N.J. Feb. 1, 2008) (citation omitted), *aff'd*, 364 F. App'x 791 (3d Cir. 2010). Put differently, the serving party must show service complied with Rule 4. *See, e.g.*, *Sportscare of Am., P.C. v. Multiplan, Inc.*, No. 10-4414, 2011 WL 589955, at *1 (D.N.J. Feb. 10, 2011). *Davis v. U.S. Bureau of Prisons*, No. 20-18769, 2022 WL 2803167, at *2 (D.N.J. July 18, 2022). District courts possess "broad discretion" in evaluating a motion to dismiss for insufficient service of process. *Umbenhauer v. Woog*, 969 F.2d 25, 30 (3d Cir.1992). "Where a plaintiff acts in good faith, but fails to effect proper service of process, courts are reluctant to dismiss an action." *Ramada Worldwide Inc. v. Shriji Krupa*, *LLC*, No. 07-2726, 2013 WL 1903295, at *6 (D.N.J. Apr. 17, 2013).

### B. Rule 12(b)(6)

Rule 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court conducts a three-step inquiry in evaluating a motion to dismiss under Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the Court identifies "the elements a plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, the Court accepts all plaintiff's well-pleaded factual allegations as true and "construe[s] the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). The Court, however, disregards "legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016). Third, the Court considers "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

**C. Rule 9 and the PSLRA**

"Fraud-based claims brought under the Securities Exchange Act and alleged as part of a private securities class action, are additionally subject to the heightened pleading requirements of both Rule 9(b) and the PSLRA." *Shulman v. Weston*, 816 F. Supp. 3d 495, 507 (D.N.J. 2025) (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–77 (3d Cir. 2006)).

Rule 9(b) requires plaintiffs alleging fraud to "state with particularity the circumstances constituting fraud or mistake." "Particularity requires sufficient details to put the defendant 'on notice of the precise misconduct with which [it is] charged.'" *Shulman*, 816 F. Supp. 3d at 507 (alteration in original) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 201 (3d Cir. 2007)). The plaintiff must include "all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events

at issue." *In re Suprema*, 438 F.3d at 276 (quoting *In re Rockefeller Ctr. Prop. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)). Rule 9(b) applies to Exchange Act claims. *See id.*

The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u, *et seq.*, imposes an "even higher pleading standard for plaintiffs bringing private securities fraud actions." *City of Warwick Ret. Sys. v. Catalent*, No. 23-1108, 2024 WL 3219616, at *3 (D.N.J. June 28, 2024) (citing *In re Suprema*, 438 F.3d at 276); *see also Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241 (3d Cir. 2013). Congress enacted the PSLRA "[a]s a check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007).

The PSLRA imposes "two distinct pleading requirements, both of which must be met for a securities complaint to survive a motion to dismiss." *Shulman*, 816 F. Supp. 3d at 507 (citing *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009)). First, the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Id.* (quoting *Avaya*, 564 F.3d at 252–53). Second, "with respect to each act or omission alleged to violate" the securities laws, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting *Avaya*, 564 F.3d at 253). PSLRA particularity "echoes the requirements of Rule 9(b)." *Id.*

## III. DISCUSSION

### A. The Motion to Dismiss for Insufficient Service

In moving to dismiss for insufficient service, Defendants collaterally attack Judge Allen's Service Order. (*See* Moving Br. at 3–4, 15–20.) First, Defendants argue Judge Allen erred in finding Huang's address was unknown. (*Id.* at 3–4.) Second, Defendants urge the Court to reject Judge Allen's conclusion and hold the Hague Convention governs service in this case. (*Id.* at 15–

20.) The Court disagrees. Defendants' attack on the Service Order is procedurally deficient and substantively meritless.

***i. The Attack on Judge Allen's Service Order is Untimely***

To start, Defendants waived their newly raised objections to the Service Order. A magistrate judge may decide any non-dispositive pretrial issue, such as a motion for alternative service. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). A party has fourteen days to appeal a magistrate judge's non-dispositive order, such as an order to permit alternative service. Fed. R. Civ. P. 72(c)(1)(A). "[A] party's failure to object to a magistrate's ruling waives the party's objection." *United Steelworkers of Am., AFL-CIO v. N.J. Zinc Co.*, 828 F.2d 1001, 1006 (3d Cir. 1987).

As Judge Allen noted, unless federal law provides otherwise, Rule 4(f) provides three methods of serving an individual outside of a United States judicial district: (1) by "any internationally agreed means of service that is reasonably calculated to give notice . . . , such as those authorized by the Hague Convention"; (2) "if there is no internationally agreed means . . . by a method that is reasonably calculated to provide notice"; or (3) "by other [court-ordered] means not prohibited by international agreement." (Service Order at 3 (quoting Fed. R. Civ. P. 4(f)(1)–(3).) Judge Allen concluded (1) the Hague Convention did not govern service on Huang and Yi because Plaintiff could not locate an address for either person; (2) service on Huang and Yi's domestic counsel was reasonably calculated to provide notice; and (3) no international agreement prohibited service on Huang and Yi's domestic counsel. (*Id.* at 4–8.) The Service Order is, therefore, a court-ordered means of service not prohibited by international agreement that complies with Rule 4.

Defendants did not timely object to the Service Order. So, Defendants waived the objections they now seek to make. On this basis alone, the Court **denies** the motion to dismiss for insufficient service of process.

***ii. Judge Allen Did Not Clearly Err in Allowing Alternative Service***

Even if the Court were to consider the merits of Defendants' untimely appeal of the Service Order, the Court would nonetheless affirm Judge Allen. This Court may reverse a non-dispositive magistrate judge order only if it was "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A). A ruling is clearly erroneous only if the Court has "the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (citation omitted). A ruling is not clearly erroneous simply because this Court "would have decided the case differently." *Id.* A ruling is contrary to law "only if the magistrate judge misinterpreted or misapplied governing legal principles." *Jones v. PHH Mortg. Corp.*, 814 F. Supp. 3d 531, 533 (D.N.J. 2026).

Judge Allen did not err in permitting service through counsel on Huang and Yi. First, Judge Allen correctly noted

> disagreement in this District on the question of whether a party must attempt service through the Hague Convention on a foreign defendant when that defendant's country is a signatory to the Convention. *Compare DUSA Pharms., Inc. v. Biofrontera*, 2024 WL 4151169, at *4 (D.N.J. Sept. 11, 2024) (service under Hague not required) *and Emgore Envesecure Private Cap. Trust v. Singh*, 2020 WL 12654314, at *1 (D.N.J. July 9, 2020) ("[c]ourts have held that there is no hierarchy of the mechanisms listed in Rule 4(f)"), *with SEC v. Dubovoy*, 2016 U.S. Dist. LEXIS 171793, at *6 (D.N.J. Dec. 13, 2016) (service under Hague required). That said, under either approach, it is well-established that "[w]hen a defendant's address is unknown, . . . the Hague Convention shall not apply." *Braverman Kaskey, P.C. v. Toidze*, 599 Fed Appx. 448, 452 (3d Cir. 2015) (citation omitted).

(Service Order at 3.) Judge Allen continued,

> Here, Plaintiff contends that Huang is in London, England, and that Yi and Chen reside in the People's Republic of China. While England and China are both

> signatories to the Hague Convention, *see Emgore*, 2020 WL 12654314, at *2-3, Plaintiff has not been able to locate an address for any of the Individual Defendants. Accordingly, service through the Hague Convention is not required, under either approach, in this case. *See Braverman*, 599 Fed. Appx. at 452.

(*Id.*) After concluding the Hague Convention did not apply in this case, Judge Allen stated:

> Where, as here, a party seeks to pursue alternative service pursuant to Rule 4(f)(3), courts in this District require a party to establish the following three factors: "'(a) there is no international agreement prohibiting service by the proposed method; (b) the proposed method of service is reasonably calculated to provide the defendant notice; and (c) [plaintiffs] have made a good faith effort to locate and serve defendants by traditional means.'" *DUSA Pharms*, 2024 WL 4151169, at *4 (at times, the "Rule 4(f)(3) factors"); *see also, e.g.*, *Quantificare v. Canfield Scientific, Inc.*, 2021 WL 8443796, at *2 (D.N.J. Jan. 12, 2021); *Vanderhoef v. China Auto Logistics, Inc.*, 2019 WL 6337908, at *2 (D.N.J. Nov. 26, 2019); *SEC v. One or More Unknown Traders in Sec. of Fortress Inv. Grp., LLC*, 2018 WL 4676043, at *7 (D.N.J. Sept. 27, 2018); *Bravetti v. Liu*, 2013 WL 6501740, at *3–4 (D.N.J. Dec. 11, 2013). Importantly, "[d]istrict courts maintain the discretionary authority to determine whether the particularities and necessities of a case warrant alternative service." *Quantificare*, 2021 WL 8443796, at *2 (citation omitted).

(*Id.*) Turning to the first Rule 4(f)(3) factor, Judge Allen held:

> Plaintiff proposes service on Huang and Yi by email, website, and on domestic counsel and registered agent. Other courts have found that none of these methods are prohibited by international agreement. *See, e.g.*, *Emqore*, 2020 WL 12654314, at *2 (service by email in China is not prohibited); *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 2020 WL 4586819, at *3 (S.D.N.Y. Aug. 10, 2020) (permitting service on individual defendants through corporate defendant's general support email address); *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 116 (S.D.N.Y. 2010) (service on domestic counsel not prohibited). This Court agrees. As Plaintiff's proposed methods of service are not prohibited by international agreement, the first factor is thus satisfied as to both Huang and Yi.

(*Id.* at 5.) As to whether service through counsel is reasonably calculated to provide notice, Judge Allen stated,

> Courts have approved substitute service on foreign defendants through domestic counsel, when there are "regular" or otherwise "adequate" contacts between domestic counsel and the foreign defendant. *Vanderhoef*, 2019 WL 6337908, at *4 (collecting cases); *Madu*, 265 F.R.D. at 116 (same). To establish "regular" or "adequate" contact, some courts have found that the existence of an attorney-client relationship in another proceeding is sufficient to establish "regular contact." Other

> courts have found regular contact has been established when there is a showing of actual contact between domestic counsel and a foreign defendant.

(*Id.* at 7.) As to service on Huang's counsel,[8] Judge Allen found:

> Here, Present proposes substitute service on Huang through the Dickinson law firm. The Dickinson law firm, Huang's counsel in the New York Action, has not denied that they are in communication with Huang. (See Counsel Cert. ¶ 11, ECF No. 31-2; Exh. F, ECF No. 31-8). And given the law firm represents Huang in another case, it follows that there must be an attorney client relationship between Huang and the firm. In fact, a review of the official docket for the New York Action confirms that on February 7, 2024, Huang "accepted service of the [SEC's] Complaint through [the Dickinson law firm]," and the Dickinson law firm filed documents on Huang's behalf as recently as September 3, 2024. (See *SEC v. Huang*, Civ. No. 24-238, ECF No. 58). Therefore, the Court finds that, based on the apparent attorney-client relationship, the Dickinson law firm has adequate contacts with Huang, and substitute service on Huang through the Dickinson law firm is reasonably calculated to provide Huang with notice of this action, and thus, comports with due process.

(*Id.* at 7.)

Having carefully reviewed the record, it is clear Judge Allen did the same and reasonably concluded the Hague Convention did not govern service. Judge Allen fully considered Plaintiff's unsuccessful service attempts and found them sufficient to determine Plaintiff could not locate either Huang or Yi. (*See* Service Order at 7–8.) Judge Allen gave due consideration to the alternative service and applied the appropriate Rules and law. (*See id.* at 3, 7–8.)

Judge Allen did not rely on "an incorrect legal standard, a clearly erroneous factual finding, or a misapplication of the law to the facts." *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019). She carefully considered the relevant factors, and the record supports her conclusion. Accordingly,

[8] Plaintiff alleges that during all relevant times, Huang resided in either China, Dubai, or London during the Class Period. (*Id.* 49 ¶¶ 108–09.) Plaintiff alleges that "Huang has travelled to New York multiple times and has owned a home in Glen Cove, New York." (*Id.* ¶ 27.) The balance of Plaintiff's jurisdictional allegations relate to Huang and Yi's alleged SEC reporting activities, all of which took place outside of New Jersey. Plaintiff alleges that, in the SEC litigation pending in the Southern District of New York ("SDNY"), Huang has: (i) entered a general appearance; (ii) accepted service; and (iii) consented to that court's personal and subject matter jurisdiction. *Id.*

the Court affirms Judge Allen's June 13, 2025 Order (ECF No. 37) and **denies** Defendants' motion to dismiss under Rule 12(b)(5).

**B. The Motion to Dismiss for Failure to State a Claim**

***i. Section 9(a)(2) (Count II)***

The Exchange Act regulates securities trading on secondary markets. *Slack Tech., LLC v. Pirani*, 598 U.S. 759, 763 (2023). Section 9(a)(2) makes it unlawful to "effect . . . a series of transactions in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2). To state a Section 9(a)(2) claim, the plaintiff must show:

> (1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter, (3) for the purpose of inducing the security's sale or purchase by others, [that] (4) was relied on by the plaintiff, (5) and affected plaintiff's purchase or selling price.

*In re RenovaCare, Inc. Sec. Litig.*, No. 21-13766, 2024 WL 2815034, at *16 (D.N.J. June 3, 2024) (alteration in original) (citation omitted).

Defendants argue Plaintiff fails to state a Section 9(a) claim because (1) Plaintiff did not show Huang actually made the trades at issue; and (2) Huang simply bought and sold shares on the open market, which did not affect prices or inject false information into the market, and could not be manipulative. (Moving Br. at 23–24, 37–39.) Both arguments lack merit.

First, the Amended Complaint adequately alleges Huang made the trades at issue. Plaintiff claims: (a) Huang opened an HSBC securities account, (Am. Compl. ¶ 42); (b) Huang was "the sole account holder for" and "the only person with authority over" the account, (*id.*); (c) "Between January 2020 and January 2021, *Huang used his securities account* to purchase over 667,000 [FTFT] shares and sell 575,500 [FTFT] shares in approximately 390 transactions," (*id.* ¶ 47

(emphasis added)); (d) Huang loaned the proceeds of his stock sales to FTFT, (*id.* ¶ 48); and (e) HSBC closed Huang's securities account, sent a letter to Huang formally ending its banking relationship with him, and liquidated the FTFT shares in Huang's account, (*id.* ¶¶ 98–100). This is more than enough to allege Huang made the trades at issue.

Next, Plaintiff adequately alleges Huang manipulated the market. Section 9(a) prohibits "specific behavior . . . that may constitute market manipulation." *In re RenovaCare*, 2024 WL 2815034, at *16 (quoting *SEC v. Gallagher*, No. 21-8739, 2023 WL 6276688, at *14 (S.D.N.Y. Sept. 26, 2023)). This includes practices "such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977). But market manipulation is not *limited* to those activities. Indeed, "[m]arket manipulation can also encompass 'open-market activity' that is not expressly prohibited, such as 'short sales and large or carefully timed purchases or sales of stock.'" *In re RenovaCare*, 2024 WL 2815034, at *16 (quoting *Gallagher*, 2023 WL 6276688, at *14). Even "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Id.* (alteration in original) (quoting *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 77 (2d Cir. 2021)). "Proof of a violation of § 9(a)(2) requires evidence of 'manipulative motive and willfulness,' which are normally inferred from the circumstances of the case." *Id.* (quoting *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 62 (S.D.N.Y. 2017)). Here, the detailed factual allegations in the Amended Complaint "including patterns of Huang's trading on individual days, are sufficient to plead that Huang intended to mislead the market and drive the price of [FTFT] stock higher than it would otherwise have been without his participation in the market." *Huang*, 2026 WL 100752, at *2. Moreover, Huang's "use of manipulative trading techniques is sufficient to support an inference of fraudulent intent. In

addition, however, his failure to disclose his ownership of Future FinTech stock, as required by the securities laws, is powerful evidence that he acted with the requisite scienter." *Id.* Accordingly, the Court **denies** the motion to dismiss Count II.

### *ii. Section 10(b) and Rule 10b-5 (Count I)*

Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" in violation of the SEC's rules or regulations. 15 U.S.C. § 78j(b). Rule 10b-5, which implements Section 10(b), makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Section 10(b) and Rule 10b-5 create a private right of action "for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory*, 114 F.3d at 1417.

To state a claim under Section 10(b) and Rule 10b-5, the plaintiff must show: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation." *Gold v. Ford Motor Co.*, 577 F. App'x 120, 122 (3d Cir. 2014). Defendants argue Plaintiff does not adequately allege a material misrepresentation or omission, scienter, or loss causation. The Court addresses each point in turn.

#### a. Material Misrepresentations/Omissions

Information is material if it "would be important to a reasonable investor in making his or her investment decision." *Shulman*, 816 F. Supp. 3d at 508–09 (quoting *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000)). Undisclosed information is material if "there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having 'significantly altered the "total mix" of information' available to that investor." *Id.* at 509 (quoting *In re*

*Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996)). A duty to disclose facts arises only when disclosure would be necessary to make statements "not misleading" in "light of the circumstances under which they were made." *Id.* (quoting *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174 (3d Cir. 2014)).

"To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002). Opinions are only actionable "if they are not honestly believed and lack a reasonable basis." *City of Edinburgh*, 754 F.3d at 170 (citations omitted). Because materiality is a mixed question of law and fact, allegations of misrepresentations or omissions are inactionable as a matter of law only if they "are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992). Moreover, the PSLRA requires Plaintiff to "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Shulman*, 816 F. Supp. 3d. at 507 (quoting *Avaya*, 564 F.3d at 252–53).

Plaintiff identifies four categories of misleading statements and/or omissions. First, Plaintiff argues FTFT's 2020, 2021, and 2022 Annual Reports were misleading because they asserted FTFT "regained compliance" with Nasdaq's minimum bid price rule, but omitted Huang artificially inflated the price of FTFT stock. (Am. Compl. ¶¶ 129–30.) Assuming the truth of Plaintiff's allegations, this omission renders the Reports misleading. "It is substantially likely that investors informed of this fact would have changed their opinion of the situation. Instead of concluding that the Company's share price rebounded naturally or fortuitously, an investor would have been alarmed that the share price rebounded through improper means." *Zhengyu He v. China*

*Zenix Auto Int'l Ltd.*, No. 18-15530, 2020 WL 3169506, at *5 (D.N.J. June 12, 2020). This alarm would "only be heightened by the concomitant risk that the [Nasdaq] would delist the Company." *Id.* Thus, because Huang's scheme would have "significantly altered" the balance of information available to investors, the Court finds its omission material. *Shulman*, 816 F. Supp. 3d at 509.

Second, Plaintiff asserts FTFT's 2020, 2021, and 2022 Annual Reports misled investors about the Company's regulatory and compliance risks. The Reports stated FTFT's "internal controls may be determined not to be effective," that FTFT could "become subject to additional scrutiny, criticism and negative publicity involving U.S.-listed China-based companies," and that the SEC issued subpoenas to FTFT regarding the "Company's accounting procedures, management oversight, and the sale of HeDeTang Holdings (HK) Ltd. to New Continent International Co., Ltd." (Am. Compl. ¶ 136.) Here, too, Plaintiff adequately alleges that omitting any reference to Huang's manipulative trading misled investors about the level of risk FTFT faced. Defendants stated FTFT's internal controls *might* be deemed inadequate because of increased scrutiny of China-based companies. They did not, however, mention that FTFT's internal controls *were* inadequate because FTFT's CEO was actively manipulating the price of FTFT stock. "Cautionary statements are not truly cautionary when the defendant knows that an identified risk has or will occur." *Levon v. CorMedix Inc.*, 797 F. Supp. 3d 381, 412 (D.N.J. 2025). These omissions were material, as Huang's price boosting scheme would significantly alter the total mix of information available to an investor. *Shulman*, 816 F. Supp. 3d at 509.

Third, Plaintiff alleges the SOX Certifications accompanying the 2019, 2020, 2021, and 2022 reports were materially misleading because they certified the Reports (a) were free of any material misstatements and omissions, and (b) disclosed any fraud involving management. (Am. Compl. ¶¶ 126–27, 131, 134, 138.) The Court finds Plaintiff adequately pleads the Certifications

were misleading. None of the Reports mentioned Huang's ongoing fraud, despite Huang and Yi's certifications to the contrary. And, as before, omitting Huang's scheme was material.

Finally, Plaintiff claims FTFT's statements about Huang's hiring were misleading. After Huang became CEO, the Company asserted Huang had the "right mix of talent, experience and success to lead the Company's next stage of growth" (Am. Compl. ¶¶ 121–22), and stated that "Huang's significant business experience will be an asset to the Company and the Board." (*Id.* ¶ 122). "These laudatory statements about [Huang] triggered a duty to disclose any fact which would make them not misleading." *Del. Cnty. Emps.' Ret. Sys. v. AdaptHealth Corp.*, 606 F. Supp. 3d 124, 135 (E.D. Pa. 2022). Huang's market manipulation scheme was ongoing when FTFT hired him as CEO. So, FTFT's "previous statements about how integral [Huang] was to the company [were] misleading as they did not disclose" that Huang was artificially inflating FTFT's share price, putting the fate of both Huang and FTFT in jeopardy. *Id.* As before, revealing Huang's trading practices would have significantly altered the information available to an investor. Accordingly, Defendants' misstatements about Huang's business acumen were material.

Defendants argued that any omissions were immaterial because Huang's trading activity did not constitute market manipulation. But as discussed above, Plaintiff adequately alleges Huang's trading activity constitutes market manipulation.

Next, Defendants argue they did not have a duty to disclose Huang's trading. The Court disagrees. "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 (1988). A duty to disclose arises only when necessary to make statements "not misleading" in "light of the circumstances under which they were made." *Shulman*, 816 F. Supp. 3d at 509 (quoting *City of Edinburgh*, 754 F.3d at 174). "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit

material facts related to that issue so as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017). A company "may not describe 'a favorable picture' of material issue 'without including the details that would have presented a complete and less favorable one.'" *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) (citation omitted).

Here, Defendants chose to speak on Huang's acumen (Am. Compl. ¶¶ 121–22), FTFT's stock price (*id.* ¶¶ 124–35), the Company's exposure to legal risk (*id.* ¶¶ 136–39), and the veracity of FTFT's Reports (*id.* ¶¶ 126–28). Defendants painted favorable pictures of each issue—they lauded Huang's experience, claimed FTFT complied with Nasdaq's minimum stock price rule, demurred that FTFT might face regulatory risk, and certified FTFT's reports disclosed all fraud committed by officers. Thus, Defendants had a duty to tell the full (if less favorable) story on each issue. Plaintiff adequately alleges Defendants failed to do so and plausibly pleads that Defendants made material misstatements and omissions.

**b. Scienter**

To successfully plead scienter under the PSLRA, "a plaintiff must allege, with particularity, facts giving rise to a 'strong inference of either reckless or conscious behavior' with respect to each act or omission." *Shulman*, 816 F. Supp. 3d at 514 (quoting *Avaya*, 564 F.3d at 267). Specifically, the plaintiff must show that the defendant made each challenged misrepresentation or omission either: (1) intentionally—that is, with "a mental state embracing intent to deceive, manipulate, or defraud," *see Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (quoting *Tellabs*, 551 U.S. at 319), or (2) recklessly—that is, "highly unreasonable" conduct beyond "merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either

known to the defendant or is so obvious that the actor must have been aware of it," *In re Ikon Off. Sols., Inc.*, 277 F.3d 658, 667 (3d Cir. 2002) (quoting *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000)).

"A plaintiff may establish a strong inference of scienter through allegations showing either directly or circumstantially, (1) that defendants had both a motive and opportunity to commit the fraud; or (2) conscious misbehavior or recklessness." *Shulman*, 816 F. Supp. 3d at 514 (citing *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 617 (D.N.J. 2023)). A plaintiff must allege motive "with particularity"; "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). Reckless or conscious misbehavior means defendants either: (1) "egregious[ly] refus[ed] to see the obvious, or [failed] to investigate the doubtful," or (2) had "knowledge of facts or access to information contradicting their public statements such that defendants knew or should have known that they were misrepresenting material facts related to the corporation." *Shulman*, 816 F. Supp. 3d at 515 (alterations in original) (quoting *In re Interpool*, *Inc. Sec. Litig.*, No. 04-321, 2005 WL 2000237, at *12 (D.N.J. Aug. 17, 2005)).

In analyzing scienter allegations, courts must weigh the "plausible, nonculpable explanations for the defendant's conduct" against "inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. A "strong inference" of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. The inference of scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 324. Courts may "aggregate the allegations in the complaint" to determine whether they collectively support a strong inference of scienter. *Shulman*, 816 F. Supp. 3d at 515 (quoting *Winer*

*Fam. Tr. v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007)). But the plaintiff must establish a strong inference of scienter "with respect to each individual defendant in multiple defendant cases." *Id.* (quoting *Winer Fam. Tr.*, 503 F.3d at 337).

*1. Huang*

Plaintiff adequately alleges Huang acted with scienter. First, Huang solely owned the HSBC account used to trade FTFT stock. (Am. Compl. ¶ 42.) "This is more than sufficient to plead Huang's knowing involvement in the trading at issue." *Huang*, 2026 WL 100752, at *2. Likewise, "[t]he detailed factual allegations in the [Amended Complaint], including patterns of Huang's trading on individual days, are sufficient to plead that Huang intended to mislead the market." *Id.* And Huang's failure to timely disclose his FTFT stock ownership and transactions to the SEC is likewise "powerful evidence that he acted with the requisite scienter." *Id.* at *3. So, the inference that Huang intentionally manipulated the market, which he purposefully (or at least recklessly) withheld from the public, is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

At most, Defendants reiterate their arguments about whether Huang actually made the trades, or whether those trades were manipulative. The Court rejected those arguments before and rejects them now. Accordingly, the Court finds Plaintiff adequately alleges Huang acted with scienter in enacting and then failing to disclose his manipulative trading scheme.

*2. Yi*

Defendants argue Plaintiff fails to show Yi acted with scienter because (a) merely signing FTFT's 10-Ks does not show scienter; and (b) Plaintiff may not show scienter based on allegations of the SEC's investigation into Huang.

The Court finds both arguments unpersuasive. To be sure, merely signing a false or misleading 10-K is, by itself, "insufficient to create strong inference of scienter" as to the signer. *Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417, 428 (D.N.J. 1999). Similarly, signing a SOX certification "attesting to the accuracy of an SEC filing that turned out to be materially false does not add to the scienter puzzle in the absence of any allegation that the defendant knew he was signing a false SEC filing or recklessly disregarded inaccuracies contained in an SEC filing." *In re Hertz Glob. Holdings Inc*, 905 F.3d 106, 118 (3d Cir. 2018). Likewise, an "investigation alone cannot form the basis for a strong inference of scienter." *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 233 (E.D. Pa. 2021). Rather, an ongoing investigation is a "piece of the puzzle when taking a holistic view of the purported facts as they relate to scienter." *Id.*

But the Court need not individually analyze Yi's signatures on each report or certification. Instead, the Court may consider whether the allegations in the Amended Complaint *collectively* support a strong inference of scienter as to Yi. *Shulman*, 816 F. Supp. 3d at 515 (quoting *Winer Family Tr. v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007)). So, the question is not whether Yi signed a false 10-K or certification. The question is whether, based on the totality of the allegations, the Court may plausibly infer Yi *knew* the documents he signed were false, or that Yi *recklessly disregarded* the truth of what he attested to. *In re Hertz*, 905 F.3d at 118. "Defendants' arguments to the contrary fail to appreciate that the Court must evaluate all inferences of scienter not in isolation, but as a whole." *Shulman*, 816 F. Supp. 3d at 517.

The Court finds the allegations, taken together, support a strong inference of scienter as to Yi. Yi became CFO in November 2020, only a few months after FTFT's stock price rose above $1 and avoided delisting. (*Id.* ¶ 162.) Huang's market manipulation continued for several more

months before HSBC froze his account in January 2021. (*Id.* ¶¶ 98–99.) Also in January 2021, FTFT repaid Huang's loan (which Huang extended using proceeds from selling FTFT stock), a matter squarely within Yi's purview as CFO. (*Id.* ¶ 168.) Yi made his first alleged misstatement when he signed FTFT's 2020 Annual Report on April 15, 2021. (*Id.* ¶ 129.) Only a few weeks later, on April 26, 2021, the SEC deposed Huang for the first time. (*Id.* ¶ 162.) Thus, the SEC's investigation into Huang's trading activity was ongoing at least as of that date. (*Id.*) The Amended Complaint establishes Yi would have been aware of the investigation into Huang's manipulative trading, particularly because FTFT's counsel appeared at Huang's deposition. (*Id.*) The next time Yi failed to disclose Huang's scheme was a year later. (*Id.* ¶ 137.)

Thus, Plaintiff plausibly alleges that Yi, as an experienced financial executive and certified public accountant (*id.* ¶ 174), who became CFO of a Company recently at risk of being delisted for its low share price; whose CEO was under SEC investigation for artificially inflating FTFT's share price; whose Company recently repaid a loan the CEO made using the proceeds of trading FTFT stock; and whose compensation depended, in large part, on FTFT's stock price (*Id.* ¶ 164) was, at the very least, reckless in failing to investigate whether Huang artificially inflated FTFT's stock price through manipulative trading.[9] Whether Plaintiff will ultimately be able to prove scienter will be borne out in discovery. At this stage of the proceedings, however, Plaintiff must

---

[9] The Court briefly notes Plaintiff has adequately alleged FTFT's scienter. "When assessing the scienter of a corporate defendant that, like [FTFT], lacks a mind of its own, the analysis reduces to multiple questions. First, does the complaint adequately allege that any individuals had scienter? If so, may we impute that individual's (or those individuals') scienter to the corporation?" *Handal v. Innovative Indus. Props., Inc.*, 157 F.4th 279, 301 (3d Cir. 2025). Here, Plaintiff adequately alleges Huang and Yi had scienter. The Court may impute Huang and Yi's scienter to FTFT. Huang was FTFT's CEO. Yi was FTFT's CFO. Both men withheld Huang's market manipulation from the public in statements and Reports made on behalf of FTFT. The Court, accordingly, concludes Plaintiff adequately pleads FTFT had scienter.

only plead particularized facts to support a strong inference of scienter, which, even considering opposing inferences, the Court concludes has been done. *Shulman*, 816 F. Supp. 3d at 517.

**c. Loss Causation[10]**

Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). This inquiry uses "general causation principles of tort law." *Shulman*, 816 F. Supp. 3d at 517. The question is "whether the misrepresentation or omission proximately caused the economic loss." *Id.* (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007)). The plaintiff, accordingly, must allege that revealing the "misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *Id.* (quoting *McCabe*, 494 F.3d at 425–26). "It is not enough for a plaintiff to show that the price of a security was artificially inflated at the time of purchase because of a defendant's misrepresentations." *Id.* (citing *In re DVI, Inc. Sec. Litig.*, No. 03-5336, 2010 WL 3522090, at *5 (E.D. Pa. Sept. 3, 2010)). The plaintiff must instead demonstrate "the share price fell significantly after the truth became known." *Id.* (quoting *In re DVI*, 2010 WL 3522090, at *5). "[L]oss causation is adequately pled when a company's stock price declines after media reports and disclosures presented new information about the alleged fraud to the public." *Id.* at 518 (quoting *City of Warwick*, 2024 WL 3219616, at *15). Loss causation "is usually not resolved on a motion to dismiss." *Id.* at 518 (quoting *Dudley v. Haub*, No. 11-5196, 2013 WL 1845519, at *18 (D.N.J. Apr. 30, 2013)); *see also EP Medsystems,*

---

[10] The Court applies Rule 8 rather than the heightened 9(b) pleading standard in determining loss causation. *See, e.g.*, *Dura*, 544 U.S. at 347; *Hall*, 2019 WL 7207491, at *27 (collecting cases); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 558 (D.N.J. 2010) ("Plaintiff need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss for loss causation; rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2).") (citation modified); *Hull v. Glob. Digit. Sols., Inc.*, No. 16-5153, 2017 WL 6493148, at *11 (D.N.J. Dec. 19, 2017) ("Importantly, alleging loss causation or economic loss does not require a plaintiff to satisfy the heightened pleading standard under Rule 9(b)[.]")

*Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) ("Whether the plaintiff has proven causation is usually reserved for the trier of fact."); *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016) (holding the "burden to plead loss causation is 'not a heavy one,' and when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, 'the chain of causation is . . . not to be decided on a Rule 12(b)(6) motion to dismiss.'" (citation omitted)).

Plaintiff adequately pleads loss causation at this stage. Plaintiff alleges (1) Huang's market manipulation artificially inflated FTFT's share price; (2) the SEC revealed the truth about Huang's conduct, FTFT's stock price, and the Company's inadequate internal controls when it sued Huang on January 11, 2024; and (3) FTFT's share price dropped over 20% the next day. (Am. Compl. ¶¶ 16, 18, 142, 146.) This is enough to causally connect the SEC's disclosure to the drop in FTFT's share price.

Defendants counter with two arguments, neither persuasive. First, Defendants argue the SEC Action cannot, as a matter of law, demonstrate loss causation. Not so. A corrective disclosure "need not take a particular form." *Hull*, 2017 WL 6493148, at *14. Rather, "it is the exposure of the falsity of the fraudulent representation that is the critical component." *Id.* So, "[a] complaint that reveals a publicly traded company may have engaged in some wrongdoing can constitute a corrective disclosure if the company previously made false statements regarding the purported wrongdoing." *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharm. Indus. Ltd.*, No. 20-4660, 2022 WL 889158, at *19 (E.D. Pa. Mar. 25, 2022); *see also In re Navient Corp. Sec. Litig.*, No. 17-8373, 2019 WL 7288881, at *13 (D.N.J. Dec. 30, 2019) ("Here, the Pennsylvania AG suit . . . disclosed a new time period during which the alleged forbearance-steering scheme operated, and it was immediately followed by a decline in the price of Navient's stock.").

Second, Defendants argue the Amended Complaint "essentially lifted" its allegations from the "unadjudicated" SEC Complaint, which fails to meet the PSLRA's pleading standards. (Moving Br. at 35.) This argument misses the mark. To start, the Amended Complaint does not copy every single allegation in the SEC Complaint—it "points to specific allegations that support or provide additional information surrounding Plaintiff['s] core allegations." *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 419 n.7 (E.D. Pa. 2019). This is not a case where Plaintiff literally "repeated the allegations word for word from the [other] case except that the name of the plaintiff and the number of shares he owned were changed." *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1276 (3d Cir. 1994). Nor is this a case where Plaintiff rests solely on the bare fact that the SEC filed a complaint to bolster the merits of his own suit. Rather, Plaintiff "rel[ies] on specific factual allegations in the government complaint, which must under [Rule] 11 be based on a reasonable inquiry, to corroborate similar factual allegations in its own complaint." *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 493 (D. Del. 2019).

In any event, Defendants identify no authority within this Circuit standing for the proposition that a securities fraud plaintiff may *never* reference allegations made a related SEC actions.[11] To the contrary, courts within this Circuit have reached the *opposite* conclusion. *See*

---

[11] Moreover, the out-of-Circuit cases Defendants cite are all off-point—they involve motions to *strike*, not motions to *dismiss*. *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893–94 (2d Cir. 1976) (granting motion to strike references to SEC complaint resulting in consent judgment); *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 218 F.R.D. 76, 78–79 (S.D.N.Y. 2003) (granting motion to strike references to SEC complaint); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10-975, 2013 WL 787970, at *5–6 (S.D.N.Y. Mar. 4, 2013) (granting motion to strike references to New York Attorney General complaint); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 09-4050, 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) (granting motion to strike references to pleadings and settlements in other cases); *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009) (granting motion to strike unrelated pleadings attached to complaint), *aff'd*, 387 Fed. Appx. 72 (2d Cir. 2010). *But see In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 621 (S.D.N.Y. 2014) ("*Lipsky* did not hold that a complaint may never reference allegations from a separate proceeding under any circumstances."); *Tobia v. United Grp. of Cos., Inc.*, No. 15-1208, 2016 WL 5417824, at *3 (N.D.N.Y. Sept. 22, 2016) ("In sum, the Court concludes that the *Lipsky* decision, which was limited to the facts of that case, does not bar Plaintiffs from referring to and including the SEC's allegations and findings in the Complaint."); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 494 (D. Del. 2019) ("[T]here is some doubt that *RSM Production* correctly summarizes Second Circuit case law.").

*Lord Abbett*, 363 F. Supp. 3d at 494 (allowing plaintiffs to rely on allegations in government complaints); *In re Navient*, 2019 WL 7288881, at *8 ("The reasoning in *Lord Abbett* is both persuasive and directly on point here. Accordingly, the Court will not discount the factual assertions in the Complaint that rely on allegations contained in government complaints."); *Utesch*, 385 F. Supp. 3d at 419 n.7 (permitting reference to allegations in related actions). "Given the foregoing, Defendants have not presented any binding or persuasive authority on the issue of whether Plaintiffs may rely on allegations in government complaints to adequately plead falsity. Therefore, the Court will not at this time 'deeply discount or decline to consider altogether' those allegations." *Lord Abbett*, 363 F. Supp. 3d at 494. The Court, accordingly, declines the invitation to dismiss the Amended Complaint simply because it references the SEC Complaint.

On a 12(b)(6) motion, the moving party has the burden of showing the non-moving party fails to state a claim. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 470 n.9 (3d Cir. 2011). Defendants argue Plaintiff fails to state a 10b-5 claim because Plaintiff did not adequately allege any material misstatements, scienter, or loss causation. For the reasons stated above, the Court disagrees with each argument. Accordingly, Defendants do not meet their 12(b)(6) burden. And so, the Court **denies** Defendants' motion to dismiss Count I.

***iii. Section 20(a) (Count III)***

Section 20(a) of the Exchange Act "creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, that has committed a violation of Section 10(b)." *Avaya*, 564 F.3d at 252 (quoting 15 U.S.C. § 78t(a)). "Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Id.* To state a Section 20(a) claim, the plaintiff must show "(1) an underlying primary violation by a controlled person or entity; (2) that the defendants exercised control over the primary

violator; and (3) that the defendants, as controlling persons, were in some meaningful sense culpable participants in the fraud." *Shulman*, 816 F. Supp. 3d at 518 (cleaned up) (quoting *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 642 (D.N.J. 2002)).

Plaintiff alleges the Individual Defendants are liable for the allegedly misleading statements FTFT made as a "controlled person." (Am. Compl. ¶¶ 233–38.) Defendants argue that, because Plaintiff fails to state a Section 10(b) claim, Plaintiff cannot plead a derivative Section 20(a) claim. But the Court finds Plaintiff sufficiently pleads a primary Section 10(b) violation. And considering the Individual Defendants' executive roles and oversight responsibilities, the focus on exceeding the Nasdaq's minimum bid price rule, the scope of Huang's market manipulation, and the red flags apparent to the Individual Defendants, the Court concludes the Amended Complaint adequately alleges Defendants controlled FTFT and culpably participated in FTFT's underlying 10(b) violation. *See, e.g.*, *Shulman*, 816 F. Supp. 3d at 518–19. The Court, therefore, **denies** Defendants' motion to dismiss Count III.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint (ECF No. 65) is **DENIED**. An appropriate Order accompanies this Opinion.

**DATED:** 9/14/2026

**JULIEN XAVIER NEALS**
**United States District Judge**